UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Michael Beaudette,<br><br>          Plaintiff,<br><br>     v.<br><br>Power Services Company,<br><br>          Defendant. | CIVIL ACTION NO.<br>303CV899 (RNC) |

## **DEFENDANT'S LOCAL RULE 56(a)1 STATEMENT**

Pursuant to L.Civ.R. 56(a)1, Defendant Power Services Company ("PSC") hereby submits this concise statement of undisputed material facts in support of its Motion for Summary Judgment.

### **Statement of Material Facts**

1. PSC hired Plaintiff on July 31, 2000 as an Operations & Maintenance Technician ("O & M technician") to work at PSC's Lake Road Generating Plant ("Lake Road"), a power generating facility. Affidavit of Tim Bofman ("Bofman Aff."), filed herewith, at ¶ 9.

2. Plaintiff had never worked in a power plant before. Pl. Dep. Tr. at 59 and 118-19.

3. Lake Road was a new plant; it would not be fully operational until 2001. Pl. Dep. Tr. at 119 and Bofman Aff. at ¶ 7. ("Pl. Dep. Tr." refers to the transcript of Plaintiff's deposition, which occurred on November 3, 2003 and May 14, 2004. The relevant portions of Plaintiff's Deposition Transcript are attached to the Affidavit of Claudia T. Centomini ("Centomini Aff."), filed herewith, as Exhibit A).

FHBoston/1092320.1

4. Lake Road would have several months of classroom training for its O & M technicians before the plant would become fully operational. For that reason, PSC decided to take a chance on Plaintiff and train him on the job. Bofman Aff. at ¶ 8.

5. As an O & M technician, Plaintiff's primary duties included performing station shift operations, maintenance of shift operating logs, routine testing, electrical and mechanical inspections, and identifying hazards and taking corrective action as authorized. Affidavit of Lawrence Alice ("Alice Aff."), filed herewith, at ¶ 7.

6. Because of the hazardous nature of the position, PSC required that Plaintiff fully understand power plant policies and procedures for high energy systems, chemical handling, heavy equipment, rotating machinery, confined spaces, fire suppression and first aid. (Copy of job description is attached to the Centomini Aff. as Exhibit B).

7. After PSC hired Plaintiff, it sent him to its medical vendor to ensure that he was medically qualified for the O & M technician position. Pl. Dep. Tr. at 49-50.

8. PSC requires all of its new hires who will be operating mechanical equipment to see its physician for a job placement examination to ensure that the new hires are medically qualified for their respective positions. Affidavit of Karen Kinder (" Kinder Aff."), filed herewith, at ¶ 6.

9. The vendor informed PSC that Plaintiff was medically qualified for the O & M technician position. (Documents from the vendor's medical examination are attached of Plaintiff to the Centomini Aff. as Exhibit C).

10. When Plaintiff started working for PSC, he attended training classes with his co-workers during which he received technical training on the operation and maintenance of the power plant. Pl. Dep. Tr. at 133 and Bofman Aff. at ¶10.

11. At the beginning of the classroom training, PSC made it clear to Plaintiff and his co-workers that they would have to work long hours. Pl. Dep. Tr. at 58.

12. Although some of his co-workers were upset by the news, Plaintiff said that it did not bother him to work long hours. Pl. Dep. Tr. at 58.

13. It is standard in the industry to work long hours before a plant goes on line, as well as during other critical junctures like outages and equipment failures. Reindl Dep. Tr. at 56-57. (Joseph Reindl's Deposition Transcript is attached to the Centomini Aff. as <u>Exhibit D</u>).

14. During the classroom trainings, Plaintiff was disruptive at times. Several lead O & M technicians spoke to Plaintiff's supervisor, Tim Bofman ("Bofman"), about Plaintiff's need to be attentive and respectful to his peers with whom Plaintiff attended class. Bofman Dep. Tr. at 13. (Bofman's Deposition Transcript is attached to the Centomini Aff. as <u>Exhibit E</u>).

15. Plaintiff would occasionally interrupt with questions even though the information was eventually going to be presented to the class. Bofman Dep. Tr. at 38.

16. Bofman provided Plaintiff with feedback from the lead O & M technicians about his conduct in the classroom. Plaintiff explained that he did not like sitting in a classroom and preferred to be out in the field doing things. Bofman Dep. Tr. at 13.

17. Plaintiff also told Bofman that he had some physical problems that required him to use the rest room frequently. Bofman Dep. Tr. at 14.

18. Plaintiff let Bofman know at nearly the beginning of his employment that he had a medical condition, which he believed to be attention deficit disorder with hyperactivity ("ADHD" or may be referred to as "ADD"). Bofman Dep. Tr. at 15-16.

19. Plaintiff has alleged that he suffers from panic attacks and agoraphobia and has trouble concentrating in a classroom. Plaintiff's Second Amended Complaint, ¶ 9 and Pl. Dep. Tr. at 60-63, 176-78.

20. Plaintiff seldom experiences panic attacks. Pl. Dep. Tr. at 66-68.

21. Plaintiff may have had problems twenty years ago with panic attacks and agoraphobia, but since he has taken medication for the last twenty years, he has rarely experienced such attacks. Pl. Dep. Tr. at 60-63.

22. Bofman and Plaintiff both recall a conversation in or about November 2000 in which Plaintiff told Bofman that he had ADHD. Pl. Dep. Tr. at 40-41 and Bofman Dep. Tr. at 15-16.

23. When Plaintiff told Bofman that he had ADHD, Bofman responded that his son had recently been diagnosed with ADHD, but Bofman sought a second opinion and the second physician disagreed with the prior physician's diagnosis, so Bofman recommended that Plaintiff get a full diagnosis to ensure that he had indeed been properly diagnosed. Bofman Dep. Tr. at 15-16.

24. Bofman recommended that Plaintiff use the company's Employee Assistance Program ("EAP"). Bofman Dep. Tr. at 16.

25. Bofman told the Plaintiff that he had used the Employee Assistance Program, and it was a resource for Plaintiff to use as well. Bofman Dep. Tr. at 16.

26. In support of his allegations that he suffered from anxiety disorder and ADHD, Plaintiff testified that he had trouble in high school paying attention in class. Pl. Dep. Tr. at 60-61.

27. Plaintiff had trouble adjusting to the classroom portion of his job at PSC. Plaintiff's Second Amended Complaint, ¶ 11 and Bofman Dep. Tr. at 13-14.

28. Plaintiff learned the material for the O & M technician position and was certified to perform job at the same time as everyone else. Bofman Dep. Tr. at 30-31 and Reindl Dep. Tr. at 90-91.

29. Plaintiff testified at his deposition that he knew more about the duties of his position than other employees who were in the same job, and that he did not need an accommodation to perform his job. Pl. Dep. Tr. at 59, 118 and 134-35.

30. Although Plaintiff now disputes that he committed any infractions for which he should have been disciplined, he made no contemporary complaints, let alone any allegations of discrimination. Pl. Dep. Tr. at 25-26, 31, and 131.

31. On November 17, 2000, Bofman reprimanded Plaintiff for violating the chain of command by requesting assistance from an employee who management believed should not have been spending time assisting Plaintiff in a computer-related matter. Bofman Dep. Tr. at 12 and Pl. Dep. Tr. at 121-22. (See also PSC's February 15, 2001 memorandum, which is attached to the Centomini Aff. as Exhibit F).

32. Bofman noted in the February 15, 2001 memorandum that Plaintiff had previously behaved in an insubordinate manner when he failed to follow proper procedures on November 17, 2000 for a computer-related matter. Exhibit F.

33. On February 13, 2001, Plaintiff was suspended for insubordination for disagreeing with Bofman's instructions regarding the lockout/tagout program. Pl. Dep. Tr. at 26, 42-43, 47-48. (See PSC's February 15, 2001, February 13, 2001, and February 16, 2001 memoranda regarding Plaintiff's failure to follow the lockout/tag out process, which are attached to the Centomini Aff. as Exhibits F, G, and H, respectively).

34. Lockout/tagout is an important safety practice. Exhibit G.

35. Plaintiff admits that he disagreed with Bofman's instructions. Pl. Dep. Tr. at 25, 128.

36. During a meeting relating to Plaintiff's insubordination for disagreeing with Bofman's instructions regarding lockout/tagout, Plaintiff mentioned that he had been diagnosed with ADD and he was taking medication for it. Pl. Dep. Tr. at 47-49.

37. Carlton responded to Plaintiff at the meeting regarding Plaintiff's insubordination that ADD had nothing to do with the issue at hand. Pl. Dep. Tr. at 48 and Carlton Dep. Tr. at 25-26 (James Carlton's Deposition Transcript is attached to the Centomini Aff. as Exhibit I).

38. PSC was disciplining Plaintiff for insubordinate behavior regarding the lockout/tagout program. Pl. Dep. Tr. at 42, 47-48 and Bofman Dep. Tr. at 40-41.

39. After Plaintiff said at the meeting that he was taking medication, PSC sent Plaintiff for a Fitness for Duty evaluation with Putnam Medical Associates to determine whether his medication and/or medical condition would have an impact on whether he could perform the duties of his position. Lavigne Dep. Tr. at 24, 30-31 and Pl. Dep. Tr. at 79-80. (Heidi Lavigne's Deposition Transcript is attached to the Centomini Aff. as Exhibit J).

40. After Plaintiff's exam in 2001, Putnam Medical Associates informed PSC that Plaintiff was fit for duty with no restrictions. Lavigne Dep. Tr. at 35-36 and Bofman Dep. Tr. at 60.

41. On the night of September 10, 2001, Plaintiff contaminated the Demineralized Water Storage Tank when he closed the wrong valve. Reindl Dep. Tr. at 30-31.

42. As a result of the contamination, the Lead O & M technician on duty, Joseph Reindl ("Reindl") shut down the plant that night. Reindl Dep. Tr. at 31-32.

43. The following morning, September 11, 2001, Reindl spoke with Bofman regarding Plaintiff's work performance and told Bofman that Plaintiff was overwhelmed with his work responsibilities and struggling to perform his job duties. Reindl Dep. Tr. at 32-34.

44. Reindl recommended to Bofman that Plaintiff be placed in a maintenance role for a period of time because Plaintiff was new to the business and was having trouble remembering different systems and the maintenance position is more structured. Reindl Dep. Tr. at 34.

45. Employees in maintenance positions are given specific tasks and generally work fewer hours than the O & M technicians do. Reindl Dep. Tr. at 34-35.

46. Reindl recalled Bofman telling him during the September 11, 2001 conversation that when you are new to power plants, you make mistakes, and Bofman denied Reindl's request to transfer Plaintiff. Reindl Dep. Tr. at 35-36.

47. Reindl was not pleased with Bofman's response to his request to transfer Plaintiff. Reindl Dep. Tr. at 35-36, 81.

48. On September 24, 2001, Bofman gave Plaintiff a written warning regarding the September 10 incident. (See September 24, 2001 written warning attached to the Centomini Aff. as Exhibit K).

49. Plaintiff did not tell Bofman that the warning was unfair although he thought it was unfair. Pl. Dep. Tr. at 31.

50. On October 18, 2001, Plaintiff failed to wear his seat belt while operating a fork lift. When a tradesperson saw Plaintiff without a seat belt that morning and told management, Andy Walz, Lake Road's Environmental Manager, directed him to wear a seat belt as required by the company's Safe Work Practice. Bofman Aff. at ¶ 12. (See also copy of safety policy and Bofman's October 18, 2001 e-mail attached to the Centomini Aff. as Exhibits L and M, respectively).

51. Later, on October 18, 2001, someone from Alstom, the company that designed and built the Lake Road facility, saw Plaintiff operating the fork lift again without a seat belt. Bofman Aff. at ¶ 12.

52. At that time, Bofman instructed Plaintiff that he could no longer operate the fork lift, and removed him from the "Qualified Fork Lift Operator" list. Plaintiff recalls Bofman telling him that he had to comply with the rule in order to set an example for the trades. Pl. Dep. Tr. at 34-35, Bofman Aff. at ¶ 12 and Exhibit M.

53. PSC gave Plaintiff a fairly positive year-end review with an annual raise of 2.5%. Bofman Dep. Tr. at 31-33 and Kinder Aff. at ¶ 7. (See also Performance Review for: 2001 attached to the Centomini Aff. as Exhibit N).

54. PSC had no intention of terminating Plaintiff's employment at that time. Bofman Dep. Tr. at 66.

55. On February 5, 2002, Plaintiff spoke with Bofman about feeling stress and said that he might "go off" on someone. Pl. Dep. Tr. at 35.

56. Bofman interpreted Plaintiff's comment to mean that he might get into an argument with someone. Bofman did not understand Plaintiff to be saying that he might become violent. Bofman Dep. Tr. at 76-77.

57. Plaintiff believes that he told Bofman that he needed a break but did not specifically ask for time off. Pl. Dep. Tr. at 36-38.

58. Plaintiff testified that he was experiencing stress and anxiety at this time. Pl. Dep. Tr. at 13.

59. Plaintiff did not want time off; he just wanted time away from the "fray." Pl. Dep. Tr. at 37.

60. Bofman thought that Plaintiff was concerned about his work performance and he told Plaintiff that the long hours were a known fact and that everyone was in the same position. Bofman Dep. Tr. at 73-74.

61. Bofman assured Plaintiff that things would get better when Alstom no longer had oversight of the plant and the plant became fully operational. Pl. Dep. Tr. at 38.

62. On February 6, 2002, Reindl asked Plaintiff over the radio if he wanted to work overtime. Pl. Dep. Tr. at 109.

63. Plaintiff did not answer Reindl directly. Instead, Plaintiff asked whether the overtime was necessary. Pl. Dep. Tr. at 110.

64. Reindl explained to Plaintiff he needed to know right away whether Plaintiff wanted to work overtime. Id.

65. Plaintiff was non-committal over the radio, so Reindl asked the next available person to work overtime and that employee accepted. Reindl Dep. Tr. at 42-43.

66. Later that evening, Plaintiff saw Reindl in the Control Room and told Reindl that he could work the overtime hours if Reindl wanted him to do so. Reindl had already found someone to work the extra hours, and Reindl said words to the effect of "I don't want to have to stroke you to get you to stay" to Plaintiff. Pl. Dep. Tr. at 111 and Reindl Dep. Tr. at 43.

67. Plaintiff became upset and argued with Reindl. Bofman came out of his office because he could hear Plaintiff and Reindl shouting from inside his office. Bofman told them to calm down. Pl. Dep. Tr. at 111-12.

68. Plaintiff then said words to the effect of "this is a bunch of B.S.," took off his hard hat, and threw it across the Control Room where it smacked into a wall. Bofman Dep. Tr. at 69-70 and Bofman Aff. at ¶ 14.

69. The force of the impact took the finish off the frame on the wall. Bofman Dep. Tr. at 70.

70. At this time, there were a number of people working in the room, including several Alstom employees who were sitting at the console table. Plaintiff's hard hat flew in the vicinity of two of the Alstom employees who were in the Control Room, and his hard hat passed by them. Bofman Dep. Tr. at 70 and Bofman Aff. at ¶ 15.

71. The Control Room contains all the controls to operate the power plant. Bofman Aff. at ¶ 15.

72. Bofman immediately directed Plaintiff to leave the room. Bofman told him that his conduct could not be tolerated. Bofman Dep. Tr. at 71.

73. Bofman escorted Plaintiff to his locker to gather his belongings and told Plaintiff that he was officially relieved of all duties pending further investigation. Bofman Dep. Tr. at 71-72 and Carlton Dep. Tr. at 18-19.

74. Under its investigation procedure, PSC places an employee, who has been temporarily relieved of his duties, on paid leave during the investigation to ensure that the employee is not unjustly punished. Kinder Aff. at ¶ 8. (See also Leaders' Guide to Human Resources, Procedure HR 7.3, attached to the Centomini Aff. as Exhibit O).

75. Bofman informed Carlton on February 7, 2002 about what had occurred the evening of February 6. That same day, Carlton sent an e-mail message to PSC's New England Regional HR Manager Karen Kinder ("Kinder") in which he wrote, "Per my voice mail, to date Mike Beaudette is suspended until further notice. Please call me tomorrow morning to discuss this case of insubordination and display of violence." (February 7, 2002 e-mail message attached to the Centomini Aff. as Exhibit P).

76.     On February 11, 2002, during Plaintiff's administrative leave, Reindl and Bruce Carr, one of Plaintiff's co-workers, approached Bofman and told him that they had concerns about Plaintiff's conduct. PSC did not solicit or encourage them to do so; they did it on their own initiative. (Bofman's February 11, 2002 notes are attached to the Centomini Aff. as <u>Exhibit Q</u>).

77.     Bofman's notes state as follows:

> On 2/11/02 at 1130 Joe Reindl and Bruce Carr requested a meeting with me to discuss Mike Beaudette. They both said they felt obligated to share this information with me.
>
> Joe told me that he had serious concerns of Mike's inability to control his temper and was concerned that Mike may want to retaliate to the last incident that occurred on the night of 2/7/02.[1] Joe said that he was really scared that night when Mike lost control of his temper. Joe said that this was not the first time he had confrontations of this nature with Mike, i.e. Joe requesting the status of equipment and Mike not giving him a straight answer leading into arguments. When Joe discussed this with Mike he replied that he was having a bad day. Joe questioned him on how he could operate not knowing if he was having a bad day or not and when he would be able to receive information.
>
> Joe said that when Mike loses his temper, the look in Mike's eyes causes a scary feeling inside of him. Joe has discussed his concerns on this subject with his wife who is agreement with him that he needs to share this with me.
>
> Joe also said that when arriving to work the morning of the 8th several employees asked him if he was concerned that Mike might retaliate against him. These employees have shared their concerns on Mike's temper with Joe.
>
> Bruce said that he shared the same concerns as Joe described. Bruce said he had also seen Mike in the same type of fits of rage at the site, as displayed on the 7th. He also said that Mike had told him that he was not capable of controlling his temper and was not sure if he could prevent from hitting people when he was in that state of mind and then he would then lose his job. Bruce told him that he did not want to be hit from Mike and that if he did he would most likely lose his job too because he would probably hit back.
>
> Both Joe and Bruce expressed that they had heard Mike tell stories of how he had lost control and hit people and on one occasion even went to a persons house and pointed a loaded firearm at the person. Joe and Bruce know that these stories

---

[1] Bofman's notes incorrectly refer to the incident as having occurred on February 7, 2002 when it actually occurred on February 6, 2002.

cannot be substantiated but have reason to believe that Mike is capable of doing these things. They both shared with me that they are not comfortable working with Mike due to all of these items mentioned.

On the same day at 1215, Larry Alice came to me and told me he needed to talk to me about Mike. He said that he had talked it over with his wife and decided he felt he had to tell me that he was scared of what he thought Mike was capable of doing. Larry said that he had witnessed Mike lose his temper on several different occasions over little items. At one point after Mike asked Larry a question, Mike became enraged with Larry when he tried to help him. Larry was scared that Mike might turn on him so he left the area to avoid Mike. Since that time Larry said that he had been avoiding Mike because he did not know what might set him off. Larry said that he would feel bad if he did not tell me about this and someone got hurt due to Mike's temper. Exhibit Q.

76. Reindl agreed at his deposition that the substance of Bofman's notes of this meeting were fairly accurate. Reindl Dep. Tr. at 51.

77. Reindl confirmed that he did have an argument with Plaintiff when Reindl requested the status of equipment because Plaintiff had not given him a straight answer. Reindl Dep. Tr. at 51-52.

78. Reindl also testified that Plaintiff did give Reindl a scary look, a look of disgust, on February 6, 2002. Reindl Dep. Tr. at 49, 52.

79. Reindl said that another co-worker, Larry Alice ("Alice"), had come to him and was quite worried that Plaintiff may retaliate against him, so Reindl mentioned that concern to Bofman even though Reindl himself was not concerned about Plaintiff retaliating against him. Reindl Dep. Tr. at 51.

80. Reindl further testified that he heard the story about the loaded firearm from Alice. Reindl Dep. Tr. at 82-83.

81. Alice testified in his Affidavit that he had witnessed Plaintiff lose his temper on one or two occasions. In particular, Plaintiff got quite angry during a discussion about "whose turn it was to work overtime." Alice Aff. at ¶ 10.

82. Alice confirmed that he went to see Bofman because he was concerned after the hard hat incident that Plaintiff might do "something significantly more violent at the plant." Alice Aff. at ¶ 11.

83. After speaking with Reindl about his concerns, Alice went to see Bofman and told him that he was "worried about what [Plaintiff] might do next." Alice told Bofman that he "was not fearful of" Plaintiff but felt compelled to approach Bofman "because [Alice] would not have been able to live with [himself] if [he] had not said anything and [Plaintiff] had done something terrible." Alice Aff. at ¶ 12.

84. At his deposition, Reindl testified that he never discussed Plaintiff's medical condition with Bofman or anyone else in management. Reindl Dep. Tr. at 38-39.

85. Reindl speculated that the concerns he relayed to Bofman about Plaintiff's past and potential future behavior related to his medical condition in that he thought that perhaps, Plaintiff was not taking his medication. Reindl Dep. Tr. at 64-65, 80-81.

86. Reindl did not share his speculation with Bofman. Reindl Dep. Tr. at 66-68.

87. Plaintiff testified at his deposition that since medication was first prescribed for him in 1984 for his alleged anxiety disorder, he has never failed to take his medication. Pl. Dep. Tr. at 195.

88. There is not any evidence that demonstrates a causal link between his alleged disabilities and his throwing of the hard hat. Pl. Dep. Tr. at 215, Selig Dep. Tr. at 11, and Zeman Dep. Tr. at 10, 69-70. (Kenneth M. Selig, M.D., J.D.'s Deposition Transcript and Peter M. Zeman, M.D.'s Deposition Transcript are attached to the Centomini Aff. as Exhibits R and S, respectively).

89. Plaintiff testified at his deposition that he did not know whether there was any connection between his mental condition and the throwing of his hard hat. Pl. Dep. Tr. at 215-16.

90. On February 12, 2002, Karen Kinder, PSC's New England Regional HR Manager ("Kinder"), Bofman, and Carlton met with Plaintiff and reviewed the hard-hat incident. Bofman Dep. Tr. at 57-58.

91. At this meeting, they provided Plaintiff with an opportunity to present his side of the story. Kinder Dep. Tr. at 15-17. (Karen Kinder's Deposition Transcript and Kinder's notes from the February 12, 2002 meeting are attached to the Centomini Aff. as Exhibits T and U, respectively).

92. During the February 12, 2002 meeting, Plaintiff presented them with a letter in which he stated that he had contacted the company's EAP program and discussed having ADD with a medical professional. Pl. Dep. Tr. at 114-16. (See Plaintiff's February 12, 2002 letter to Bofman attached the Centomini Aff. as Exhibit V).

93. Carlton, Bofman, Kinder and Sharon Hanrahan ("Hanrahan"), PSC's Human Relations Manager, had several discussions concerning the facts of the February 6, 2002 incident and the appropriate discipline for Plaintiff's misconduct. Carlton Dep. Tr. at 19-21 and Bofman Dep. Tr. at 44.

94. After the February 12, 2002 meeting with Plaintiff, Carlton, Bofman, Kinder and Hanrahan collectively made the decision to terminate Plaintiff's employment. Bofman Dep. Tr. at 43-45, Kinder Dep. Tr. at 26, and Carlton Dep. Tr. at 22.

95. All of them had learned about Bofman's February 11, 2002 conversation with Plaintiff's co-workers. Carlton Dep. Tr. at 21-24.

96. All testified that they made the decision to terminate Plaintiff's employment because he had exhibited violent behavior in the workplace, which could not be tolerated. The employee complaints about Plaintiff's conduct contributed to their decision, but it was only a factor, not the primary reason that they decided to discharge Plaintiff. Kinder Dep. Tr. at 28-29, Bofman Dep. Tr. at 50-51, and Carlton Dep. Tr. at 22-24.

97. In addition, Plaintiff's prior misconduct was considered in PSC's decision to discharge Plaintiff. Carlton Dep. Tr. at 24.

98. Carlton, Bofman and Kinder informed Plaintiff on February 13, 2002 that PSC was terminating Plaintiff's employment effective immediately. (February 13, 2002 letter attached to the Centomini Aff. as Exhibit W).

99. Plaintiff's medical expert, Dr. Selig testified that generalized anxiety disorder and panic disorder do not necessarily lead to physically aggressive behavior. Selig Dep. Tr. at 9-11.

100. Plaintiff himself is unsure as to whether his medical condition triggered the throwing of his hard hat. Pl. Dep. Tr. at 214-15.

101. PSC's medical expert, Dr. Zeman denies that the throwing of his hard hat was not the product of Plaintiff's generalized anxiety disorder and panic disorder. Zeman Dep. Tr. at 10-11, 68-70.

Respectfully submitted,

**POWER SERVICES COMPANY**

By its attorneys,

*/s/ Claudia T. Centomini*
James W. Bucking (ct 24940)
Claudia T. Centomini (ct 24941)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
(617) 832-1000

Date: August 10, 2004

### CERTIFICATE OF SERVICE

I, Claudia T. Centomini, certify that on August 10, 2004, I served the foregoing document on plaintiff by causing a copy of the same to be delivered by first class mail, to Gregg D. Adler, Esq., Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C., 557 Prospect Avenue, Hartford, CT 06105-2022 and Daniel Krisch, Esq., Horton, Shields & Knox, P.C., 90 Gillett Street, Hartford, CT 06105.

*/s/ Claudia T. Centomini*
Claudia T. Centomini