UNITED STATE DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| MICHAEL BEAUDETTE | : | CIVIL ACTION NO: |
|  | : | 3:03 CV 0899 (RNC) |
| Plaintiff | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| POWER SERVICES COMPANY | : |  |
| Defendant | : |  |
|  | : | September 21, 2004 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

The Plaintiff, Michael Beaudette,  (hereinafter "the Plaintiff" or "Beaudette") brought this action against his previous  employer, Defendant Power Services Company, ("hereinafter "the Defendant" or "PSC "), alleging that the Defendant discriminated against him and terminated him because of his disability  in violation of the Connecticut fair Employment Practices Act., C.G.S. §46a-58 et seq. (CFEPA), and the Americans with Disabilities Act, 42 U.S.C. §12101  et seq. (ADA).   The Defendant has moved for summary judgment on both counts.  As demonstrated below, the Defendant's motion must be denied because it ignores critical factual issues, misstates others,  relies on facts disputed by the Plaintiff, and misapplies the relevant law.

## II.    FACTS

### A.    Background

Michael Beaudette is an individual who has had a long history of mental disorders impacting his ability to learn, concentrate, think, sleep and interact with others.  (Ex. 1 ¶ 4; Ex.

2. at 32)[1]   From early childhood, Beaudette  had difficulty learning in school .  (Ex. 1 ¶ 5;  Ex.

2. at 38; Ex. 3 at 59-60; Ex. 4)   He had difficulty sitting still and difficulty concentrating in the

classroom. (Ex. 1 ¶ 5;  Ex. 2 at 38;  Ex. 4)  He had particular difficulty with reading, and could

read only slowly and painstakingly.   (Ex. 1 ¶ 5;  Ex. 2 at 38; Ex. 5 )   Moreover,  he would often

find that he could not recall what he had just read.  (Ex. 1 ¶ 5; Ex. 3 at 60-61)  In order to learn a

subject, Beaudette required extra time and/or tutors.   (Ex. 1 ¶ 5; Ex. 4)  While he was able to

complete High  School, he graduated with mostly C's and  D's.  (Ex. 1¶ 5 ;   Ex. 5).

     In 1977, Beaudette began attending college.  (Ex.1 ¶ 7)   He continued to have difficulty

learning, particularly with respect to his ability to concentrate.   (Ex. 1 ¶ 7; Ex. 4)  He felt a great

deal of anxiety  in  class room settings which made it difficult to focus on the material.   (Ex. 1 ¶

7)   Beaudette eventually developed study strategies. (Ex. 1¶  8; Ex. 3 at 38)   However, even

using these strategies it  took him much longer to learn the material.   (Ex. 1¶ 8)   By using these

strategies, and by taking  a few courses at a time, Beaudette was able to receive his associates

degree.   (Id.) However, doing so took enormous effort, and many years.  He finally received his

degree in 1984.   (Id.)[2]

     Beaudette  also had significant problems with anxiety outside of the classroom.  He began

experiencing panic attacks in 1981, when he was approximately 21 years old.    (Ex. 1¶ 10)

These began occurring more frequently during his early twenties. (Id.) These panic attacks and

the anxiety surrounding them had a profound impact on his life.   Beaudette began to avoid

---

[1]The exhibits cited herein refer to exhibits which are attached to Plaintiff's Rule 56(a)2
Statement.

[2]Beaudette subsequently attended  Worcester College, and began a certificate program at
Northeastern, but did not complete either program.   (Ex. 1¶ 9)

situations in which he feared he would have a panic attack or in which he might be particularly embarrassed by a panic attack. (Id. ; Ex. 6). His anxiety reached a point where he found it difficult to socialize without drinking alcohol or otherwise self-medicating. (Id.) Eventually, Beaudette developed severe agoraphobia.[3] (Ex. 6)

In the mid to late 80's with treatment and medication, Beaudette began to get better control over these problems. (Ex. 1 ¶ 11) He had fewer problems with agoraphobia and reduced his panic attacks.[4] (Id.) In the 1990's Beaudette married and began to raise a family. (Ex. 1 ¶ 12) With some accommodations, he was able to succeed at his job as a laborer.[5] (Id.) However, he continued to have difficulty sleeping and concentrating, often going for a day without sleeping. (Ex. 1 ¶ 11)

In February 2000, Beaudette applied for work with the Defendant. (Ex. 1¶ 13) He did not have any experience in the power plant field, and informed the Defendant of this fact. (Ex. 1 ¶ 13; Ex. 3 at 118-120) Despite his lack of experience the Defendant offered Beaudette a position an Operations and Maintenance Technician[6]. His employment with the Defendant

_____

[3] Beaudette also had difficulty sleeping and with controlling impulsive behavior during this period. (Ex. 1¶ 10) He would often go for a day or more without being able to sleep. (Id.) He also had occasions where he would get involved in impulsive verbal disputes. (Ex. 1¶ 10; Ex. 3 at 201-204)

[4] Medication also significantly reduced his impulsive acts. (Ex. 1¶ 11 ; Ex. 3 at 201-204)

[5] Beaudette needed to write down any instructions. (Ex. 1¶ 12)

[6] The Defendant informed Beaudette that this was because of his intelligence, initiative, enthusiasm, and strong work ethic. (Ex. 1 ¶ 13) At the time that these statements were made, the Defendant had no knowledge of Beaudette's disability. (Id.)

began July 31, 2000. (Ex. 1¶ 14)[7]

**B.    The Plaintiff's Employment With Defendant**

When Beaudette began work he was required to go through a lengthy training course, during which the employees were expected to learn large volumes of material it in a classroom setting. (Ex. 1 ¶ 16)    Despite his medication, Beaudette had a great deal of difficulty concentrating in this setting.  (Id. ; Ex. 4)    He was anxious and fidgety, and found himself unable to restrain himself from repeatedly asking questions and blurting out his thoughts.  (Ex. 1 ¶ 16; Ex. 4)    He had to take frequent bathroom breaks in order to leave the class and calm down.  (Ex. 1 ¶ 16)

Beaudette understood that these anxiety-related behaviors were probably annoying to his employer and co-workers. (Ex. 1 ¶ 17)    This awareness made him more anxious, making it even more difficult to concentrate and learn the material.  (Id.)  During the Fall of 2000, Beaudette approached James Carlton, the Defendant's General Manager, to discuss the difficulties he was having.  (Ex. 1 ¶ 18)    Carlton refused to discuss Beaudette's difficulties, telling him to speak to Operations Manager Tim Bofman.    (Id.)

On the following day, Beaudette spoke to Bofman. (Ex. 1 ¶ 19)  Beaudette told Bofman that he was having trouble staying still and not asking too many questions. (Id.)    While he did not provide Bofman with a diagnosis, he told him that his difficulties were due to his anxiety.

---

[7]    Beaudette was sent for a pre-employment medical exam to determine if he was capable of performing the essential functions of the position. (Ex. 1 ¶ 15  )    During this exam, he disclosed that he was taking Paxil and Xanex for anxiety.  (Id.) The physician, who the Defendant had provided with a list of requirements for the position, found that he was qualified to perform the duties of the position.   (Ex. 7)

(Id.)   Bofman  suggested that he contact the Defendant's EAP program.[8]   (Id.)  Beaudette was

unable to get an EAP referral, and instead found a doctor on his own.  (Ex. 1 ¶ 20)  He began

treatment with  Dr. Jonathan Rothman, a psychiatrist who gave him  a preliminary diagnosis of

Attention Deficit Hyperactivity Disorder ("ADHD").   (Ex. 1 ¶ 20; Ex. 4)

On or about November 17, 2000,  Bofman criticized  Beaudette for asking for help with a

computer problem.  (Ex. 1 ¶ 21;  Ex. 3 at  122-123)   Beaudette explained that he had ADHD,

and  was having some difficulties.[9]  (Ex. 1¶ 21)   Bofman  knew that a person with ADHD

would have difficulty absorbing information and paying attention.  (Ex. 9 at 15-19)  Despite this,

Bofman did not discuss any potential accommodations for  Beaudette.  (Ex. 1 ¶ 21)

Beaudette also told Bofman that he had been prescribed medication for ADHD.  (Ex. 1 ¶

22)  He explained that he was concerned about how the medication would impact him, and

wanted to delay starting the medication until he had a few days off in a row.  (Ex. 1 ¶ 22)

Bofman told Beaudette to bring him information about the prescriptions.    (Ex. 9 at 20)

Bofman immediately reported Beaudette's diagnosis to Carlton and Lavigne.[10]  (Ex. 9  at

21)  Lavigne promptly contacted the medical  facility that had  conducted the Defendant's fitness

for duty exams.  (Ex. 11 at 14-16)   She reported that  Beaudette had attention deficit disorder

_____

[8]  It is clear that Bofman understood that the Plaintiff was complaining about anxiety.   In
fact, the Defendant's Human Resources Official,  Heidi Lavigne testified that Bofman told her
that he had recommended EAP because the plaintiff was having problems with anxiety and job
stress.  (Ex. 8 at 17, 23-24)

[9]  It is unclear whether Beaudette informed Bofman  that the diagnosis was ADD or
ADHD.  (Ex. 9 at 11) The witnesses appear to use the terms interchangeably.  For purposes of
clarity, the condition is referred to as "ADHD"  throughout.

[10]  Lavigne and Carlton have denied this, claiming that they did not know at the time that
Mike Beaudette had ADD or ADHD.  ( Ex. 8 at 15-16, 19-20; 23-25; 37-39; Ex. 10 at 25, 29)

and was taking medication for the condition[11].    (<u>Id.</u> at 16)   Lavigne asked Nurse Beaudry if Beaudette had disclosed this condition  during his pre-employment physical.  (<u>Id.</u>)   She also indicated that the Defendant wanted  Beaudette evaluated for safety reasons.  (<u>Id.</u> at 14-15) Beaudry informed Lavigne of the Americans with Disabilities Act, and explained that the Defendant should  have  Beaudette's treating physician review the job description and make recommendations with respect to possible accommodations.  (<u>Id.</u> at 14-16)   The Defendant did not do so, and no exam was scheduled.   ( <u>Id.</u> at 17)

  Beaudette gave Bofman information about his medications, and began to take the medication.    (Ex. 1 ¶ 23)   Beaudette also began to inform his co- workers about his ADHD diagnosis  and the medications he was taking.  (<u>Id.</u>)   Beaudette was frequently teased about his condition by his co-workers.   (<u>Id.</u>)   However, he did not become  angry or upset.  (<u>Id.</u>)  Instead, he told his co-workers that he was getting treatment so that he could be more effective at work. (<u>Id.</u>)

On December 29, 2000,  Beaudette received his first performance review.  (Ex. 13) His overall performance was rated as "needs improvement",  and specific concerns about his performance were noted.  (Ex. 13)    Most of the areas in which concerns were noted related to difficulties concentrating and learning.   (Ex. 13)  During the next months Beaudette worked hard, and was  frequently praised for his improved performance.     (Ex. 1 ¶ 24)

In February 2001, the Plaintiff was disciplined for incorrectly performing a

---

[11]  Lavigne has lied about this conversation, denying that she even knew about the diagnosis. ( Ex 8 at 15-16; 19-20; 23-25; 37-39)

lockout/tagout procedure.[12]  (Ex. 1 ¶ 25)   There were no written procedures at that time. (Ex 9 at 75-76; Ex. 12 at 76)   Beaudette was verbally told what to do.  (Ex. 1 ¶ 25)  He was  told to identify all of the isolation points for locking out or tagging out systems on various pieces of equipment, and to  write down all of the number designations.  (Ex. 1 ¶ 25;  Ex. 3 at  23-27) However, he was also told to ignore any designations written in marker or on tape, and told to pretend that they, "did not exist".[13]  (Id.)  Beaudette did as he believed he had been told- writing down all of the number designations, except those written in marker or on tape.   (Id.)   The Defendant claimed that he had failed to follow instructions and was insubordinate. (Ex. 14) Beaudette  explained that he had **thought** he was following  instructions.  (Ex. 1 ¶ 25)   He also told Bofman  that he was very anxious and was having trouble concentrating.   (Id.)

On or about February 13, 2001,   Beaudette met with Carlton, Bofman, and  Lavigne about the alleged insubordination.  (Ex. 1 ¶ 26)   The Plaintiff again reported  that he had been diagnosed with anxiety and ADHD, and tried to tell them of the problems that he was having.[14] (Id.)   Beaudette explained that  he had been put on different medications for his ADHD, and felt like his "head was spinning" and he "didn't know if he was coming or going".   (Id.; Ex. 3 at 47-

---

[12]  Although the Defendant contends that this was an example of  deliberate insubordination and  a refusal to follow the Defendant's procedures with respect to an "important safety practice", (See Defendant's Memorandum at 6), this is simply false.    Joseph Reindl, the Plaintiff's former team leader testified that, "that is just a total misrepresentation of what was going on.... I mean, this is a sham".  (Ex. 12 at 75-76)

[13]  Because the plant was still in the construction stage, some identifications were not intended to be permanent.  (Ex. 1 ¶ 25)   These temporary designations were written in marker or on tape.       (Id.)

[14]  The Defendant's notes of this meeting indicate that the plaintiff reported having ADD or ADHD.   (Ex. 15)   However, Lavigne and Carlton again deny that they knew of the diagnosis. (Ex. 8 at 15-16; 19-20; 23-25; 37-39; Ex. 10 at 26).

49)  Carlton cut him off- refusing to discuss the problems that Beaudette was having.  (Ex. 1 ¶ 26; Ex. 10 at 26)  Carlton said that he did not want to hear about it, and that ADD was not the issue.   (Id.) Carlton then suspended Beaudette and  ordered him to write a paper explaining the importance of following orders.    (Ex. 1 ¶ 26; Ex. 15)

Although Beaudette  was being falsely accused of insubordination and was being ignored when he tried to explain about his diagnosis and need for help,  he did not get angry or belligerent.  (Ex. 1 ¶ 27)   He signed the warning, accepted the suspension, and wrote the paper. (Id.; Ex. 15; Ex. 16)  In his paper, he set out what he would try to do to self-accommodate. (Ex. 16)

Although the Defendant refused to discuss Beaudette's disability or need for accommodation, the Defendant **did** require that he undergo a fitness for duty exam.   (Ex. 1 ¶ 26; Ex. 17)  The Defendant made him undergo this exam because they were concerned that he might be a risk to himself or others.  (Ex. 8 at  27-28)  The exam showed that Beaudette could perform the essential functions of the job.  (Ex. 8  at 35)

When Beaudette returned to work after his fitness for duty exam, he  began to implement his  own method for learning.[15]  (Ex. 1 ¶ 28)   This learning system was very effective but very time consuming.  (Id.)  On or about March 19, 2001,  Beaudette  took all of his materials and went to talk to Bofman. (Ex. 1 ¶ 29)   He explained his system, and that he was having problems

---

[15]Beaudette went through each training manual and outlined the systems, and then went into the field and traced the system.  (Ex. 1 ¶ 28)  He would write down any questions and ask them.  (Id.)  He would then write out an overview of this system, circulate it to the employees in charge to be sure that it was correct.  (Id.)   Once it was perfect,  he traced out the system, and added notes and set point information.  (Id.)   He would then quiz himself, make tests for himself and use flash cards to study.   (Id.)

trying to learning all of this at home.  (Id.)  He explained that he learned differently than others, and asked that he be provided with some time during work hours to learn.  (Id.)  Bofman refused.[16]  (Id.)  Beaudette continued to work full time and worked at home to learn the systems.  (Id.)

On September 10, 2001, Beaudette was told that he had to perform all of the shift duties (normally split between two employees).  (Ex. 1 ¶ 30)  During the night he was also told to take a demineralization trailer off line.  (Id.)  He had very little experience doing this, and the Defendant had no written procedures.  (Id.) He  had been verbally instructed on how to do this only once several weeks before.  (Id.) The schematics that Beaudette was given were inaccurate. [17]  (Id.;  Ex. 12 at 74).  The system itself was also very confusing.  As leadman Joseph Reindl explained,

> [i]t was literally a menagerie of piping with nothing labeled, and then to top it off, everything was insulated and heat trace, so you really had trouble tracing it out.  There wasn't any training on how to operate the system, other than tribal knowledge.  One guy saying, well I did it this way the last time and it worked. There was nothing, no documented training, no procedure, and it was a very, very difficult system to trace out.

(Ex. 12 at 73-74)   Beaudette, trying to perform an unfamiliar task in a dimly lit area with inaccurate schematics, neglected to close one of the valves, and raw water contaminated the Demin water tank.[18]  (Ex. 1 ¶ 30)  The plant had to be shut down..

---

[16]   Bofman told Beaudette that he admired all of his efforts, and that he was doing a great job.  (Ex. 1 ¶ 29)

[17]   He was given construction drawings even though changes had been made in the machinery during the process of building it.  ( Ex. 12 at 74)

[18]   In addition, one of the valves on the tank was not operable.  (Ex. 9 at 82-83) Had the valve been operable the tank would not have been contaminated.  (Id.)

9

The next morning Reindl went to Bofman and explained that Beaudette was struggling, and was having trouble remembering the different systems. (Ex. 12 at 32-34) Reindl told Bofman that Beaudette, "had so much to offer, but he was having trouble". (Id) Reindl asked for accommodations for Beaudette, suggesting that the Defendant either put another person on the night shift to help him or transfer him temporarily to an open maintenance role, and bring him back into operations when things slowed down. (Ex. 18; Ex. 12 at 34; 62-64) Bofman refused to discuss any accommodations; telling Reindl that the mistake was not a big deal, and that when he was new to power plants, he made mistakes too[19]. (Ex. 12 at 34)

Shortly after the Demin Tank incident, Beaudette talked to Bofman himself, asking again for more time to learn and/or more training. (Ex. 1 ¶ 31) His request was rejected. (Id.) Instead, Bofman assured Beaudette that he was doing fine and told him not to worry. (Id.) Beaudette continued to spend most of his free time trying to memorize the various systems. (Id.)

During the weeks after the Demin tank incident, the plaintiff's co-workers began to talk openly about their concerns about his mental condition[20]. (Ex. 12 at 64) Co-worker Larry Alice went to Reindl and expressed concern that Beaudette might not be taking his medication. (Ex. 12 at 65-66) Larry Alice, Bruce Carr and Reindl discussed going to management with their concerns about whether or not Beaudette was taking his medication every day, but ultimately

---

[19]Although Bofman told Reindl it was not a big deal, the Defendant gave Beaudette a written warning for the Demin tank incident telling him to be more careful and to double-check his work. (Ex. 19) While Beaudette thought the discipline for the Demin tank incident was unfair, he accepted it. (Ex. 3 at 31-33) He did not get angry, violent or or belligerent. Instead, he wrote up standard operating procedures. (Id.; Ex. 9 at 81-82). Bofman admitted that Beaudette responded positively to the discipline. (Ex. 9 at 83)

[20] By this time it was common knowledge that Beaudette had ADHD. (Ex. 12 at 64)

decided not to do so.  (Ex. 12  at 65-66)

In October 2001,  Beaudette twice  forgot to wear a seatbelt on a  forklift[21].    (Ex. 1 ¶ 33)   He was concerned that this forgetfulness was related to his mental impairments.  (Id.)  He went to Bofman and told him about his concerns, explaining that his forgetfulness scared him.  (Id.)  Once again, Bofman told  Beaudette not to worry.  (Id.;  Ex. 3  at  34-35)

On or about November 30, 2001, Beaudette received his annual review.  (Ex. 20)    He received an overall rating of "competent."   (Ex. 20)   The Summary Comments section of the review stated, *inter alia*, that Beaudette,

> is a steady, hard worker.  He is tireless in learning the plant and the processes.
> What [he] lacks in experience in the field he makes up for in motivation to
> learn and strong desire to succeed. ... Mike has a very positive attitude and is
> fun to work around.

(Ex. 20)

The Defendant did not express any concerns that Beaudette was unable to perform the essential duties of his position or was otherwise not qualified.  (Ex. 20)

From December 2001 through February 2002, Defendant began requiring that  all of its employees work in excess of 70 hours a week.[22]  (Ex. 1¶ 34)     Beaudette was still trying to learn various processes at home, and was worried that  he did not understand all of the processes well enough, and might make a mistake.  (Ex. 1 ¶ 35)   He began to have even more trouble sleeping, which increased his anxiety.  (Id.)

---

[21]Beaudette was removed from the forklift operator list for three days  until he was retrained.   (Id.)

[22] The Defendant suggests that these types of long hours were essential functions of the position.   This is false.   The Defendant's own documents indicate that mandatory overtime was moderate and not frequent. (See Ex. 7)

On February 5, 2002, Beaudette spoke to Bofman about his anxiety. (Ex. 1¶ 36)   He told Bofman that he was afraid he would "go off" on someone or walk off the job[23], explaining, "I was just so stressed, mentally stressed, hadn't been sleeping I was totally consumed with the job. I was – I couldn't slow down. I couldn't relax". (Ex. 3 at 35-36)   Beaudette asked Bofman for a break- either time off or time away from the stress. (Ex. 1 ¶ 36; Ex. 3 at 37-38)   Bofman refused to discuss accommodations, telling Beaudette he was doing a great job, that everyone was under stress, and that things would change and get better when the commission turned over. (Ex. 1 ¶36; Ex. 3 at 37-38; Ex. 9 at 74-75)  Bofman told Beaudette to, "maintain control". (Ex. 9 at 74-75)

The next day Beaudette received a call from Reindl, asking if he would be willing to work overtime. (Ex. 1 ¶ 38)  Beaudette was just finishing a 12 hour shift, was already scheduled to work a 72 hour week, and was feeling overwhelmed from the stress and anxiety. (Id.)  He told Reindl that he did not want to work the overtime, but that he would stay if Reindl really needed him. (Id.)  When Reindl pushed him for a yes or no answer, he said no. (Id.)

Later that evening, Beaudette had a further conversation with Reindl in the control room regarding the overtime issue during which Reindl began to shout and swear at him.    (Ex. 1 ¶ 39)  Reindl explains,

> he came into the control room and he came up to me and said that he would work if I needed him to or something like that, and I got right in his face, and I said it's a simple F'ing question, it's a yes or a no answer and that kind of escalated things to the next level.  Something to that effect.

(Ex. 12 at 69)

---

[23]  Beaudette also told his co-workers, including Reindl and Carr how he felt, including his belief that he was overwhelmed, and that he might "go off".  (Ex. 3 at 38)

When Reindl shouted at Beaudette, Beaudette shouted back. (Ex. 1 ¶ 39)  Bofman,  made an attempt to diffuse the situation, telling Beaudette to go to his locker.  (Id.)   While walking away, Beaudette  threw his hard hat against the wall.  (Id.)   Beaudette did not intend to harm anyone when he threw the hard hat.  (Id.;  Ex. 12 at 86)   It was an impulsive act of frustration.  (Id.)

The Defendant suggests that someone might have been hurt by this.  This is nonsense. There were no people in the area in which he threw the hard hat.  (Ex. 1 ¶  40)  There was no chance of him harming anyone or anything.  (Ex. 1 ¶ 40)  Reindl testified that it was not, "remotely possible" that Beaudette could have hurt someone, explaining, "the direction he threw his hat, there was nobody standing there and it was pinpoint accuracy.  So there is no way that there was any danger of somebody being hurt". [24]  (Ex. 12 at  46-47)

As soon as the moment had passed,  Beaudette was calm.  (Ex. 1 ¶ 41; Ex. 9 at 71)   He was co-operative when Bofman asked him to go to his locker, gathered his belongings, and left voluntarily.  (Ex. 1 ¶ 41)   He did not argue or act in a belligerent manner.  (Id.)  Beaudette was suspended pending an investigation.  (Ex. 1 ¶ 42)[25]

On or about  February 11, 2002, Reindl, Larry Alice  and Bruce Carr again talked about their concerns that Beaudette might not be able to do his job because of his medical condition.

---

[24]  The Defendant claims a white board was dented.  No mark is  visible, however, in the photographs produced by the Defendant,  (Ex. 21), and Beaudette and Reindl have explained that he threw the hard hat way from all equipment, causing no damage.  (Ex. 1 ¶ 40; Ex. 12 at 47)

[25]Carlton  asked human resource official Karen Kinder to investigate the incident. (Ex. 10 at 19-21)  However, it is unclear what, if anything, Kinder did to investigate.  Carlton testified that she interviewed other individuals.  (Ex. 10 at 21)  However,  the only thing which Kinder was able to recall doing was meeting with Beaudette.  (Ex.  22 at 25-26)

(Ex. 12 at 79-81)   Reindl believed that the stress in the plant was impacting the plaintiff because of his mental disability.   (Ex. 12 at 68)   He was concerned that if Beaudette came back and nothing changed, there would be problems.  (Ex. 12 at 49-54; 67-68)

Reindl, Carr and Alice  went to talk with Bofman about their concerns[26].  (Ex. 12

---

[26]  The Defendant, in describing the concerns and fears of the plaintiff's co-workers, relies on Bofman's notes.  However, these notes are clearly hearsay. FRCP 805.   As such the notes cannot be relied upon for the truth of the matters asserted.  Thus, the Defendant cannot rely on these notes as evidence that Baudette ever: scared his co-workers, lost his temper, engaged in "fits of rage, had confrontations or arguments with his coworkers; told his co-workers that he could not control his temper and was not sure that he could prevent himself from hitting people or told stories about losing control, pointing a loaded gun at someone, or hitting people.

Moreover, the notes do not accurately describe the communications.  While Bofman's notes claim that Reindl reported that he was afraid of retaliation,   Reindl testified that he was not concerned or afraid of  retaliation. (Ex. 12 at 49, 51) While Bofman's notes indicate that Reindl reported that he was scared by the look in Beaudette's eyes,  Reindl testified that he was not afraid and described the look as one of   "disgust" not one of rage.  (Id.)   While Bofman's notes claim that Reindl reported having heard Beaudette tell  stories of hitting people, pointing a loaded gun, and losing control,  Reindl testified that he had never  heard Beaudette tell stories about hitting people, pointing a gun or losing control as the Defendant contends.  (Id. at 82-83) Finally, while Bofman's notes indicate that Reindl had previous confrontations with Beaudette and was concerned that Beaudette could not control his temper,  Reindl testified that there had been only one  argument with Beaudette, that it had not been violent, that Beaudette did not lose his temper, and that Beaudette later apologized.  (Id. at 51-52)   He explained  that other than the hard hat incident,  Beaudette had never been  belligerent, and had never been insubordinate.  (Id. at 75)  Furthermore, he testified that he was concerned about how  the stress in the plant was impacting the Plaintiff because of  his mental disability -not Beaudette's temper.   (Id. at 49-54; 67-68)

With respect to Larry Alice, while Bofman's notes claim  that Larry Alice reported that he was afraid of  Beaudette, Alice has produced an affidavit in which he indicated that he, "was not fearful of Beaudette".  (Ex. 24).   Bofman's notes also falsely claim  that Bruce Carr reported that Beaudette had told Carr  he could not control his temper and might hit people, and that Beaudette had told Carr stories about losing control, hitting people and pointing a loaded gun at someone.   Carr has produced an affidavit indicating that  while Carr had heard stories about Beaudette he does not claim that he heard them from Beaudette.  (Ex. 23)  Instead, these may have been rumors spread  by other co-workers who knew of Beaudette's disability. (Id.) Moreover, while the notes suggest that Carr was afraid of Beaudette, feared being hit by Beaudette, and had seen Beaudette in "fits of rage", this was not the case.   Carr was not afraid

14

at 77-81; 91; Ex. 23)  These concerns were directly related to Beaudette's diagnosis  and fears

that he might not be taking his medication.    (Ex. 12  at 49-54; 67-68;  Ex. 23)    Carr believes

that they told Bofman that they were concerned that Beaudette was not  retaining information and

might not be taking his medication.   (Ex. 23)   While he could not recall specifically mentioning

that his concerns were related to  Beaudette's ADHD, Reindl testified that he also believed

Bofman understood that this was the basis for the conversation and the basis of the concerns.

(Ex. 12  at 77-81; 9)


        On February 12, 2002, Beaudette faxed  Bofman a memo discussing the February 6

incident, and providing further detailed information about his ADHD and treatment, including

―――――――――――――――

of being hit by Beaudette at the time that he spoke to Bofman.  (Id.)  In fact, he was not afraid of
Beaudette at all.  (Id.)   While he had seen Beaudette upset or frustrated, he had seen other
employees similarly upset or frustrated.  (Id.)   Carr explained that all of the workers were
unhappy and on edge because of the number of hours worked, and Beaudette's behavior was
similar to that of his co-workers. (Id.)   Perhaps most importantly, Carr explained that the reason
that he went to Bofman was not fear of  Beaudette, but rather fear Beaudette might  not be  taking
his medication. (Id.)

        Had the Defendant investigated they would have learned that Beaudette had never
engaged in the type of misconduct alleged by the Defendant.   He did not tell stories about
chasing people with loaded guns. (Ex. 1 ¶ 48)   While he occasionally had disagreements, he did
not become "enraged" with his co-workers or act in a violent manner.  (Id. at 46-46) Moreover,
the only conversations he had  about losing control was his statement on February 5, that the
stress was unbearable and he was concerned that he might "go off".   (Id.)  Moreover, the
Defendant knew or should have known that, prior to the night of February 6, 2002, Beaudette had
never thrown anything in  anger while  working for the Defendant.   (Ex. 1 ¶ 46) He had never
hit or kicked or broken anything in  anger.  (Id.)  He had never had any type of physical
confrontation with any co-workers.  (Id.)   He  had never threatened to harm any co-workers.
(Id.)  He  had not threatened anyone with any kind of violence, been violent, been belligerent, or
even been insubordinate.  (Id.)

the fact that he was seeing a mental health counselor referred through the Defendant's EAP who had been very helpful[27].  (Ex. 1 ¶ 44; Ex. 18)    Beaudette stated that he  would make any findings or recommendations from the medical evaluations available to the Defendant.  (Id.) Later that day, Beaudette met with Carlton, Kinder, and Bofman, and was asked  to give a statement concerning the February 6 incident.   (Ex. 1 ¶ 44)   He did so. (Id.)   He also gave them a copy of the letter in which he identified his medical condition and his plans for treatment.  (Id.)

On the evening of February 12, the Defendant drafted a letter terminating Beaudette.[28] (Ex. 26)   It stated that the termination was the result of , "a culmination of incidents in which there have moderate to severe behavior/ performance problems.   Specifically in the area of taking and accepting instructions".  (Ex. 26)   The letter referred to the February and September discipline and then referred to the, "latest incident on February 6th in which you displayed an

---

[27] On February 7, 2002, Beaudette voluntarily contacted  EAP and was referred to a counselor for an evaluation.   (Ex. 1 ¶ 43)   The counselor determined that the Plaintiff was suffering from Attention-Deficit/Hyperactivity Disorder.  (Id.)

[28] The Defendant's agents have offered inconsistent testimony as to the termination decision.   Carlton suggests that the termination decision  was made by someone from human resources.   (Ex. 10 at 22)   Kinder claims that she doesn't know.  (Ex. 22  at 25-26)  Bofman claims that it was a unanimous decision by him, Carlton, Kinder, and the head of human resources.  (Ex. 9 at 44-45)  Bofman testified that  each of the individuals involved with the decision were aware that Mr. Beaudette claimed to be suffering from a psychiatric medical condition.   (Ex. 9 at  59)   However, Carlton denies knowing  this.  (Ex. 10 at 25-26)

Bofman testified  that the  reason for the termination was the hard hat incident, explaining that as a result of that incident he believed that Beaudette was a safety risk.  (Ex. 9 at 45-46) Carlton testified that he recommended firing  Beaudette because of workplace violence.  (Ex. 10 at 22)   However, he conceded that he believed  that Beaudette was a safety risk because of the **potential** for violence.  (Ex. 10 at 24) He also admitted that his belief that other employees had voiced concern about their safety, along with the Plaintiff's performance problems, were factors in his decision.   (Ex. 10 at 24)

angry outburst and a total disregard of the presence of the Operations Manager in the Control Room". (Ex. 26)

Carlton edited this termination letter.  (Ex. 27)   He removed the reference to "behavior" and the reference to  Beaudette's difficulty in taking instructions.  (Ex. 27)    He also changed the description of  the February 6th incident from a display of "anger" to a display of "violence". (Ex. 27) Finally, he indicated that Beaudette's three day removal from the qualified fork lift driver list was  a performance issue that led to his termination.   (Ex. 27)   The termination letter did not indicate that  the plaintiff was terminated because he was unable to work long hours, was a safety risk, or was otherwise unable to perform the duties of the position[29]. (Ex. 27) Nor did the letter state that the alleged fears of Beaudette's co-workers played  a role in the termination decision.   (Ex. 27 )

The Defendant's interrogatory responses explain the termination decision as follows:

[the defendant] decided it could no longer employ Plaintiff because his conduct posed a risk to the safety of other workers at Lake Road.   Plaintiff had other work performance problems, including refusing to follow his supervisors instructions on safety procedures, so when the plaintiff threw his hard hat against the wall in a room filled with people, [the defendant] decided to terminate plaintiff's employment.

(Ex. 28)

The Defendant has policies under which  an employee may be sent for a fitness for duty

---

[29]The Defendant now contends that Beaudette was not qualified.  Reindl, however, testified that he believed that Beaudette would have been a good operator if he were given an opportunity to learn the job.  When asked if Beaudette could have succeeded if given some help to learn the job, he replied, "I know so" .  (Ex. 12 at 89) In his affidavit,  Bofman even conceded that Beaudette was capable of performing the technical aspects of the job.  (Ex. 32)

exam when there is a request for accommodation, when there is a concern that the plaintiff is

unable to perform the essential functions of the job, or when there is a concern about safety.  (Ex.

10 at 30-32)   Carlton was aware of this policy  but did not send Beaudette  for such an exam to

determine if he was a safety risk or to determine if he was capable of performing the essential

functions of his position.  (Id.)  Carlton could not explain why he did not follow the policy.  (Id.)

### C.    The Medical Testimony

The record contains substantial medical evidence, none of which was referred to by the

Defendant in support of its motion for summary judgement.   That evidence includes reports and

depositions testimony from two forensic psychiatrists- Kenneth Selig, MD (Plaintiff's expert)

and Peter Zeman MD (Defendant's expert).   The record also contains medical records and notes

from the Plaintiff's various treating physicians.        Based on the testimony of the two forensic

psychiatrists, it is undisputed that the Plaintiff has Generalized Anxiety Disorder[30] and Panic

Disorder with Agoraphobia[31].  (Ex. 2 at 52-55; Ex. 6; Ex. 31)[32] .  Both of these conditions  are

---

[30]Generalized Anxiety Disorder is a diagnosis set out in the DSM IV. (Ex. 2 at 52-53)
This disorder is characterized by, "a greater than two year period of excessive worry,
accompanied by a variety of associated symptoms consistent with anxiety such as problems
sleeping, problems concentrating, physical symptoms of anxiety such as tremulousness or
sweating or maybe hyperventilation." (Ex. 2 at 10-11)   Impulsivity is a  feature of this illness.
(Ex. 2 at 56)

[31]Panic Disorder with Agoraphobia is a diagnosis set out in the DSM IV. (Ex. 2 at 52-53)
It is characterized by an avoidance of social situations.  (Ex. 30 at 21)

[32] Dr. Rothman  has also diagnosed Beaudette  as having ADHD.  (Ex. 4)  ADHD or
ADD  is a diagnosis contained in DSM IV.   (Ex. 2 at  54-55)   ADHD is characterized by
symptoms of inattention and impulsivity. (Ex. 2  at 11-12, 57)   Dr. Selig could not state, based
on reasonable medical certainty, that Beaudette had ADD or ADHD.  (Ex. 2 at 23-25) .
However, while the expert testimony does not establish  that Beaudette had ADD or ADHD, it

long lasting, and have caused significant distress and impairment to Beaudette. (Ex. 6)

Even with medication and treatment these conditions substantially limit Beaudette with respect to the major life activities of thinking, sleeping, concentrating and learning, as compared to the average person. (Ex. 6; Ex. 2 at 32-35)  With respect to thinking, concentrating and learning, Dr. Selig has explained that,

> [w]hen put in a situation where he needs to learn something, his anxiety increases and impairs his ability to sufficiently think straight and focus and be able to pay attention and understand what it is that he's being taught because of the increase in his anxiety.... When his anxiety is high, and it is high even when he's in treatment, even when he's being medicated, he had problems with thinking and his mind may go blank or he may have trouble where he has trouble tracking his thoughts which is a well-known and understood symptom of an anxiety disorder.

(Ex. 2 at 32-33)  Dr. Selig has also explained that when Beaudette is under stress, such as when he was in a classroom setting or working long hours, he would, "have to exert especially high effort and determination to do what the rest of us can do with much less effort much more normally".[33] (Ex. 2 at 34-35)

Moreover, Beaudette has moderate to severe difficulties with sleeping as compared to the average person. (Ex. 30 at 26-28; 51-52)  He regularly has trouble getting to sleep, remaining awake all night approximately once or twice per week.   (Ex. 5 at 4/3/00;

---

clearly establishes that had a record of having these impairments. (Ex. 2 at 23-25)

[33]Beaudette's other doctors confirm his difficulties, explaining that even as an adult, Beaudette has had problems focusing, and concentrating. (Ex. 29; Ex. 5).  Even Dr. Zeman, the Defendant's expert, testified that with respect to learning it took Beaudette, "long hours to do this, and he had to work hard at it, and he was working long hours in the evening at night at home and that he had to outline things and rework the material...  I think that he has to work hard at learning material, certainly is on the higher side of the bell-shaped curve...".  (Ex. 30 at 50-52)

4/27/00)     On occasion he goes 3-4 days without sleeping at all. (Ex. 5 at 5/25/00)     Despite

these impairments, Beaudette  was, "able to perform the essential functions of his job, because of

his determination to do so and the amount of effort he exerted".   (Ex. 6; See Also: Ex. 31 at 8)

Because of his mental impairments Beaudette is particularly susceptible to stress[34].  (Ex.

6) While working for the Defendant, this stress,

> [took] a serious toll on him, causing him to be preoccupied with work, feeling
> more anxiety from his wish to do well at work, and even affecting his sleep.
> Thus, to accommodate this stress, he substantially limited his out of work
> activities during his period of employment".

(Ex. 6)

This  work- related stress, combined with Beaudette's mental  impairments, and

the Defendant's repeated refusal to consider any accommodations, resulted in Beaudette's

throwing the hard hat at a wall.  Dr. Selig explained  that in his expert opinion the  throwing of

the hard hat was, "an impulsive reaction to tremendous inner stress", and **not** a violent act.[35]

(Ex. 6; Ex. 2 at 45)   He  further explained that such impulsive behavior  is a feature  of

generalized anxiety and ADHD. (Ex. 2 at 55-57)[36]

---

[34]Beaudette's anxiety also increases when he is sleep deprived and that this , "can
sometimes  drive [him] to a panic ".  (Ex. 5 at  5/25/00).

[35] Even Dr. Zeman admitted that  Beaudette has greater anxiety than the average person,
that his anxiety would be exacerbated by stress, and that his anxiety could also be accommodated
by the lessening of the stress. (Ex. 30 at 67-68)

[36]Dr. Zeman agrees that Beaudette has poor impulse control as a result of his  mental
impairments, and that his symptoms- including poor impulse control-  would increase under
stress.  (Ex. 30 at 61-62; 65-66)  He also noted that  lack of sleep can exacerbate poor impulse
control, and that  reducing the stress on  Beaudette could have helped help him better control his
impulses.   (Ex. 30 at 65-66)

Despite the throwing of the hard hat, Dr. Selig found that there was no basis to conclude that Beaudette was a threat to himself or others or that he could not safely perform all of the functions of his job. (Ex. 2 at 46-47, 59) Dr. Zeman, the Defendant's expert, also admitted that at the time that the Defendant fired Beaudette, there was no basis to conclude, based on reasonable medical certainty, that Beaudette posed a significant risk of substantial harm to the health and safety of himself or others. (Ex. 30 at 16)

## III.    THE LEGAL STANDARD

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See: Fed.R.Civ.P. 56(c). A "material fact" is one whose resolution will affect the ultimate determination of the case. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A "genuine" issue as to such a material fact "only arises if the evidence would allow a reasonable jury to return a verdict for the non-moving party." Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988); Anderson, 477 U.S. at 248.

The moving party bears the initial burden of proving that no factual issues exist. Gallo v. Prudential Residential Services, 22 F.3d 1219, 1223 (2d Cir. 1994); Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party carries its burden, the party opposing summary judgment "may not rest upon mere allegations or denials," rather, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Because credibility is not an issue on summary judgement, the non-

21

movant's evidence must be accepted as true.  <u>Gupta v. City of Norwalk,</u> 221 F.Sup.2d 282, 296 (2nd Cir. 2002).   Moreover, in assessing the record, the Court must resolve all ambiguities and draw all inferences in the light most favorable to the non-moving party.  <u>Gallo,</u> 22 F.3d at 1223; <u>Anderson,</u> 477 U.S. at 255.

The trial court's task at summary judgment "is carefully limited to discerning whether there are any issues of material fact to be tried, not to deciding them."  <u>LaFond v. General Physics Services Corp.,</u> 50 F.3d 165, 171 (2d Cir. 1995), citing <u>Gallo,</u> 22 F.3d at 1224.  "When reasonable persons, applying the proper legal standards, could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury".  <u>Hogan v. State of Connecticut,</u> 220 F.Sup.2d 111 (Conn. 2002), citing <u>Sologub v. City of New York,</u> 202 F.3d 175,178 (2d Cir. 2000).  See also: <u>Gupta,</u> 221 F.Sup.2d at 289.

**IV.    ARGUMENT**

A.    The Elements of An Employment Discrimination Claim

In a disability case where, as here,  the employer disclaims reliance on the disability, the case is to be analyzed using the McDonnell-Douglas burden shifting framework.  <u>Teahan v. Metro-North Commuter Railroad Co.,</u> 951 F.2d. 511, 514 (2nd. Cir. 1991)cert. den. 506 U.S. 815 (1991); <u>Levy v. CHRO,</u> 236 Conn. 96, 103 (1996). Under this three step analytical framework, the Plaintiff must prove by the preponderance of the evidence the *prima facie* case: (1) that he was in the protected class, (2)  that he was qualified for the position, (3) that he suffered an adverse employment action,  and (4) that the facts support an inference of discrimination. <u>Roge v. NYP Holdings, Inc.,</u> 257 F.3d 164, 168 (2d Cir. 2001), citing <u>O'Connor v. Consol. Coin Caterers</u>

Corp., 517 U.S. 308, 313, 116 S. CT. 1307 (1996).  The Plaintiff's burden at this stage is not a

heavy one.  Soares v. University of New Haven, 154 F. Supp.2d 365, 373 (D. Conn. 2001).

     If the Plaintiff makes out a *prima facie* case, a presumption arises that the employer

unlawfully discriminated, and the burden shifts to the Defendant to proffer a nondiscriminatory

reason for the adverse employment action.    The reason provided must be both "clear and

specific." Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir.1985) cert denied 474 U.S. 829 (1985). If

such a reason is proffered, the Defendant, "will be entitled to summary judgment ... unless the

plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination."

James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir.2000).   However, summary judgment

must  be denied if the evidence, viewed fully and most favorably to the Plaintiff, permits a

logical inference that the articulated reason is a pretext for discrimination.  Reeves v. Sanderson

Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).   The

ultimate question is whether a reasonable person could find that the adverse employment action

complained of was motivated at least in part by prohibited discrimination.  Stratton v.

Department for the Aging for the City of New York, 132 F.3d 869, 878 (2d Cir. 1997).

     To meet this burden, the Plaintiff may rely "on the evidence constituting the *prima facie*

case, together with supportable inferences to be drawn from the false or erroneous character of

the employer's proffered reason for the adverse action." Carlton v. Mystic Transp., Inc., 202

F.3d at 129135 (2nd Cir. 2000) cert denied 530 U.S. 1261 (2000).[37]    The Supreme Court in

---

[37]The Plaintiff is not required to prove that the prohibited motivation was the sole or even
the principal factor in the decision, or that the employer's proffered reasons played no role in the
employment decision, but only that those were not the only reasons and that the Plaintiff's

<u>Reeves</u> made it plain that proof that the fact that the employer's explanation for its decision is

unworthy of belief constitutes "circumstantial evidence that is probative of intentional

discrimination....". 530 U.S. at 147; <u>see also</u> <u>Aka v. Washington Hosp. Ctr.</u>, 156 F.3d 1284,

1292-1293 (D.C. 1998).   Evidence that the employer's reason is false,  combined with the prima

facie case, will usually be sufficient to allow the issue to go the jury.  <u>Reeves</u>, 530 U.S. at 148.

In such cases summary judgement may be granted only if,

> the record conclusively revealed some other non-discriminatory reason for the
> employer's decision [or] the Plaintiff created only a weak issue of  fact as to
> whether the employer's reason was untrue, and there was abundant and
> uncontradicted evidence that no discrimination had occurred.

<u>Reeves</u>, 530 U.S. at 148.


      B.     <u>A Reasonable Jury Could Conclude that the Defendant Violated the
              Connecticut Fair Employment Practices Act</u>

         1.     <u>Introduction</u>

With respect to the CFEPA claim, the Defendant first claims that summary judgement

must be granted because the Plaintiff allegedly cannot make out a prima facie case.   Specifically,

the Defendant  argues that the Plaintiff  engaged in an act of workplace violence that threatened

---

protected status contributed to the employer's decision.  <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62,
78-79 (2d Cir. 2001); <u>Renz v. Grey Advertising, Inc.</u>, 135 F.3d 217, 220-222 (2d Cir. 1997);
<u>Stratton</u>, 132 F.3d at 878; <u>Cronin v. Aetna Life Insurance Co.</u>, 46 F.3d 196, 203 (2d Cir. 1995).
Because direct evidence of discrimination is seldom available with respect to an employer's
mental processes, plaintiffs in discrimination suits must rely on the cumulative weight of
circumstantial evidence. <u>Carlton v. Mystic Transport, Inc.</u>, 202 F.3d 129, 135 (2d Cir. 2000),
<u>cert. denied</u>, 530 U.S. 1261 (2000); <u>Banks v. Travelers</u>, 180 F.3d 358, 367 (2d Cir. 1999);
<u>Danzer v. Norden Systems, Inc.</u>, 151 F.3d 50, 56-57 (2d Cir. 1998); <u>Norton v. Sam's Club</u>, 145
F.3d 114, 119 (2d Cir. 1998), <u>cert. denied</u>, 525 U.S. 1001 (1998).

the safety of others, and that this misconduct renders him unable to perform the essential

functions of the job of O&M technician.[38]   (See Def. Memo. at 15-16).   In the alternative, the

Defendant claims that summary judgement must be granted because no reasonable jury could

find that the stated reason for terminating the Plaintiff- an unacceptable act of workplace

violence- was a pretext for discrimination.   (Def. Memo. at 17-19)   In making these arguments,

however, the Defendant impermissibly views the facts in the light most favorable to itself.   As is

explained  below, when the standard for summary judgement is correctly applied, it is readily

apparent that the Defendant's motion  must be denied.

> 2.    A Reasonable Jury Could Find That The Plaintiff Is Qualified
>        To Perform The Essential Functions of His Position

In order to make out a prima facie case of disability discrimination, Beaudette  need only

show that: (1) he is disabled within the meaning of CFEPA; (2) he is otherwise qualified to

perform the essential functions of the position; and  (3) he suffered an adverse employment

action under circumstances giving rise to an inference of discrimination.  Heyman v. Queens

Village, 198 F.3d. 68, 72 (2nd Cir. 1999).   In the present case,  the Defendant concedes that the

Plaintiff has a disability within the meaning of CFEPA, and has suffered an adverse employment

---

[38]   CFEPA does not explicitly include the requirement that the plaintiff prove that he is
capable of performing the essential functions of the position.   However, in interpreting CFEPA
the courts have looked to federal precedent for guidance. Levy, 236 Conn. at, 103  See Also: The
Ann Howard's Apricot's Restaurant Inc. v. CHRO , 237 Conn. 209 (1996).  Thus, for the
purposes of this motion, the Plaintiff will presume that in analyzing the CFEPA claim, the Court
will rely on the body of law developed with respect to the ADA.

action under circumstances giving rise to an inference of discrimination.[39]   However, the

Defendant contends that no reasonable trier of fact could find that the Plaintiff was qualified to

perform the essential functions of his position.

The Defendant does not claim that the Plaintiff lacks the education or skill necessary to

perform the duties of the position.[40]   Instead, the Defendant claims that, "the essential functions

of any job include the requirement that an employee abstain from violent behavior that threatens

the safety of other employees", and that the Plaintiff's conduct in arguing with co-workers and

throwing his hard hat constituted violent behavior that rendered him not qualified . (Def. Memo.

at 15-16)   In essence, the Defendant claims that the Plaintiff could not perform the essential

duties of his position because he posed  a threat to the health and safety of his co-workers[41].

---

[39]It is undisputed that the plaintiff suffered an adverse employment action, in that he was
terminated,  and that his duties were re-assigned to someone outside of the protected class.    This
is sufficient to create an inference of discrimination.   Valenti v. Carten Controls, Inc., 1997  WL
766854at * 21-22 (D. Conn. 1997)(noting that whether position was eliminated or duties were
reassigned to implement discriminatory objectives was issue for the jury); Shkolnik v.
Combustion Eng. Inc., 856 F.Sup. 82, 86 (D. Conn. 1994).

[40]   Indeed, the Defendant could not do so.   The Plaintiff had received a positive
evaluation in the end of 2001.  Moreover, it is undisputed that just days before his termination,
Bofman told the Plaintiff that he was, "doing a good job".

[41]   The Defendant also seems to suggest that the Plaintiff could be terminated even if he
did not actually pose a threat because his conduct violated workplace standards.   As an initial
matter, this argument is not supported by the record evidence.   The alleged decision makers-
Bofman, Kinder and Carlton- all testified that Beaudette was fired because of concerns that he
was a safety risk, and not because he violated a known work rule.   Moreover, the Defendant
misconstrues the law.   The  EEOC has explained that  whenever an employer relies on a safety
qualification standard in terminating a disabled employee this defense must be read together with
the direct threat defense, and the employer must meet the direct threat criteria.  29 C.F. R. §1630.
To date,  the Supreme Court has declined to rule on this issue.   Chevron USA Inc. v.  Echazabal,
536 US. 73, at f.n.3; (2002).  See Also: Albertson's Inc. v. Kirkinburg, 527 U.S. 555, f.n. 15

The Defendant suggests that the question of whether or not the plaintiff posed a direct

threat to the health and safety of others  should be determined in the context of deciding whether

or not the Plaintiff  is a "qualified" individual, and that the Plaintiff, therefore, has the burden of

proving that he is capable of performing the essential functions of his position.  This mis-states

the burden of proof in this circuit.[42]    However, even if the Defendant were correct, it is clear that

_____

(1999).  However, the Second Circuit has held that "great deference" should be afforded the
EEOC's interpretation of the ADA since it is charged with administering the statute.  <u>EEOC v.
Blue Cross Blue Shield of Connecticut</u>, 30 F. Supp.2d. 296, f.n. 14 (D. Conn. 1998)  quoting
<u>Francis v. City of Meriden</u>, 129 F.3d.  281, 284 (2nd. Cir. 1997).  Thus, since the alleged
"misconduct" clearly involves a safety concern, the Defendant in this case must be able to prove
that the Plaintiff was a "direct threat".

[42]While the ADA requires that a plaintiff prove that he is an "otherwise qualified"
employee with a disability, (42 U.S.C. §12111(8)), it also provides  that it may be a **defense** to
discrimination,

> (a)...that an alleged application of qualification standards, tests or selection
> criteria that screen out or tends to screen out or otherwise deny a job or
> benefit to an individual with a disability has been shown to be job related
> and consistent with business necessity, and such performance cannot
> be accomplished by reasonable accommodation, as required under this
> subchapter.

> (b) The term "qualifications standards" may include a requirement that
> an individual shall not pose a direct threat to the health or safety of other
> individuals in the workplace.

42 U.S.C. §12113.

Thus, while the statute can be read as placing the burden of proof of "qualification" on
the Plaintiff, it also appears to place the burden of proving that the Plaintiff did not meet
"qualification standards" because he posed a  threat to others, on the Defendant.  The Supreme
Court has not directly addressed this issue.  However, in dicta in  <u>Chevron USA Inc. v.
Echazabal</u>, 536 US 73, *10-11, (2002), the Court did expressly state that the defense provisions
of the ADA are  "affirmative defenses" of the employer.  Since an employer bears the burden of
proof as to its affirmative defenses, it appears likely that the Supreme Court would hold that it is
the Defendant's burden to  prove that the Plaintiff posed a threat.   Moreover, the Second Circuit

summary judgement would have to be denied because a reasonable jury could find that the

Plaintiff was "qualified".

The question of whether a disabled employee is qualified for his or her job if there is a

risk of harm to others, was initially addressed by the Supreme Court in <u>School Board of Nassau

County v. Arline</u>, 480 U.S . 273 (1987), a case involving Section 504 of the  Rehabilitation Act

of 1973, 29 U.S.C. §794.    <u>Arline</u>  dealt with the question of whether or not an employee with a

contagious disease was "otherwise qualified" for a position as a school teacher. <u>Id.</u>   The Court

first rejected a blanket exclusion of such disabled employees, explaining,

> [s]uch exclusion would mean that those accused of being contagious would
> never have the opportunity to have their condition evaluated in the light of
> medical evidence and a determination made as to whether they were "otherwise
> qualified".   Rather, they would be vulnerable to discrimination on the basis
> of mythology– precisely the type of injury Congress sought to prevent.

<u>Id.</u> at 285.

The Court went on to consider the question of whether or not the plaintiff was "otherwise

---

has recently made clear that, "[i]n the employment context it is the defendant's burden to
establish that a plaintiff poses a `direct threat' of harm to others'.  <u>Hargrave v. Vermont</u>, 340
F.3d. 27, 35 (2nd . Cir. 2003) citing <u>Lovejoy-Wilson, v. NOCO Motor Fuel, Inc.</u>, 263 F.3d. 208,
220 (2nd. Cir. 2001).   See Also: <u>Hutton v. ELF ATOCHEM North America, Inc.</u>, 273 F.3d. 884,
893 (9th Cir. 2001)(employer bears the burden of proving direct threat); <u>Davidian v. Village of
Wilmette</u>, 269 F.3d. 831, fn 7 (7th Cir. 2000)(burden of proving direct threat is generally on the
employer, unless the plaintiff has a safety sensitive job in which the threat of health and safety is,
"intertwined with her qualifications")    But See:  <u>EEOC v. Amego, Inc.</u>, 110 F.3d. 135, 142-144
(1st Cir. 1997)( "burden is on the plaintiff to show that he or she is qualified in the sense of not
posing a direct threat"); <u>Rizzo v. Childrens World Learning Centers, Inc</u>, 173 F.3d. 254, 259 (5th
Cir. 1999)(burden  generally on the plaintiff unless the safety requirements imposed tend to
screen out an individual with a disability or class of individuals with disabilities, in which case
defendant bears the burden); <u>Moses v. American NonWovens Inc.</u>, 97 F.3d. 446, (11th Cir. 1996)
<u>cert.</u> <u>denied</u> 117 S. Ct. 964 ( 1997)( plaintiff bears the burden of proving that  he was not a direct
threat).

qualified". Id. at 285.   The Court stated that an otherwise qualified person is one who can

perform the functions of the job in question.    Id. at f.n. 17. The Court further  noted that in

determining whether the plaintiff was qualified,

> the district court will need to conduct an individualized inquiry and make
> appropriate findings of fact.   Such an inquiry is essential if §504 is to achieve
> its goal of protecting handicapped individuals from deprivations based on
> prejudice, stereotypes, or unfounded fear, while giving appropriate weight to
> such legitimate concerns of grantees as avoiding exposing others to significant
> health and safety risks.

Id.

      The Court explained that  this inquiry must include findings of fact "based on reasonable

medical judgements" as to the nature, duration, severity, likelihood, and imminence  of the

potential harm to others.   Id. at 288.[43]

      In enacting the ADA, Congress codified this "otherwise qualified" analysis, and

applied it to disabilities other than contagious diseases.   As the Second Circuit has explained,

> [t]o determine whether a person is `otherwise qualified' under Section 504 an
>  individualized assessment must be conducted which balances the goals of
> protecting handicapped individuals from discrimination with the legitimate
> concerns not to expose others to significant health and safety risks.... Although
> Arline applied the 'otherwise qualified' language of the  Rehabilitation Act, the
> regulations relating to the `direct threat' exception of the ADA, 42 U.S.C.
> §12182(b)(3), were patterned after the standards set forth in Arline, 28 C.F.R.
> §36.208 (App.B), rendering   the inquiry identical under the two statutes in the
> present context.

Ascani v. Hofstra University, 173, F.3d. 843, (2nd. Cir. 1999)

---

      [43]    Finally, the Court must, " evaluate in light of these medical findings, whether the
employer could reasonably accommodate the employee under the established standards for that
inquiry.  Id.

Accordingly summary judgment may be granted in this case only if, as a matter of law, the Plaintiff presented  a significant risk of substantial harm to the health or safety of his co-workers.  See: Eidshahen v. Pizza Hut of America Inc. , 115 F. Supp. 2d. 279 (D. Conn. 1998), citing 29 C.F.R. § 1620.2(r).    A "significant risk", is a high risk and not just a slightly increased risk.  29 C.F.R. §1630.2.  As the Second Circuit has explained,

> [a]n employer... is not permitted to deny an employment opportunity to an individual with a disability merely because of a slightly increased risk.  The risk can  only be considered when it poses a significant risk, i.e. high probability, of substantial  harm; a speculative or remote risk is insufficient.

Lovejoy-Wilson, v. NOCO Motor Fuel, Inc., 263 F.3d. 208, 220 (2nd. Cir. 2001), quoting Hamlin v. Charter Township of Flint, 165 F.3d. 426, 432 (6th Cir. 1999).

Moreover, the determination as to whether a significant risk exists must be based on, "reasonable medical judgement that relies on the most current medical knowledge and/or the best available objective evidence".   29 C.F.R. §1630.2    The factors to be considered are the: duration of the risk; (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm.  Id. ; Bragdon v. Abbott, 524 U.S. 624, 649 (1998); Gragg v, NYS Department of Environmental Conservation, 2000 WL 246272 (NDNY, 2000).

In the present case, consideration of the above factors make clear that Michael Beaudette was qualified.[44]   The reasonable medical judgement of both Dr. Selig and Dr. Zeman is that

---

[44]The cases cited by the Defendant in support of its claim that the Plaintiff cannot make out a prima facie case are factually distinguishable.  LaPenta v. CHRO, 1994 WL 591774 (Conn. Super. 1994), in which the plaintiff was terminated for theft, did not  even involve direct threat or a  risk to others.  In Palmer v. Circuit Court of Cook County Illinois, 117 F.3d. 351, 352 (7th Cir.

Michael Beaudette could perform the essential functions of his job.   They also agreed that there was no basis for concluding that Beaudette posed a substantial risk of harm to himself or others at the time he was terminated.

There is also no **objective** evidence that the risk of harm to others  was severe or  highly probable as is required.   See: 29 C.F.R. 1630(2)(r).   There is no evidence that  Beaudette had ever harmed anyone - in even a minor way.   There is no evidence that he had ever threatened to harm anyone.   His previous performance problems involve, at most,  mistakes, and there is no evidence that these mistakes  placed his co-workers at risk.   The  record evidence in this case shows that the plaintiff engaged in one spontaneous outburst during which nobody was hurt. This does not establish- as a matter of law- that his co-workers were in imminent danger of severe harm.

The fact that some of the Plaintiff's co-workers, who knew of his mental impairments, expressed concern does not alter this analysis.    These concerns were directly related to the

---

1997), and Calef v. Gillette, 322 F. 3d 75, 77-84, (1 st Cir. 2003)  the employees involved admitted to threatening co-workers with physical violence.   Moreover, in Calef, at f.n.10, the Court refused to analyze the case as a direct threat case, finding that the "direct threat"  defense was a different and separate inquiry from the "otherwise qualified " analysis.    As was explained, supra, the Second Circuit Court of Appeals disagrees with the First Circuit on this point of law. In Misek-Falkoff v. IBM Corp., 854 F. Supp. 215, 227 (SDNY 1984), and EEOC v. Amego,  110 F.3d. 135 (1st Cir. 1997), the employee was unable to perform an admittedly essential duty.   In EEOC v. Amego,  110 F.3d. 135,140  (1st Cir. 1997) the plaintiff, a behavioral therapy team leader, was unable to reliably provide medication to patients.   In Misek-Falkoff, 854 F. Supp. 227-228, the plaintiff had a disorder of the nervous system, which required her to be absent from the workplace for extended periods of time.   In this case, there is no evidence that the Plaintiff committed fraud, threatened to kill or harm others, was unable to work for long periods of time, or was unable to perform a critical job related task.

Plaintiff's impairments, and the fear that he might not be taking his medication[45].   Terminating the Plaintiff because of this speculation is exactly the type of discrimination based on, "prejudice, stereotypes or unfounded fear" that is prohibited.   See: Lovejoy-Wilson, 263 F.3d. at 220.

While the Defendant is free to argue to the jury that the Plaintiff had a history of angry arguments, or that his conduct in throwing the hard hat was a violent act that might have hurt someone, these are clearly issues of disputed fact.   Viewing the facts in the light most favorable to the Plaintiff there is simply no evidence that he posed a danger to anyone.   A rational jury could  conclude that  Beaudette was capable of performing the essential functions of his position.  Summary judgement must, therefore, be denied.

3.     A Reasonable Jury Could Conclude that the Defendant's Stated Reason For Terminating the Plaintiff Was A Pretext For Discrimination

The Defendant next asserts that summary judgement must be granted because no reasonable jury could find that the stated reason for the Plaintiff's termination was  pretextual. In making this claim the Defendant again ignores  all of the evidence that contradicts its version of events.[46]   When the facts are truly viewed in the light most favorable to the Plaintiff,

---

[45]  Moreover, each has denied having any personal fear of the Plaintiff.

[46]  Citing Valentine v. Standard & Poors, 50 F. Supp. 2d. 262 (f.n. 16 (SDNY 1999); Reed v. Lepage Bakeries, Inc., 102 F. Supp. 2d. 33, (D. Me. 2000) aff'd 244 F.3d. 254 (1st Cir. 2001); Carozza v. Howard County, Maryland, 847 F. Supp. 365,368 (D. Md. 1994); Francis v. Runyon, 928 F. Supp. 195, 205 (EDNY 1996).   Bradford v. City of Chicago, 308 F.Supp.2d. 895 (ND Ill. 2004; Misek-Falkoff v. IBM, Corp., 854 F. Supp.2d. at 221, and Husowitz v. Runyon, 942 F. Supp. 2d. 822, 834 (EDNY 1996) the Defendant  claims that an employer may legitimately terminate an employee for misconduct or for co-worker complaints.   (See Defendant's memorandum at 17-19).     However,  as  was explained at fn. 41 supra, where the termination involves fears of future harm, the direct threat analysis must be applied to misconduct cases, and an employee may be terminated only where there is a significant risk of substantial harm.

something which the Defendant has utterly failed to do in its Memorandum, the evidence

demonstrates that a reasonable jury could find that the stated reason for termination was a

pretext.

First, while the Defendant presently suggests that the Plaintiff was terminated  because he

had exhibited violent behavior and his co-workers had expressed fear for their safety,  (Def.

Memo.  at 17),  this was not the reason given at the time of his termination.    At that time, the

Defendant unambiguously claimed that the Plaintiff  was being terminated for, "moderate to

severe performance problems... in the area of accepting instructions". (Ex. 27)[47].  Concerns about

future risks to the safety of others and co–worker complaints were not even mentioned.

Perhaps realizing that the reasons stated in the termination letter were not credible, the

Defendant, in responding to the Plaintiff's  interrogatory responses, explained the termination

decision as follows:

> [the defendant] decided it could no longer employ Plaintiff because his conduct
> posed a risk to the safety of other workers at Lake Road.   Plaintiff had other
> work performance problems, including refusing to follow his supervisors

---

Moreover, the misconduct  must be the actual reason for the termination and **not** a pretext.  See:
Valentine, 50 F. Supp. 2d. at 289-290; Misek-Falkoff ., 854 F. Supp.2d. at 227; Husowitz, 942 F.
Supp. 2d. at 834-835; Bradford, 308 F.Supp.2d. at  897-899.   As is explained below, a
reasonable jury in this case could find that the Defendant's claim that the Plaintiff was terminated
due to misconduct or due to co-worker complaints, is a pretext for discrimination.

[47]The termination letter  identified the four specific instances of poor performance on
which the Defendant was relying.  These were: (1)  an alleged incidence of insubordination in
not following directions which purportedly could have, compromised the safety systems
(lockout/tagout) that were then under development; (2) an alleged incidence of a failure to
follow directions resulting in the contamination of the Demin water tank: (3)  the failure to  wear
a seatbelt on the forklift, resulting the Plaintiff's removal from the Qualified Forklift Operator
list; and (4) the hard hat incident. (Ex. 27)

> instructions on safety procedures, so when the plaintiff threw his hard hat
> against the wall in a room filled with people, [the defendant] decided to terminate
> plaintiff's employment.

(Ex. 28)    Thus, the Defendant's second stated reason for terminating the Plaintiff was a belief

that his conduct in throwing the hard hat posed a risk to other workers.

Unfortunately for the Defendant the testimony of the purported decision makers[48], does

not support this second explanation either.    While Bofman claimed that the termination decision

was made due to safety concerns raised by the hard hat incident, Carlton admitted that he also

relied on the complaints from the Plaintiff's co-workers.    Carlton further explained that it was

not the actual risk posed by the throwing of the hard hat, but potential future harm that motivated

him to recommend the termination.

In a transparent attempt to weave together the various asserted reasons for termination,

the Defendant now claims that  the Plaintiff was terminated because of:  (1) an exhibition of

violent behavior in the workplace; (2) employee complaints about the Plaintiff; and (3) the

Plaintiff's prior performance problems.    (Def. Memo. at 13-14)    Since an inconsistency

between offered explanations, "raises a genuine issue of material fact with regard to the veracity

of this non-discriminatory reason", a reasonable jury could conclude that these shifting

explanations indicate a lack of truthfulness.  Carlton v. Mystic Transportation Inc., 202 F.3d 137

(2d Cir. 2000)(citations omitted); EEOC v. Ethan Allen Inc., 44 F.3d 116, 120 (2d Cir. 1994).

---

[48]   As was explained above, the identity of the actual decision maker in this case is
unclear– with various management officials each claiming that someone else made the final
decision.    A reasonable jury could consider this refusal to name the decision maker as evidence
of pretext.

Moreover, a reasonable trier of fact could find that each of the various asserted reasons are false. There is substantial evidence that the claims of poor performance were either false or grossly exaggerated, and would not have caused the Defendant to terminate the Plaintiff absent discriminatory animus.[49]   The incident involving the lockout/tagout was not insubordination, and did not compromise safety. Furthermore, it did not suggest any performance deficiencies on the Plaintiff's part, since he was merely following the instructions of his supervisor to ignore anything written on tape.   While the Plaintiff did make errors with respect to the forklift and Demin water tank incident, a reasonable trier of fact could find that these problems were understandable mistakes and not "misconduct" as the Defendant now alleges.

More importantly, the evidence clearly shows that the Defendant was generally satisfied with the Plaintiff's performance in 2001. Two months before the termination the Defendant evaluated the Plaintiff's performance as satisfactory and mere days before his termination Bofman told him that he was doing a good job.   This renders the claim of poor performance suspect.   As one Court has explained,

> [w]here dismissal is based on factors covered by a positive job appraisal, the appraisal becomes suspect as do the articulated reasons for dismissal.  One may draw the inference that the reasons given are pretextual and that the employee was in fact fired.... because of [his] handicap

---

[49]  A reasonable trier of fact could also find that any performance difficulties were related to the Plaintiff's mental disabilities, and the result of the Defendant's refusal to grant the Plaintiff reasonable accommodations with respect to these disabilities.   Had the Defendant provided the Plaintiff with more time to learn the systems, as he had requested, his anxiety might have remained at reasonable levels, and he might not have made mistakes with respect to the lockout/tagout; the Demin water tank or the forklift.   Had he been given the break he requested, he would not have engaged in the impulsive act of throwing his hard hat.

Misek-Falkoff, 854 F. Supp. at 226, affd 60 F.3d. 811, cert denied. 516 U.S. 991 (1995)  Relying on this evidence,  a reasonable trier of fact could conclude that the claims of misconduct and/or poor performance are pretextual.

A reasonable trier of fact could similarly find the claim of workplace violence to be a pretext.   As was explained above, there is absolutely no reason to believe that  the Plaintiff had any intention of harming anyone.   There was no risk to any person or equipment.   Unlike the cases relied upon by the Defendant, the Plaintiff had no history of violence, or even of threatening behavior.  Moreover, this was clearly something of a rough and tumble environment.

Reindl admittedly,  "got in his face", yelled at him and swore at him- for offering to work overtime if needed. [50]   Carr explained that disagreements occurred- particularly when everyone was working 70 hour weeks.  In this environment, after being yelled and sworn at,  Beaudette's threw an inanimate object into an empty corner of a  room.   Given this evidence, a reasonable trier of fact could choose not to credit  the Defendant's claim that this was an intolerable act of violence.

A reasonable trier of fact could also find that the claim that the Defendant acted upon concerns from other employees, without considering Beaudette's mental impairments, to be false. As was explained above, the Defendant has mis-stated the content and context of these complaints.   None of the employees claimed to have feared Beaudette - as the Defendant claims. Instead, their  complaints involved concerns about his mental impairment, and fears that he might not be taking his medication.

---

[50]  Reindl was not disciplined for this.

36

In addition to the substantial evidence of the falsity of the Defendant's various stated reasons for terminating Beaudette, this case involves an unexplained failure to follow company policies. Carlton admitted that the Company had policies and procedures for fitness for duty exams, and that such exams were typically utilized for, "violation of a safe work practice, suspicion that there is an unfitness for duty". (Ex. 10 at 30) Although each of the alleged decision makers indicated that a fear of future violence was one of the primary reasons for the Plaintiff's termination, he was not sent for a fitness for duty exam. Carlton was unable to explain why no fitness for duty exam was requested. (Id. at 30-32) Since a failure to follow an organization's stated policies or routine procedures can be evidence of pretext, summary judgement should be denied. See: Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir.1997); Zahorik v. Cornell University, 729 F.2d 85, 93 (2d Cir.1984).

There is also substantial evidence from which a jury could conclude that the there was discriminatory animus. Bofman and Carlton disciplined Beaudette for asking for help and for misunderstanding unclear directions- despite knowing that Beaudette had mental impairments that impacted his ability to learn and concentrate. Carlton cut Beaudette off in a disciplinary meeting involving a failure to understand directions- not even permitting him to speak of his disability. Reasonable accommodation requests, from both Beaudette and Reindl, were repeatedly rejected. In addition, both Carlton and Lavigne lied about their knowledge of the Plaintiff's disabilities- falsely claiming that they were unaware of his mental impairments. A reasonable trier of fact could find that this was an attempt to hide the discriminatory nature of the decision.

Finally, the timing of the termination is suspicious. The Defendant did not terminate the Plaintiff immediately after the hard hat incident. Instead, the Defendant initially suspended him pending investigation. The termination decision was not made until after the Plaintiff produced

a letter indicating he had gone to a mental health professional about the incident.

In sum, the evidence-viewed in the light most favorable to the Plaintiff indicates that the Defendant: (1) refused to accommodate the Plaintiff; (2) refused to listen to him when he mentioned his disabilities or asked for accommodation; (3) disciplined him  for conduct which was arguably disability related; (4) lied about the severity of fault of the Plaintiff with respect to his disability- related mistakes; (5) lied about wanting to have a fitness for duty examination upon learning he had ADD; (6) refused to consider accommodations when so advised by Nurse Beaudry, and falsely denied that the conversation had taken place; (7) lied about knowing about the Plaintiff's  diagnosis; (8) lied about the content of co-worker complaints; (9) failed to investigate the co-worker complaints; (10) failed to investigate the hard hat incident; (11) terminated him shortly  after learning that he had gone to see a doctor about his disability and would be providing further information; (12) terminated him without a fitness for duty exam despite a policy of giving exams under such circumstances; (13) lied about knowing that co-worker fears were related to stereotypes about persons with mental disabilities; and  (14) repeatedly provided false and shifting explanations for the termination.    Under these circumstances, a reasonable jury could find pretext.  Accordingly, the Defendant's motion for summary judgement must be denied.

C.    A Reasonable Jury Could Conclude that the Defendant Violated the
       Americans With Disabilities Act

The Defendant contends that summary judgement must be granted with respect to the

ADA claim because the Plaintiff is not disabled within the meaning of the Act[51].   (Def's  Memo

at 19-22) This is incorrect.

The ADA defines a disability, in relevant part, as,

(A) a physical or mental impairment that substantially limits one or more of the major life
activities of an individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

In <u>Bragdon v. Abbott</u> , 524 U.S. 624, 632-633 (1998),  the Supreme Court explained that

the determination of disability status under the ADA, involves three steps: (1) the determination

---

[51]  It is clear that under the ADA, like CFEPA , the Plaintiff must be able to make out a
prima facie case and show that a reasonable jury could conclude that the stated reason for the
termination is pretextual.   There is, however, one important difference between the ADA and
CFEPA.   Under the ADA it is clear that even if the record evidence established that Michael
Beaudette posed a significant risk of substantial harm to his co-workers- which it clearly does
not- summary judgement could only be granted if it were also clear that no accommodation could
have permitted the Plaintiff to perform the essential functions of his position.  <u>Lovejoy-Wilson</u>,
263 F.3d. at 217.

The Plaintiff has produced expert testimony,  through Dr.  Selig, that impulsive acts, like
the throwing of the hard hat are a feature of the Plaintiff's anxiety disorder, and that the
workplace stress exacerbated this anxiety.   The Plaintiff also produced evidence  that he asked
the Defendant for accommodations because of the stress and anxiety related to his mental
impairments- including asking for time off and/or for a break.   Modified work schedules or
adjustments to the work environment or the circumstances under which the work is customarily
performed are reasonable accommodations,  See: 24 U.S.C. §12111(9)(b); 29 CFR
1630.2(o)(1)(ii); and the  Defendant has not claimed that granting the requested accommodations
would have been an undue hardship.    Under these circumstances a reasonable jury could
conclude that the Plaintiff would not have thrown the hard hat if his request for accommodations
had been granted and could similarly find that he could perform the essential functions of his
position with a reasonable accommodation.

of whether the Plaintiff has an impairment: (2) whether the activity that the Plaintiff relies upon constitutes a major life activity under the ADA, and (3) the determination of whether the impairment substantially limited the major life activity. See: Lajeunesse v. Great Atlantic and Pacific Tea Co. Inc., 160 F.Sup.2d 324, 330-331 (D. Conn. 2001); citing Colwell v. Suffolk County Police Dept., 158 F.3d 635, 641 (2d Cir. 1998). cert denied 526 U.S. 1018 (1999) Because the existence of a disability must be determined on a case-by case basis, the critical inquiry is how the individual was actually impacted by the condition. See: Alberston's Inc. v. Kirkingburg, 527 U.S. 555, 566 (1999).

The Defendant apparently does not dispute that the Plaintiff has mental impairments which impact major life activities[52]. Instead, the Defendant contends that no reasonable jury, even viewing the facts in the light most favorable to the Plaintiff, could find that the Plaintiff was substantially limited with respect to any major life activity. (See Defendant's Memorandum at 19-21) The term "substantially limited" has been defined as, either unable to perform a major life function or significantly restricted in the duration, manner or condition under which the individual can perform that function as compared to the average person. 29 C.F.R. 1630.2(j). The United States Supreme Court, in Toyota Motor Mfg. Ky.,Inc. v. Williams, 534 U.S. 184,

_____

[52]Indeed, the Defendant could not do so. The Plaintiff has been diagnosed by both Dr. Selig and Dr. Zeman as suffering from Generalized Anxiety Disorder and Panic Disorder with Agoraphobia. These are clearly mental impairments within the meaning of the ADA. Dr. Selig has testified that the major life activities impacted include: sleeping, learning, thinking and concentrating. Each of these have been identified as major life activities. 29 C.F.R. 1630(2)(i); 2 EEOC Compliance Manual§902.3(b); Colwell v. Suffolk County Police Dept., 158 F.3d. 635, 643 (2nd Cir. 1998); EEOC v. J.B. Hunt Transport, Inc., 128 F. Supp. 2d. 117, 132 (NDNY 2001) aff'd 321 F.3d 69 (2nd. Cir. 2003).

196-197 (2002), has also explained that,

> substantially" in the phrase "substantially limits" suggests "considerable" or "to
> a large degree.".... The word "substantial" thus clearly precludes  impairments that
>  interfere in only a minor way.

Id.

     In determining whether or not the individual is substantially limited, the effect of any

mitigating measures, must be taken into account.  Sutton v. United Airlines Inc., 527 U.S. 184,

197 (1999).  Furthermore, the determination of whether an individual, even with mitigating

measures is substantially limited should be based not on the diagnosis, "but rather on the effect of

that impairment on the life of the individual".   Albertson's Inc., 527 U.S. at 566, (citations

omitted); Sutton, 527 U.S. at 482.[53]   Finally,

> [d]etermining how well the average person in the general population performs
> any given major life activity and whether the plaintiff .... is unable to perform
>  or is significantly restricted in performing a major life activity involves weighing
> evidence and assessing credibility of witnesses, tasks historically given to the jury.'

Bristol v. Board of County Commissioners, 281 F.3d. 1148, 1158 ((10th Cir. 1 2002), *rev'd in*

*part on other grounds* 312 F.3d. 1213 (10th Cir. 2002), quoting 29 C.F.R. 1630 (2)(j).

     Accordingly, the issue is whether or not a reasonable jury could conclude that the

Plaintiff, with medication and treatment,  was still significantly restricted  with respect to any

---

[53]  Other factors to be considered include:
(1) the nature and severity of the impairment;
(2) the duration or expected duration of the impairment; and
(3) the permanent or long term impact, or the expected permanent or long term impact of
    the impairment.

29 C.F.R. §1630.2(j)(2).

major life activity as compared to the average person.   The medical testimony and other

evidence shows even with mitigating measures- the Plaintiff was substantially limited with

respect to the major life activities of sleeping, and learning, thinking and concentrating as

compared to the average person.      With respect to the major life activity of sleeping, the

Plaintiff's medical records indicate that  despite medical treatment and medication, the Plaintiff

has suffered from insomnia for  years, and that this impairment is severe.  In fact, the records

indicate that the  Plaintiff sometimes goes for  several days without sleeping at all.   The Plaintiff

has produced an affidavit confirming these restrictions.    The Plaintiff has also produced expert

medical testimony that he is substantially limited in his ability to sleep as compared to the

average person.   (Ex. 2 at 32,44; Ex. 6 )   Since a reasonable trier of fact could  find that the

average person does not regularly have insomnia severe enough to keep him awake all night, and

occasionally severe enough to keep him awake for days at a time, this evidence is sufficient.

See: Colwell v. Suffolk County Police Department, 153 F.3d. at, 644 (noting that with respect to

sleep, plaintiff must show that difficulties with respect to sleep "are worse than is suffered by a

large portion of the nation's adult population").  Thus, a reasonable jury  could find that the

Plaintiff was disabled within the meaning of the ADA due to the long-term, significant

restrictions on his ability to sleep.

     A reasonable trier of fact could also find that the Plaintiff had substantial impairments

with respect to his ability to learn, think,  and/or  concentrate due to his mental impairments.

While the record evidence indicates that  Beaudette was capable of learning, thinking, and

concentrating, it also indicates serious and persistent problems in these areas.     He had difficulty

in school as a child.   While he was able to complete an undergraduate degree, he was not able to

do so within the average four year time period.  Instead, it took him seven  years.    The medical

records for a two year period confirm  the Plaintiff's difficulties  learning and/or concentrating

despite medication and treatment.   (See Ex. 4,5)

       The expert testimony confirms that these difficulties render the Plaintiff substantially

limited with respect to concentrating, thinking and learning as comparted to the average person.

With medication and self-accommodations, he was able to learn but as Dr. Selig testified,

> [w]hen put in a situation where he needs to learn something, his anxiety
> increases and impairs his ability to sufficiently think straight and focus and be
> able to pay attention and understand what it is that he's being taught because
> of the increase in his anxiety....  When his anxiety is high, and it is high even when
> he's in treatment, even when he's being medicated, he had problems with thinking
> and his mind may go blank or he may have trouble where he has trouble tracking
> his thoughts which is a well-known and understood symptom of an anxiety disorder.

(Ex. 2 at 32-33)  Dr. Selig also explained that when the Plaintiff is under stress, such as when he

is in a classroom setting or working long hours, he would, "have to exert especially high effort

and determination to do what the rest of us can do with much less effort much more normally".

(Ex. 2 at 34-35)

        Finally, the Plaintiff has produced an affidavit specifically explaining the limitations that

he has with respect to learning, thinking and concentrating.   He has explained that he is only

able to learn by making heroic efforts on his own time- tracing and retracing systems by hand,

writing out the steps,  and then creating tests and flashcards.    A reasonable trier of fact could

find that these restrictions are substantial.  See: Davidson v. Midelfort Clinic, Inc., 133 F.3d.

499, 510 (7th Cir. 1998) (noting that jury could infer substantial limitation where there was

evidence of a history of impediments to learning, combined with specific testimony about the ways in which the limitations manifested themselves and the ways in which the plaintiff compensated).  Since there is substantial evidence that  Beaudette had long-standing, significant problems learning, thinking, concentrating,  and sleeping, a reasonable jury could find that he is disabled within the meaning of the ADA. [54]  Summary judgement must therefore be denied.

    In addition, a reasonable jury could find that the Plaintiff had a record of a disability within the meaning of the ADA.   The "record of impairment" category refers to plaintiffs who

---

[54]  In claiming otherwise, the  Defendant  suggests that: (1) the Plaintiff's panic disorder does not render him disabled because  he has not had  a panic attack for many years, was able to learn the material and become certified; and did not need an accommodation to perform his job after learning the material; (2) the Plaintiff's ADD can not render him disabled because  several courts have held that ADD is not a disability within the meaning of the ADA; and (3) the Plaintiff's Generalized Anxiety Disorder can not render him disabled because most people have difficulty in stressful situations and there was no evidence that Plaintiff was unable to perform  as compared with the general population.  (See Defendant's Memorandum at 20-21) These claims are either incorrect or simply beside the point.

    First, the frequency of his panic attacks is not determinative.  It is the impact his panic disorder and anxiety have on his ability to sleep, learn, and concentrate that render him disabled. Furthermore that fact that the Plaintiff testified that he was capable of learning is not dispositive. As was explained above, the ADA  protects not  only those employees who are totally incapable of performing a major life activity, but also those who are significantly restricted.  Third, none of the cases cited by the Defendant actually stand for the proposition that ADD or ADHD can never be a disability within the meaning of the ADA.  Instead, these are cases in which the plaintiff failed to show any restrictions in his ability to learn.  See: Calef, 322 F.3d. at 84-86 (no evidence of difficulty in these areas in the plaintiff's everyday life); Wright v. Comp USA, Inc., 352 F.3d. 472, 476 (1st Cir. 2003);  Davidson v. Midelfort Clinic Inc., 133 F.3d. 499, 509 (7th Cir. 1998); Spychalsky v. Sullivan, 2003 WL 22071602 at *8-9 (EDNY 2003); Doebele v. Sprint/United Management Co., 342 F.3d. 1117, 1131(10th Cir. 2003).   Finally, while it is true that most people find stress difficult, Beaudette has far greater limitations.   Beaudette has  trouble thinking straight  or understanding what he is being taught when he is anxious.   He is unable to track his thoughts and his mind will go blank.  He may be unable to sleep for days at a time.   A reasonable jury could find that these are significant restrictions.

have a history of or who have been mis-classified has having an impairment that substantially limits major life activities.  29 C.F.R. §1630.2(k).   The impairment listed must  be one that would substantially limit one or more major life activities.  Id.   The Plaintiff must also prove that the Defendant was aware of the record in question.   Id.  See Also: <u>DeMar v. Car-Freshner Corp.</u>, 49 F. Supp. 2d. 84, 93 (NDNY 1999).

The Plaintiff had a history of and/or was misclassified as having ADHD.   The Defendant was aware of this history.[55]   Thus, the only question is whether or not a reasonable jury could conclude that the ADHD was the type of impairment that would  limit one or more major life activities.    In the present case, a reasonable jury could find that the Plaintiff disclosed an impairment that substantially limited the major life activities of learning and concentrating.   As was explained above, Bofman believed that, "a person with this condition has difficulties absorbing information, paying attention".  (Bofman Depo Ex. I at 18-19) The Defendant  was also aware of the Plaintiff's specific limitations  because the Plaintiff reported them.  After the lockout/tagout incident, the Plaintiff  reported that his ADHD, and the medication he was on,  was causing him to have difficulties thinking and concentrating.  He explained to Bofman that he was  having trouble concentrating, and told Bofman, Carlton and Lavigne that his, "head was spinning" and he "didn't know if he was coming or going". (Ex. A; Beaudette Depo Ex. B at 47-49) Later he went  Bofman and again reported his concerns about concentration- explaining his forgetfulness with respect to wearing a seatbelt concerned him.

---

[55] The Plaintiff told Bofman, Carlton and Lavigne of his diagnosis.   He provided copies of the medications he was taking.  In fact, there are several "records" that note his diagnosis. (See Exs.15, 17, 25)

The Plaintiff also reported his difficulties learning on several occasions.   On one occasion he specifically told Bofman  that he learned differently than other people, that he was having problems learning the material and that it was taking him a long time at home.   He even showed Bofman the materials that he used to help him learn.   Under these circumstances a reasonable trier of fact could find that the Plaintiff had a record of a disability within the meaning of the ADA.    See: <u>Davidson</u>, 133 F.3d. at 510;   <u>Lawson v. CSX Transportation Inc.</u>, 245 F.3d. 916, 927 (7th Cir. 2001); <u>Murray v. Surgical Specialties Corp.</u>, 1999 WL 46583 at *4-5 (ED Pa. 1999).

The Plaintiff has produced evidence that during the relevant time period, he was significantly restricted with respect to the time, manner and/or  condition under  which he could sleep, learn, think and concentrate as compared to the average person.   In the alternative, he has produced evidence that he had a record of such limiting impairments, and that the Defendant was aware both of the condition and the substantial limitation it caused.    Accordingly, the Defendant's motion for summary judgement as to the ADA claim  must be denied.

## V.     <u>CONCLUSION</u>

For all of the foregoing reasons, the Plaintiff, Michael Beaudette,  respectfully requests that the Court deny the Defendant's  Motion for Summary Judgment in its entirety.

<div style="margin-left: 40%;">

RESPECTFULLY SUBMITTED,
THE PLAINTIFF

By:     _____
        Mary E. Kelly ct# 07419
        Gregg D. Adler ct#05698
        Livingston, Adler, Pulda,
        Meiklejohn & Kelly, P.C.
        557 Prospect Avenue
        Hartford, CT 06105-2922
        (860) 233-9821

</div>

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment has been mailed first-class, postage pre-paid on this 21st day of September, 2004 to the following counsel of record:

Claudia T. Centomini
James W. Bucking
Foley, Hoag, LLP
155 Seaport Boulevard
Boston, MA 02210-2600

Michael S. Taylor
Daniel J. Krisch
Horton, Shields & Knox, P.C.
90 Gillett Street
Hartford, CT 06105


_____
Mary E. Kelly