## UNITED STATE DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | : | CIVIL ACTION NO: |
| MICHAEL BEAUDETTE, | : | 3:03 CV 0899 (RNC) |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| PG&E NATIONAL ENERGY GROUP, INC. | : | |
| Defendant | : | |
| | : | September 21, 2004 |

## PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT
## IN SUPPORT OF MEMORANDUM OPPOSING SUMMARY JUDGMENT

The plaintiff provides the following statements of material facts in dispute, pursuant to D. Conn. L. Civ. R. 56(a)2.

I.    PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

1.    Michael Beaudette is an individual who has had a long history of mental disorders impacting his ability to learn, concentrate, think, sleep and interact with others. (Affidavit of Michael Beaudette, attached hereto as Exhibit 1 at ¶; 4[1] Deposition Testimony of Kenneth Selig, M.D. J.D., attached hereto as Exhibit 2 at 32 [2])

2.    From early childhood, Beaudette had difficulty learning in school . (Beaudette Aff.¶ 5 ; Selig Depo at 38; Deposition Testimony of Michael Beaudette attached hereto as Exhibit 3 at 59-60 [3]; Medical Records of Dr. Rothman attached hereto as Exhibit 4 dated 4/23/03 [4]) He had difficulty sitting still and difficulty concentrating in the classroom. (Beaudette Aff.¶

---

[1] Hereinafter cited as "Beaudette Aff ¶ ___".

[2] Hereinafter cited as "Selig Depo. at p. ___."

[3] Hereinafter cited as "Beaudette Depo. at p. ___."

[4] Hereinafter cited as "Rothman Records at at ___."

5; Selig Depo at 38.; Rothman Records at 4/23/03)  He was diagnosed as hyperactive by a family physician.  (Beaudette Aff.¶  6)   Beaudette had particular difficulty with reading, and could read only slowly and painstakingly.    (Beaudette Aff.¶ 5; Selig Depo at 38;  Medical Records of Dr. Deering attached hereto as Exhibit 5 dated 4/23/00 [5] )  Moreover,  he would often find that he could not recall what he had just read.  (Beaudette Aff.¶ 5 ; Beaudette Depo. at 60-61)  In order to learn a subject,  Beaudette required extra time and/or tutors.   (Beaudette Aff.¶  5; Rothman Records  at 4/23/00) He was able to complete High  School, but graduated with mostly C's and D's.  (Beaudette Aff.¶  5;  Deering Records  at 4/27/00).

3.       In 1977, Beaudette began attending community college.  (Beaudette Aff.¶ 7)   He continued to have difficulty learning, particularly with respect to his ability to concentrate. (Beaudette Aff.¶ 7)   He felt a great deal of anxiety  in  class room settings which made it difficult to focus on the material.   (Beaudette Aff.¶ 7)  While he had initially considered a degree in science, he found the course work too difficult and transferred to a liberal arts course of study. (Beaudette Aff.¶ 7)

4.       Beaudette eventually developed study strategies that made it possible for him to learn. (Beaudette Aff.¶  8; Beaudette Depo  at 38)   However, even using these strategies it  took him much longer to learn the material.  (Beaudette Aff.¶ 8)   By using these strategies, and by taking only a few courses at a time, Beaudette was able to receive his Associates degree. (Beaudette Aff.¶  8) However, doing so took enormous effort, and many years.  He finally received his degree in 1984.   (Beaudette Aff.¶   ; Beaudette Depo  at 8)

5.       Beaudette subsequently attended  Worcester College, and began a certificate

---

[5]Hereinafter cited as "Deering Records at  at  ___."

program at Northeastern, but did not complete either program.   (Beaudette Aff.¶ 9)

6.      Beaudette  also had significant problems with anxiety outside of the classroom.

 He began experiencing panic attacks in 1981, when he was approximately 21 years old.

(Beaudette Aff.¶ 10)  These began occurring more frequently during his early twenties.

(Beaudette Aff.¶ 10) These panic attacks and the anxiety surrounding them had a profound

impact on his life.   Beaudette began to avoid situations in which he feared he would have a panic

attack or in which he might be particularly  embarrassed by a panic attack.  (Beaudette Aff.¶ 10;

Report of Dr.  Selig attached hereto as Exhibit 6[6]).   His anxiety reached a point where it was

difficult for him to socialize without drinking alcohol or otherwise self-medicating.   (Beaudette

Aff.¶ 10)      Eventually, Beaudette developed severe agoraphobia.   (Selig Report)   He also

had difficulty sleeping and with controlling impulsive behavior during this period.     (Beaudette

Aff.¶ 11)      He  would often go for a day or more without being able to sleep.      (Beaudette

Aff.¶ 10)      He had occasions where he got involved in  verbal disputes- particularly when

driving.    (Beaudette Aff.¶ 10)

7.      In the mid to late 80's with treatment and medication,  Beaudette began to get

 better control over these symptoms. (Beaudette Aff.¶ 11)    He had fewer problems with

agoraphobia and reduced his panic attacks. (Beaudette Aff.¶ 11)      Medication also significantly

reduced his  impulsive conduct.  (Beaudette Aff.¶ 11)

8.      In the 1990's Beaudette  married and began to raise a family.   (Beaudette Aff.¶

12)  He worked as a laborer, and other than having to write  down  any  instruction was able to

perform the duties of the job without accommodations.  (Beaudette Aff.¶ 12)  However, he

_____

[6] Hereinafter cited to as  "Selig Report at p. _____".

3

continued to have  anxiety and difficulty sleeping and concentrating.  (Beaudette Aff.¶ 12)

9.      In February 2000,  Beaudette applied for work with the Defendant. (Beaudette Aff.¶ 13)   He did not have any experience in the power plant field, and informed the Defendant of this fact.  (Beaudette Aff.¶ 13; Beaudette Depo at 118-120)    Knowing that he had a history of problems with learning and concentrating, Mr. Beaudette asked whether he would be taught the skills necessary for the job.  (Beaudette Aff.¶ 13)  The Defendant told him that he would, explaining that, "they start off showing what happens when you rub two sticks together, and they take it right along".  (Beaudette Depo at 118-120; 208)  Despite his lack of experience the Defendant offered Beaudette a position an Operations and Maintenance Technician.  (Beaudette Aff.¶ 13)  The Defendant informed Beaudette that this was because of his intelligence, initiative, enthusiasm, and strong work ethic.  (Beaudette Aff.¶ 13)  At the time that these statements were made, the Defendant had no knowledge of Beaudette's disability.  (Beaudette Aff.¶ 13)

10.     Beaudette's  employment with the Defendant began  July 31 2000. (Beaudette Aff.¶ 14)

11.     Beaudette was sent for a pre-employment medical exam to determine if he was capable of performing the essential functions of the position. (Beaudette  Aff.¶  15)        During this exam, he disclosed that he was taking Paxil and Xanex for anxiety.   (Beaudette  Aff.¶ 15) The physician, who the Defendant had provided with a list of requirements for the position, found that he was  qualified to perform the duties of the position.   (Beaudette  Aff.¶15; See Ex. 7)

12.     When Beaudette began work he was required to go through a lengthy training course, during which the employees were expected to learn large volumes of material in a classroom setting. (Beaudette  Aff.¶ 16)  Despite his medication,  Beaudette had a great deal of

4

difficulty concentrating in this setting.  (Beaudette  Aff.¶ 16;  Rothman Records  at

4/23/03;1/11/01)    He was anxious and fidgety, and found himself unable to restrain himself from

repeatedly asking questions and blurting out his thoughts.  (Beaudette  Aff.¶ 16;  Rothman

Records  at 4/23/03)    He had to take frequent bathroom breaks in order to leave the class and

calm down.  (Beaudette  Aff.¶  16)    Beaudette understood that these  anxiety-related behaviors

were probably annoying to  his employer and co-workers.  (Beaudette  Aff.¶ 17)    This awareness

made him more anxious,  making it even more difficult  to concentrate and learn the material.

(Beaudette  Aff.¶  17)

13.      During the Fall of 2000,  Beaudette  approached James Carlton, the Defendant's

General Manager, to discuss the difficulties he was having.  (Beaudette  Aff.¶ 18)   Carlton

refused to discuss Beaudette's difficulties, telling him to  speak to Operations Manager Tim

Bofman.   (Beaudette  Aff.¶ 18)

14.      On the following day, Beaudette spoke to Bofman.  (Beaudette  Aff.¶ 19)

Beaudette told  Bofman that he was having trouble staying still and not asking too many

questions.  (Beaudette  Aff.¶  19)   While he did not provide Bofman with a diagnosis, he told him

that his difficulties were due to anxiety.  (Beaudette  Aff.¶  19)   Bofman  suggested that he

contact the Defendant's EAP program. (Beaudette  Aff.¶ 19)  It is clear that Bofman understood

that the Plaintiff was complaining about anxiety.   In fact, the Defendant's Human Resources

Official,  Heidi Lavigne testified that Bofman told her that he had recommended EAP because the

Plaintiff was having problems with anxiety and job stress.   (Deposition of Heidi Lavigne attached

hereto as Exhibit 8 at 23-24[7])

_____

[7]  Hereinafter cited as "Lavigne Depo at ____".

5

15.     Beaudette was unable to get an EAP referral, and instead found a doctor on his

own.  (Beaudette  Aff.¶ 20)  He began treatment with  Dr. Jonathan Rothman, a psychiatrist who

gave him  a preliminary diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD").

(Beaudette  Aff.¶ 20;  Rothman Records  at 4/23/03)

16.     On or about November 17, 2000,  Bofman criticized  Beaudette for asking for

 help with a computer problem.  (Beaudette  Aff.¶  21; Beaudette Depo  at  122-123)    Beaudette

explained that he had ADHD, and  was having some difficulties.  Beaudette  Aff.¶  21)

17.     Bofman  knew that a person with ADD or ADHD would have difficulty absorbing

 information and paying attention.   (Deposition of Tim Bofman attached hereto as Exhibit 9 at 11;

15-19[8])  Despite this, Bofman did not discuss any potential accommodations for  Beaudette.

(Beaudette  Aff.¶ 21)

18.     On or about November 2000 Beaudette also told Bofman that he had been prescribed

medication for ADHD.  (Beaudette  Aff.¶  22)  He explained that he was concerned about how

the medication would impact him, and wanted to delay starting the medication until he had a few

days off in a row.  (Beaudette  Aff.¶  22)  Bofman told Beaudette to bring him information about

the prescriptions.    (Bofman Depo  at 20)

19.     Bofman immediately reported Beaudette's diagnosis to Carlton and Lavigne.

 (Bofman Depo  at 21)  Lavigne and Carlton have falsely denied this, claiming that they did not

know at the time that Mike Beaudette had ADD or ADHD.  (Lavigne Depo at 15-16; 19-20;23-25;

37-39; Deposition of James Carlton attached hereto as Ex. 10 at 25, 29[9] )

---

[8]  Hereinafter cited as "Bofman Depo at p. ____".

[9]  Hereinafter cited to as "Carlton Depo at p. ___"

20.     Lavigne promptly contacted the medical  facility that had  conducted the Defendant's fitness for duty exams.   (Deposition of Nancy Beaudry attached hereto as Exhibit 11 at 14, 16[10])   Lavigne  reported that  Beaudette had attention deficit disorder and was taking medication for the condition.   (Beaudry Depo  at 16)   Lavigne asked Nurse Beaudry if Beaudette had disclosed this condition  during his pre-employment physical.   (Beaudry Depo at 16)   She also indicated that the Defendant wanted  Beaudette evaluated for safety reasons.  (Beaudry Depo at 14-15)   Beaudry informed Lavigne of the Americans with Disabilities Act, and explained that the Defendant should  have  Beaudette's treating physician review the job description and make recommendations with respect to possible accommodations.   (Beaudry Depo at 14-16)   The Defendant did not do so.    No exam was scheduled at that time. (Beaudry Depo  at 17)

21.     Lavigne has lied about having a conversation with Beaudry, and denied that she even  knew about the diagnosis at the time that the conversation took place. (Lavigne Depo at 15-16; 19-20; 23-25; 37-39)

22.     Beaudette gave Bofman information about his medications, and began to take the medication.   (Beaudette  Aff.¶ 23)

23.     Beaudette also began to inform his co- workers about his ADHD diagnosis  and the medications he was taking. (Beaudette  Aff.¶  23)   It eventually became a matter of common knowledge that Beaudette  had ADD or ADHD.  (Deposition of Joseph Reindl attached hereto as Ex. 12 at 64)[11]

24.     Beaudette was frequently teased about his condition by his co-workers.  (Beaudette  Aff.¶

---

[10]Hereinafter cited to as "Beaudry Depo at p. ____"

[11]  Hereinafter cited to as "Reindl Depo at p. ____"

23)  However, he did not become  angry or upset.  (Beaudette  Aff.¶  23) Instead, he told his co-workers that he was getting treatment so that he could be more effective at work. (Beaudette Aff.¶  23)

25.      On December 29, 2000,  Beaudette received his first performance review.  (Evaluation attached hereto as Exhibit 13)  His overall performance was rated as "needs improvement",  and specific concerns about his performance were noted.  (Ex. 13)   Most of the areas in which concerns were noted related to difficulties concentrating and learning.   (Ex. 13)

26.      During the next months Beaudette worked hard, and was  frequently praised for  his improved performance.  (Beaudette  Aff.¶  24)  On one occasion, Bofman referred to  him as "stupendous", and  said that he was doing an excellent job.  (Beaudette  Aff.¶ 24)

27.      In February 2001, the Plaintiff was disciplined for allegedly performing a  lockout/tagout procedure incorrectly.  (Beaudette  Aff.¶ 25)

28.       There were no written lockout/tagout procedures at that time.  (Bofman Depo at 75-76; Reindl Depo  at 76)     Beaudette was verbally told what to do.      (Beaudette  Aff.¶ 25) He was  told to identify all of the isolation points for locking out or tagging out systems on various pieces of equipment, and to  write down all of the number designations.  (Beaudette  Aff.¶ 25; Beaudette Depo  at  23-27)   However, because the plant was still in the construction stage, some identifications were not intended to be permanent.  (Beaudette  Aff.¶  25; Beaudette Depo at  23-27)  These temporary designations were written in marker or on tape.     (Id.)  Beaudette  had been  told to ignore any designations written in marker or on tape.     (Beaudette  Aff.¶    25; Beaudette Depo  at 23-27)  Beaudette did as he believed he had been told- writing down all of the number designations, except those written in

8

marker or on tape.    (Beaudette  Aff.¶ 25;  Beaudette Depo at 23-27)

29.      The failure to perform the procedure in the way that the Defendant apparently

 wanted it performed did not in any way involve a risk to safety.   (Reindl Depo  at 75-76)

30.      The Defendant claimed that Beaudette  had failed to follow instructions and had

 been insubordinate.     (Ex. 14)

31.      Beaudette  explained to Bofman that he had not been insubordinate, and that

 he had **thought** he was following  instructions.   (Beaudette  Aff.¶ 25)   He also told Bofman  that

he was very anxious and was having trouble concentrating.  (Beaudette  Aff.¶ 25)

32.      On or about February 13, 2001,   Beaudette met with Carlton, Bofman, and

 Lavigne about the alleged insubordination.  (Beaudette  Aff.¶  26; Minutes to 2/13/01 Suspension

Meeting attached hereto as Exhibit 15)   The Plaintiff reported again that he had been diagnosed

with anxiety and ADHD, and tried to tell them of the problems that he was having.    (Beaudette

Aff.¶  26 ; Ex. 15)   Beaudette explained that  he had been put on different medications for his

ADHD, and felt like his "head was spinning" and he "didn't know if he was coming or going".

(Beaudette Depo  at 47-49) Carlton cut him off- refusing to discuss the problems that Beaudette

was having.   (Beaudette  Aff.¶  26; Carlton Depo  at 26)   Carlton said that he did not want to

hear about it, and that ADD was not the issue.   (Id.; Beaudette Depo  at  48.) Carlton then

suspended Beaudette and  ordered him to write a paper explaining the importance of following

orders.  (Ex. 15)

33.      Lavigne and Carlton have lied and claimed that they did not know of the ADD or ADHD

 diagnosis- despite the fact that Defendant's own notes refer to the diagnosis.  (Carlton Depo at

25-26; 29; Lavigne Depo  at 15-16; 19-20; 23-25; 37-39; Ex. 15).

34.     Although Beaudette  was being falsely accused of insubordination and was

being ignored when he tried to explain about his diagnosis and need for help,  he did not get

angry or belligerent.  (Beaudette  Aff.¶ 27)   He signed the warning, accepted the suspension, and

wrote the paper.  (Beaudette  Aff.¶ 27)  In his paper, he set out what he would try to do to self-

accommodate. (Paper attached hereto as Exhibit 16)

35.      His action plan explained that he would ensure that he would not make further

mistakes by:

1.     Take three breaths and relax;
2.     Ask only the questions that need to be asked
3.     Listen, really listen
4.     If given instructions, listen, do not finish sentences, do not interrupt
5.     Write down instructions and repeat back to supervisor.  If unclear, ask for
       clarification.
6.     Once given instructions complete to the best of my ability as soon as possible, or
       otherwise directed
7.     If I experience problems go to my ABC co-ordinator only after I have tried
       to find the answer through conventional sources....
8.     Don't stray from the path unless directed by superiors.
       (Don't bother others unnecessarily).
9.     Find a corner, where ear plugs, don't get caught up in other
       People's conversations.  (Avoid distractions)
10.    Do not question everybody regarding every thing.
11.    If I feel like speaking, stop, think, refer to action #2.
12.    Make conscious decisions before acting.
13.    Prioritize.
14.    Read this list twice a day.

(Ex. 16)

36.    Although the Defendant refused to discuss Beaudette's disability or need for

accommodation, the Defendant **did** require that he undergo a fitness for duty exam.   (Beaudette

Aff.¶ 26; Minutes to 2/16/01 Suspension meeting attached as Exhibit 17)

37.     The Defendant made Beaudette undergo a fitness for duty exam because they

10

were concerned that he might be a risk to himself or others.   (Lavigne Depo at  27-28)

38.     The exam showed that Beaudette could perform the essential functions of the job.

(Lavigne Depo at 35)

39.     When Beaudette returned to work after his fitness for duty exam, he  began to

implement his  own method for learning.  (Beaudette Aff.¶ 28)   Beaudette went through each

training manual and outlined the systems, and then went  into the field and traced the system.

(Beaudette  Aff.¶  28)   He would write down any questions and ask them.  (Beaudette  Aff.¶ 28)

He would then write out an overview of this system, circulate it to the employees in charge to be

sure that it was correct.  (Beaudette  Aff.¶    28)     Once it was perfect,  he traced out the system,

and added notes and set point information.  (Beaudette  Aff.¶ 28)   He would then quiz himself,

make tests for himself and use flash cards to study.    (Beaudette  Aff.¶ 28)

40.     This learning system was very effective but very time consuming.    (Beaudette

 Aff.¶ 28)

41.     On or about March 19, 2001,  Beaudette  took all of his materials and went to

 talk to Bofman.  (Beaudette  Aff.¶ 29)   He explained his system, and that he was having

problems trying to learning all of this  at home.  (Beaudette  Aff.¶ 29)   He explained that he

learned differently than others, and asked that he be provided with some time during work hours

to learn.  (Beaudette  Aff.¶ 29)   Bofman refused to give Beaudette any extra help or extra time.

(Beaudette  Aff.¶ 29)  Bofman told  Beaudette that he admired all of his efforts, and that he was

doing a great job.  (Beaudette  Aff.¶ 29)

42.      Beaudette continued to work full time and to learn the  systems at home.

 (Beaudette  Aff.¶  29)

11

43. On September 10, 2001, Beaudette was told that he had to perform all of the shift duties (normally split between two employees). (Beaudette Aff.¶ 30) During the night he was also told to take a demineralization trailer off line. (Beaudette Aff.¶ 30) He had never done this before. (Beaudette Aff.¶ 30) The Defendant had no written procedures on how to perform the task. (Beaudette Aff.¶ 30) Beaudette had been verbally instructed on how to do this only once several weeks before. (Beaudette Aff.¶ 30)

44. The schematics that Beaudette was given were wrong. (Beaudette Aff.¶ 30; Reindl Depo at 74). He was given construction drawings even though changes had been made in the machinery during the process of building it. (Reindl Depo at 74)

45. The system itself was also very confusing. As leadman Joseph Reindl explained,

> [i]t was literally a menagerie of piping with nothing labeled,
> and then to top it off, everything was insulated and heat trace,
> so you really had trouble tracing it out. There wasn't any
> training on how to operate the system, other than tribal knowledge.
> One guy saying, well I did it this way the last time and it worked.
> There was nothing, no documented training, no procedure, and it
> was a very, very difficult system to trace out. A very simple system,
> but very difficult to trace out without having valves labeled and such.

(Reindl Depo at 73-74)

46. In addition, one of the valves was not operable. (Bofman Depo at 82-83)

47. Beaudette, trying to perform his tasks in a dimly lit area, neglected to close a valve, and raw water contaminated the Demin water tank. (Beaudette Aff.¶ 30; The plant had to be shut down.

48. If the valve had been operable, the tank would not have been contaminated by Beaudette's

failure to close a valve.  (Bofman Depo  at 82-83)

49.     The next morning Reindl went to Bofman and explained that Beaudette was struggling, and was having  trouble remembering the different systems.   (Reindl Depo  at 32-34) Reindl told Bofman that  Beaudette, "had so much to offer, but he was having trouble".   (Id)

50.     Reindl asked for accommodations for Beaudette, suggesting that the Defendant either put another person on the night shift to help him  or transfer him   temporarily to an open maintenance role, and bring him back into operations when things slowed down.   (Statement by Reindl attached hereto as Ex. 18; Reindl Depo   at 34; 62-64)

51.     Bofman refused to discuss any accommodations; telling Reindl that the mistake was not a big deal, and that when he was  new to power plants, he made mistakes too.   (Reindl Depo  at 34)

52.     Although Bofman told Reindl it was not a big deal, the Defendant gave Beaudette  a written warning for the Demin tank incident  telling him to be more careful and to double-check his work.   (2/24/01 Discipline Notice attached hereto as Ex. 19)

53.     While Beaudette  thought the discipline for the Demin tank incident was unfair, he accepted it.   (Beaudette Depo at 31-33)   He did not get angry, violent or  or belligerent. Instead,  he wrote up standard operating procedures for the demineralized water tanks. (Beaudette Depo at 32; Bofman Depo  at 81-82).   Bofman admitted that  Beaudette  responded positively to the discipline.  (Bofman Depo  at 83)

54.     Shortly after the Demin Tank incident,  Beaudette  talked to Bofman himself, asking again for more time to learn and/or more training. (Beaudette Aff.¶ 31)    His request was rejected. (Beaudette  Aff.¶ 31)     Instead, Bofman assured Beaudette that he was doing fine  and

13

told him not to worry about it.  (Beaudette  Aff.¶ 31)

55.      Beaudette continued to spend most of his free time trying to memorize the

various  systems.   (Beaudette  Aff.¶ 31)

56.      During the weeks after the Demin tank incident, the plaintiff's co-workers began

to talk openly about their concerns about his mental condition.  (Reindl Depo  at 64)  Co-worker

Larry Alice went to Reindl and expressed concern that   Beaudette might not be  taking his

medication.  (Reindl Depo  at 65-66)  Larry Alice, Bruce Carr and Reindl discussed going to

management with their concerns about whether or not Beaudette was taking his medication every

day, but ultimately decided not to do so.  (Reindl Depo  at 65-66)

57.     In October 2001,  Beaudette  forgot to wear a seatbelt on a  forklift twice in one

day.  (Beaudette  Aff.¶  33)   He was concerned that this forgetfulness was related to his mental

impairments.  (Beaudette  Aff.¶ 33)     He went to Bofman and told him about his concerns,

explaining that his forgetfulness scared him.  (Beaudette  Aff.¶ 33)   Once again, Bofman

shrugged off the concern, assuring  Beaudette that he was not worried about the

absentmindedness.   (Beaudette  Aff.¶ 33; Beaudette Depo  at 34-35)  He also told Beaudette  to

wear a seatbelt, explaining that they needed to set an example for the trades.   (Beaudette  Aff.¶

33)  He  removed Beaudette from the forklift operator list for three days  until he was retrained.

(Beaudette  Aff.¶ 33)

58.     On or about November 30, 2001, Beaudette received his annual review.

(2001 Review attached hereto as Exhibit 20)     He  received an overall rating of "competent."

(Ex. 20)   The Summary Comments section of the review stated, *inter alia*, that Beaudette,

          "is a steady, hard worker.  He is tireless in learning the plant and

> the processes.   What [he] lacks in experience in the field he makes
> up for in motivation to learn and strong desire to succeed. ... Mike
> has a very positive attitude and is fun to work around.

(Ex. 20)  The Defendant did not express any concerns that Beaudette was unable to perform the

essential duties of his position or was otherwise not qualified.  (Ex. 20)

59.     From December 2001 through February 2002, Defendant began requiring that  all of its

employees work overtime.  Beaudette was working over 70 hours per week.   (Beaudette  Aff.¶

34)

60.     The Defendant suggests that these types of long hours were essential functions

 of the position.   However, Defendant's records show that  mandatory overtime was moderate and

not frequent. (See Ex. 7)

61.     Beaudette was still trying to learn various processes at home, and was

 worried that  he did not understand all of the processes well enough, and might make a mistake.

(Beaudette  Aff.¶ 35)   He began to have even more trouble sleeping, which increased his anxiety.

 (Beaudette  Aff.¶ 35)

62.      On February 5, 2002, Beaudette  spoke to Bofman about his  anxiety.

 (Beaudette  Aff.¶ 36)    He told Bofman that he was afraid he would "go off" on someone or

walk off  the job, explaining,

> I was just so stressed, mentally stressed, hadn't been sleeping I was
> totally consumed with the job.  I was – I couldn't slow down.  I couldn't relax"

(Beaudette Depo  at 35-36)

63.     Beaudette asked Bofman  for a break- either time off or time away from the stress.

(Beaudette  Aff.¶  36; Beaudette Depo  at 37-38)   Bofman refused to discuss accommodations,

telling Beaudette he was doing a great job, that everyone was under stress, and that things would

change and get better when the commission turned over. (Beaudette Aff.¶ 36; Beaudette Depo

at 37-38; Bofman Depo at 74-75) Bofman told Beaudette to, "maintain control".  (Bofman

Depo at 74-75) Beaudette also told his co-workers, including Reindl and Carr how he felt,

including that he felt overwhelmed, and that he might "go off".    (Beaudette Depo at 38)

64.    The next day Beaudette received a call from Reindl, asking if he would be willing

to work overtime.  (Beaudette Aff.¶ 38) Beaudette was just finishing a 12 hour shift, was

already scheduled to work a 72 hour week, and was feeling overwhelmed from the stress and

anxiety. (Beaudette Aff.¶ 38) He told Reindl that he did not want to work the overtime, but that

he would stay if Reindl really needed him.  (Beaudette Aff.¶ 38) When Reindl pushed him for a

yes or no answer, he said no. (Beaudette Aff.¶ 38)

65.    Later that evening, Beaudette had a further conversation with Reindl in the

control room regarding the overtime issue during which Reindl began to shout and swear at him.

(Beaudette Aff.¶ 39)

66.    Reindl explains,

> he came into the control room and he came up to me and said that he
> would work if I needed him to or something like that, and I got right in
> his face, and I said it's a simple F'ing question, it's a yes or a no answer
> and that kind of escalated things to the next level.  Something to that effect.

(Reindl Depo at 69)

67.    Reindl began to shout and swear at Beaudette and said words to the effect of "I

don't want to have to stroke you to get you to stay".  (Beaudette Aff. ¶ 39)

68.    When Reindl shouted at Beaudette, Beaudette shouted back.  (Beaudette Aff.39)

69.    Bofman made an attempt to diffuse the situation,

telling Beaudette to go to his locker. (Beaudette Aff. ¶ 39)

70.    While walking away, Beaudette  threw his hard hat against the wall.

(Beaudette Aff. ¶ 39)

71.    In throwing the hard hat, Beaudette did not intend to harm anyone.  (Beaudette

Aff. ¶ 40; Reindl Depo at 86)

72.    The throwing of the hard hat was  was an impulsive act of frustration. (Beaudette

Aff. ¶ 40; Reindl Depo at 86)   This was not an act of violence.   (Beaudette Aff. ¶ 40)   While

frustrated, Beaudette  was not out of control.  (Beaudette Aff. ¶ 40)

73.    Nobody was hurt.    (Beaudette Aff. ¶ 40)

74.    There was no risk of harm to anyone.   There were no people in the area in which

Beaudette threw the  hard hat.  (Beaudette Aff. ¶ 40)    It did not fly in the vicinity or pass near any

of the people in the room.   (Beaudette Aff. ¶ 40)  Reindl testified that it was not, "remotely

possible" that Beaudette could have hurt someone.  (Reindl Depo   46)  He stated,

> he has the arm of an All Star baseball player, and the direction he
> threw his hat, there was nobody standing there and it was pinpoint
> accuracy.  So there is no way that there was any danger of somebody
> being hurt.  And I specifically remember that.

(Reindl Depo at  47)

75.    There was no risk of harm to equipment.  (Beaudette Aff. ¶ 40; Reindl Depo at

47)  The Defendant claims a white board was dented.   No mark is  visible, however, in the

photographs produced by the Defendant.  (See Photographs attached hereto as Exhibit 21)   Reindl

testified that the Beaudette threw the hard hat away from all equipment, causing no damage.

(Reindl Depo at 47)

76.     As soon as the moment had passed,  Beaudette was calm.  (Beaudette Aff. ¶ 41

Ex. A; Bofman Depo   at 71) He  did not give Reindl a look of rage as he left.  (Beaudette Aff. ¶

40; Reindl Depo at 44,51)    He was co-operative when Bofman asked him to go to his locker,

gathered his belongings, and left voluntarily.   (Beaudette Aff. ¶ 41)   He did not argue or act in a

belligerent manner.   (Beaudette Aff. ¶ 41)

77.      Beaudette was suspended pending an investigation.  (Beaudette Aff. ¶ 42)

78.     Carlton  asked human resource official Karen Kinder to investigate the incident.

(Carlton Depo  at 19-21)   However, it is unclear what, if anything, Kinder did to investigate.

Carlton testified that she interviewed other individuals.   (Carlton Depo at 21)   However, there is

no evidence of this, and the only thing which Kinder was able to recall doing was meeting with

Beaudette.   (Deposition of Karen Kinder attached hereto as Exhibit 22 at 25-26[12])

79.     On February 11, 2002, Reindl, Larry Alice  and Bruce Carr again talked about

their concerns that  Beaudette might not be able to do his job because of his medical condition.

(Reindl Depo  at 79-81)

80.     Reindl believed that the stress in the plant was impacting the plaintiff because of

his mental disability.   (Reindl Depo  at 68)   He was concerned that if Beaudette came back and

nothing changed, there would be problems.  (Reindl Depo at 49-54; 67-68)

81.     Reindl, Carr and Alice  went to talk with Bofman about their concerns.  (Reindl

Depo  at 77,81,91)   These concerns were directly related to Beaudette's diagnosis and fears that

he might not be taking his medication.   (Reindl  Depo  at 49,54, 67-68; Affidavit of Bruce Carr

---

[12]  Hereinafter cited to as "Kinder Depo at  __".

attached hereto as Exhibit 23)   Carr told Reindl that they were concerned that Beaudette was not

retaining information and might not be taking his medication.   (Ex. 23)   While Reindl cannot

recall specifically mentioning that his concerns were related to  Beaudette's ADHD, he testified

that he believed Bofman understood that this was the basis for the conversation and the basis for

the concerns.   (Reindl Depo.  at 77-81; 91 )

82.     Bofman's notes of the conversations are not accurate.   While Bofman's notes

 claim that Reindl reported that he was afraid of retaliation,   Reindl testified that he was not

concerned or afraid of  retaliation.  (Reindl Depo Ex. L at 49, 51)

83.     While Bofman's notes indicate that Reindl reported that he was scared by the

 look in Beaudette's eyes,  Reindl testified that he was not afraid and described the look as one of

"disgust" not one of rage.  (Reindl Depo at 49, 51)

84.      While Bofman's notes claim that Reindl reported having heard Beaudette tell

 stories of hitting people, pointing a loaded gun, and losing control,  Reindl testified that he had

never  heard Beaudette tell stories about hitting people, pointing a gun or losing control as the

Defendant contends.    (Reindl Depo  at 82-83)

85.     Finally, while Bofman's notes indicate that Reindl had previous confrontations

 with Beaudette and was concerned that Beaudette could not control his temper,  Reindl

testified that there had been only one  argument with Beaudette, that it had not been violent, that

Beaudette did not lose his temper, and that Beaudette later apologized.   (Reindl Depo  at 51-52)

He explained  that other than the hard hat incident,  Beaudette had never been  belligerent, and

had never been insubordinate.  (Reindl Depo at 75)

86.      Furthermore, Reindl explained that  what he was concerned about was not

Beaudette's temper, but that the stress in the plant was impacting the plaintiff because of his

mental disability.   (Reindl Depo at 49-51; 67-68)

87.     With respect to Larry Alice, while Bofman's notes claim  that Larry Alice reported

that he was afraid of   Beaudette, Alice has produced an affidavit in which he indicated that he,

"was not fearful of Beaudette".  (Affidavit of Larry Alice attached hereto as Exhibit 24. )

88.     Bofman's notes also falsely claim  that Bruce Carr reported that Beaudette had

told Carr  he could not control his temper and might hit people, and that Beaudette had told Carr

stories about losing control, hitting people and pointing a loaded gun at someone.   Carr has

produced an affidavit indicating that  while Carr had heard stories about Beaudette, he does not

claim that he heard them from Beaudette.  (Ex. 23)   Instead, these may have been rumors spread

by other co-workers who knew of Beaudette's disability.   (Ex. 23)

89.     Moreover, while the notes suggest that Carr was afraid of Beaudette, and/or

feared  being hit by Beaudette, this was not the case.    Carr was not afraid of being hit by

Beaudette at the time that he spoke to Bofman.     (Ex. 23) In fact, he was not afraid of Beaudette

at all.    (Ex. 23)

90.     The notes also incorrectly state that Carr reported having seen Beaudette in "fits of

rage".  While Carr had seen Beaudette upset or frustrated, he had seen other

employees similarly upset or frustrated.    (Ex. 23)  Carr explained that all of the workers were

unhappy and on edge because of the number of hours worked, and that Beaudette's behavior was

similar to that of his co-workers.    (Ex. 23)

91.      Prior to the night of February 6, 2002, Beaudette had  never had any

disagreements with Reindl, Carr or Alice in which he lost his temper.     (Beaudette Aff. ¶ 47)  He

did have one disagreement with Reindl on February 5, 2002- but did not lose his temper.

(Beaudette Aff. ¶ 47) The two simply had a difference of opinion, for which Beaudette later

apologized.  (Beaudette Aff. ¶ 47)  Similarly, while Beaudette  did have one disagreement with

co-workers Bruce Carr and Larry Alice about working overtime, it was not violent, and he did not

lose his temper.  (Beaudette Aff. ¶ 47)   He did not threaten anyone or become" enraged".

(Beaudette Aff. ¶ 47)

92.     Beaudette did not tell Carr, Reindl or Alice stories about pointing a  gun at anyone.

(Beaudette Aff. ¶ 48)  He did not  tell them  that he could not control his  temper or  might hit

someone.       (Beaudette Aff. ¶ 48)  The only conversation he had  about losing control was his

statement on February 5, that he was feeling overwhelmed  and that he was concerned that he

might "go off", or walk off the job.   (Beaudette Aff. ¶ 48)

93.      Prior to the night of February 6, 2002, Beaudette had never thrown anything in

 anger while  working for the Defendant.    (Beaudette Aff. ¶ 46) He had never hit or kicked or

broken anything in  anger.  (Beaudette Aff. ¶ 46) He had never had any type of physical

confrontation with any co-workers.   (Beaudette Aff. ¶ 46) He  had never threatened to harm any

co-workers.  (Beaudette Aff. ¶ 46) He  had not threatened anyone with any kind of violence, been

violent, been belligerent, or even been insubordinate.   (Beaudette Aff. ¶ 46) He did not engage in

"fits of rage" .  (Beaudette Aff. ¶ 46)

94.     On February 7, 2002, Beaudette voluntarily contacted  EAP and was referred to

 a counselor for an evaluation.    (Beaudette Aff. ¶ 43)   The counselor determined that the

plaintiff was suffering from Attention-Deficit/Hyperactivity Disorder.  (Beaudette Aff. ¶ 43)

95.      On February 12, 2002, Beaudette faxed  Bofman a memo discussing the

21

February 6 incident, and providing further detailed information about his ADHD and treatment, including the fact that he was seeing a mental health counselor referred through the Defendant's EAP who had been very helpful.  (Beaudette Aff. ¶ 44; Beaudette Statement attached hereto as Exhibit 25)    Beaudette stated that he  would make any findings or recommendations from the medical evaluations available to the Defendant. (Beaudette Aff. ¶ 44; Ex.  25)

96.      Later that day, Beaudette met with Carlton, Kinder, and Bofman, and was asked to give a statement concerning the February 6 incident.  (Beaudette Aff. ¶ 44)   He did so.  (Beaudette Aff. ¶ 44)   He also gave them a copy of the letter in which he identified his medical condition and his plans for treatment.  (Beaudette Aff. ¶ 44)

97.      On or about February 12, the Defendant made the decision to terminate Beaudette.  (Draft Termination Letter attached hereto as Exhibit 26)

98.      The Defendant's agents have offered inconsistent testimony as to the termination decision.   Carlton suggests that the termination decision  was made by someone from human resources.   (Carlton Depo  at 22)   Kinder claims that she doesn't know who made the final decision.   (Kinder Depo at  25-26) However,  Bofman claims that it was a unanimous decision by him, Carlton, Kinder, and the head of human resources.  (Bofman Depo.  at 44-45)

99.      Bofman testified that  each of the individuals involved with the decision were aware that  Beaudette claimed to be suffering from a psychiatric medical condition.   (Bofman Depo. at  59)   However, Carlton denied knowing  this.  (Carlton Depo  at 25-26)

100.    Bofman testified  that the  reason for the termination was the hard hat incident, explaining that as a result of that incident he believed that  Beaudette was a safety risk.  (Bofman Depo.  at 45-46)  Carlton testified that he recommended firing  Beaudette because of workplace

violence.  (Carlton Depo at 22)    However, he conceded that he believed  that Beaudette was a safety risk because of the **potential** for violence.  (Carlton Depo  at 24) He also admitted that his belief that other employees had voiced concern about their safety  was a factor in his decision, as was previous performance concerns.   (Carlton Depo  at 24)

101.    The Defendant has policies under which  an employee may be sent for a fitness for duty exam when there is a request for accommodation, when there is a concern that the plaintiff is unable to perform the essential functions of the job, or when there is a concern about safety. (Carlton Depo  at 30-32)

102.    Carlton was aware of this policy  but did not send Beaudette  for such an exam to determine if he was a safety risk or to determine if he was capable of performing the essential functions of his position– even though he admittedly recommended the termination because of fears of workplace violence.    (Carlton Depo  at 30 -32)

103.    Carlton was unable to explain why he did not follow the policy with respect to Beaudette.   (Carlton Depo  at 30-32)

104.    On the evening of February 12, the Defendant drafted a letter terminating Beaudette.  (Ex. 26) The draft letter stated that the termination was the result of , "a culmination of incidents in which there have moderate to severe behavior/ performance problems. Specifically in the area of taking and accepting instructions".  (Ex. 26)   The letter referred to the February and September discipline and then referred to the

> latest incident on February 6th in which you displayed an angry outburst
> and a total disregard of the presence of the Operations Manager in the
> Control Room.   This behavior is totally unacceptable for employment".

(Ex. 26)

105.    Carlton edited this termination letter.  (E-mail and termination letter attached

 hereto as Exhibit 27)   He removed the reference to behavior and the reference to  Beaudette's

difficulty in taking instructions.  (Ex. 27)   He also changed the description of  the February 6th

incident from a display of "anger" to a display of "violence".  (Ex. 27)   Finally, he indicated that

Beaudette's three day removal from the qualified fork lift driver list was  a performance issue that

led to his termination.   (Ex. 27)

106.    The termination letter did not indicate that  the plaintiff was terminated because

 he was unable to work long hours, was a safety risk, or was otherwise unable to perform the

duties of the position. (Ex. 27) Nor did the letter state that the alleged fears of Beaudette's co-

workers played  a role in the termination decision.   (Ex. 27 )

107.    The Defendant's interrogatory responses explain the termination decision as follows:

> [the defendant] decided it could no longer employ Plaintiff because his
> conduct posed a risk to the safety of other workers at Lake Road.   Plaintiff
> had other work performance problems, including refusing to follow his
> supervisors instructions on safety procedures, so when the plaintiff threw
> his hard hat against the wall in a room filled with people, [the defendant]
> decided to terminate plaintiff's employment.

(Interrogatory responses attached hereto as Exhibit 28)

108.    The Plaintiff has Generalized Anxiety Disorder and Panic Disorder with

 Agoraphobia.   (Selig Depo  at 52-55; Records of Dr. Bahnassi attached hereto as Exhibit 29[13];

Deposition of Dr. Zeman attached hereto as Exhibit 30 at 19[14]) Both of these conditions  are long

lasting, and have caused significant distress and impairment to  Beaudette.  (Selig Report)

---

[13] Hereinafter cited as "Bahnassi records at ____".

[14]Hereinafter cited as "Zeman Depo  at ____

109.    Generalized Anxiety Disorder is a diagnosis set out in the DSM IV. (Selig Depo at 52-53)   This disorder is characterized by, "a greater than two year period of excessive worry, accompanied by a variety of associated symptoms consistent with anxiety such as problems sleeping, problems concentrating, physical symptoms of anxiety such as tremulousness or sweating or maybe hyperventilation." (Selig Depo at 10-11) Impulsivity is a feature of this illness. (Selig Depo at 5-6)

110.    Panic Disorder with Agoraphobia is a diagnosis set out in the DSM IV. (Selig Depo at 52-53) It is characterized by an avoidance of social situations. (Zeman Depo at 21)

111.    Beaudette has also been diagnosed as having Attention Deficit and Hyperactivity Disorder. (Rothman Records at 4/23/03)

112.    Attention Deficit Hyperactivity Disorder is a diagnosis contained in DSM IV. (Selig Depo at 54-55)   ADHD is characterized by symptoms of inattention and impulsivity. (Selig Depo at 11-12; 57)

113.    Dr. Selig could not state, based on reasonable medical certainty, that Beaudette had Attention Deficit Hyperactivity Disorder. (Selig Depo at 23-25)   Dr. Selig explained,

> "he may well have had ADHD as a child.  It is not uncommon for people
> to have it as a child and outgrow it in their teens.  It's also not, you know,
> rare for it to continue into adulthood.  I don't know what the percentages
> are.  However, he, though prescribed Ritalin as a child, didn't take it.
> His mother wouldn't give it to him.  So we don't know what his response
> to Ritalin was as a child, but we do know his response to Ritalin as an adult
> was not consistent with somebody with ADHD.

(Selig Depo at 25)

114.     Even with medication and treatment these conditions substantially limit Beaudette with respect to the major life activities of thinking, sleeping, and concentrating and

learning, as compared to the average person.    (Selig Depo  at 32-35; Beaudette Aff.  ¶50-52)

115.    With respect to thinking,  concentrating and learning, Dr. Selig has explained

that,

> [w]hen put in a situation where he needs to learn something,
> his anxiety increases and impairs his ability to sufficiently think straight
> and focus and be able to pay attention and understand what it is that he's
> being taught because of the increase in his anxiety....
>
> When his anxiety is high, and it is high even when he's in treatment, even
> when he's being medicated, he had problems with thinking and his mind
> may go blank or he may have trouble where he has trouble tracking
> his thoughts which is a well-known and understood symptom of an anxiety disorder.

(Selig Depo at 32-33)

116.    Dr. Selig has also explained that when Beaudette is under stress, such as when

he was in a classroom setting or working long hours, he would,

> have to exert especially high effort and determination to do what
> the rest of us can do with much less effort much more normally.

(Selig Depo at 34-35)

117.    Dr. Zeman similarly testified that Beaudette reported that with respect to

learning,

> it took him long hours to do this, and he had to work hard at it, and he
> was working long hours in the evening at night at home and that he had
> to outline things and rework the material he got...... .  I think that he has
> to work hard at learning material, certainly is on the higher side of the
> bell-shaped curve...   It's hard more [sic] for me to compare him to average.
>  He does have to work hard at learning materials based on again what he
> told me and what I have gleaned from the records......  I think by – by dint of
> hard effort, he can counter his problems and attention and concentrate on a
>  task.   It takes him longer to do it....”

(Zeman Depo at 50-52)

118.    Beaudette's other doctors confirm his  difficulties,  explaining that even as an

Case 3:03-cv-00899-RNC    Document 55-2    Filed 09/23/2004    Page 27 of 56

adult, Beaudette has had problems focusing, and concentrating. (Bahnassi Records at 3/29/02; 3/4/03; Deering Records at 5/25/00)

119.    Beaudette also has moderate to severe difficulties with sleeping as compared to the average person.  (Selig Report; Zeman Depo at 26-28; 51-52; Beaudette Aff. ¶ 52) He regularly has trouble getting to sleep, remaining awake all night approximately once or twice per week.  (Beaudette Aff. ¶ 52; Deering Records at 4/3/00; 4/27/00)   On occasion he goes over two days without sleeping at all. (Beaudette Aff. ¶ 52; Deering Records at 5/25/00)

120.    Beaudette's anxiety increases when he is sleep deprived and that this , "can sometimes drive [him] to a panic ".  (Deering Records 5/25/00).

121. Beaudette is also particularly susceptible to stress.  (Selig Report) While working for the Defendant, this stress,

> [took] a serious toll on him, causing him to be preoccupied with work, feeling more anxiety from his wish to do well at work, and even affecting his sleep. Thus, to accommodate this stress, he substantially limited his out of work activities during his period of employment".

(Selig Report)

122.    Despite these impairments, Beaudette was, "able to perform the essential functions of his job, because of his determination to do so and the amount of effort he exerted". (Selig Report; Zeman Report Attached hereto as Exhibit 31[15].)

123.    Reindl, the Plaintiff's leadman, also believes that Beaudette would have been a good operator if he were given an opportunity to learn the job.  When asked of Beaudette could have succeeded if given some help to learn the job, he replied, "I know so" .  (Reindl Depo at 89)

---

[15] Hereinafter cited to as "Zeman Report at ___"

124.    In his affidavit,  Bofman conceded that Beaudette was capable of performing the

technical aspects of the job.  (Bofman Affidavit attached hereto as Exhibit 32)

125.    Beaudette was not a direct threat at the time he was terminated.  In  Dr. Selig's

expert opinion, there is no basis to conclude that  Beaudette  was a  threat to himself or others or

that he could not safely perform all of the functions of his job.   (Selig Depo at 47; 59; Selig

Report)  He explained,

> He did not verbalize any threats that I am aware of.  He did not throw
> anything that hit anybody that I'm aware of or throw anything that was
> meant to hit anybody, in my opinion.  He did not engage in any other
> aggressive behavior.  Even if his throwing of his hard hat is, in my view, incorrectly,
> construed as aggressive or with the intent to harm, I do not
> believe that it was, but even if it's construed that way, there's no
> evidence that there was any other behavior that threatened others or himself,
> and that he was quit cooperative at that point with Tim, I think it's Bofman...

(Selig Depo at 46)        Even Dr. Zeman, the Defendant's expert  admitted that he had no reason to

believe, based on reasonable  medical certainty, that at the time that the Defendant fired

Beaudette, Beaudette posed a significant risk of substantial harm.  (Zeman Depo  at 16)

126.    Dr. Selig concluded that in his expert opinion the  throwing of the hard  hat was,

 "an impulsive reaction to tremendous inner stress", and **not** a violent act.   (Selig Depo  at 45;

Selig Report)   He  explained that such impulsive behavior  is a feature of generalized anxiety and

ADHD. (Selig Depo at 55-57)

127.    Dr. Zeman, the defendant's expert, believes that Beaudette has poor

 impulse control as a result of his  mental impairments, and that his symptoms- including poor

impulse control- would increase under stress.   (Zeman Depo at 61-62; 65-66)  He also conceded

that  lack of sleep can exacerbate poor impulse control.  (65-66)  He concedes that  even with

treatment and medication Beaudette has greater anxiety than the average person, that his anxiety would be exacerbated by stress, and that his anxiety could also be accommodated by the lessening of the stress. (Zeman Depo at 67-68)   Finally, Dr. Zeman admitted that reducing the stress on Mr. Beaudette could help him better control his impulses.   (Zeman Depo at 65)

II.     **PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT**

1.     Admitted.

2.     Admitted.

3.     Admitted.

4.     Denied in part.   Admit that Lake Road would have several months of classroom  training for its O & M technicians before the plant would become fully operational. Denied that this was the reason that the Plaintiff was hired.    (Beaudette Aff ¶.13)

5.     Denied in part.  Admit that the Plaintiff's duties  included, inter alia, performing station  shift operations and  maintaining the accuracy  of shift operating logs.  (Job Description attached hereto as Exhibit 33)   Admit that his duties included routine testing but only insofar as the testing involved cycle chemistry.  (Ex. 33)   Admit that his duties also involved  electrical and mechanical inspections but only under the direction of management.   Admit that his duties included identifying hazards and taking corrective action but only as necessary  as authorized. (Ex. 33)   Deny that these were his only primary duties.    (Ex. 33)   His primary duties also included conducting tours, performing station maintenance, becoming lead system representative on assigned systems, maintaining the accuracy  of records, time sheets, work orders, and other administrative documents, checking daily consumption rate of chemicals, gases, fuels, water and other consumables, performing in plant switching and tagging of equipment in accordance with approved procedures and practices, investigating plant problems , developing and revising operations and maintenance related procedures, performing and maintaining housekeeping standards, performing routine preventive and predictive maintenance, representing the company,

and assisting other team members.  (Ex. 33 )

6.      Denied.  When Beaudette applied for work with the Defendant, he informed the

Defendant that he did not have any experience in the power plant field.    (Beaudette Aff.¶ 13)

Knowing that he had a history of problems with learning and concentrating,  Beaudette asked

whether he would be taught the skills necessary for the job.    (Beaudette Aff.¶ 13)   The

Defendant told him that he would, explaining that, "they start off showing what happens when

you rub two sticks together, and they take it right along".    (Beaudette Aff ¶13:  Beaudette Depo.

at 118-120; 208).

7.      Admitted.

8.      Admitted that Defendant required the Plaintiff  to see its physician for a job

placement examination to ensure that the new hires are medically qualified.  Plaintiff would be

unable to stipulate to the factual assertion with respect to the Defendant's treatment of others

because he  does not have  knowledge of such treatment.

9.      Admitted.

10.     Admitted in part, denied in part.    Admitted that when Plaintiff started working for

 Defendant, he attended  training  classes with his co-workers during which he received technical

training on the operation and maintenance of the power plant.  However, because of his disability-

related anxiety and learning problems, he had difficulty in this environment.   (Beaudette Aff ¶¶

16-17.)   He tried to explain his difficulties to both Carlton and Bofman.    (Beaudette Aff. ¶¶ 18-

19)  They did not discuss potential accommodations, or otherwise engage in the required

interactive process.    (Beaudette Aff. ¶¶ 18-19)

11.     Denied in part.  At the beginning of the classroom training, the Plaintiff learned that he

would sometimes have to work long hours.  However, the essential duties of the position do not

include long hours regularly.  (Ex. 7; Beaudette Depo at 89) Instead, the essential duties include

mandatory overtime on  only a moderate basis.    (Ex. 7)

12.    Denied in part.  Although some of his co-workers were upset by the news,

the  Plaintiff was not bothered at the time by  the idea of sometimes working long hours.

(Beaudette Depo.  at 58).   He knew that long hours were not an essential duty of the position.

(Beaudette Depo at 89)

13.    Denied in part.  The essential duties of the position require overtime on  only a

 moderate basis.    (Ex. 7; Beaudette Depo at 89)

14.    Denied insofar as the Defendant characterizes the Plaintiff's behavior as failing

 to show attention and/or respect to his peers.    (Beaudette Aff. ¶¶ 16-17)        This  conduct  was

related to his anxiety. (Beaudette Aff. ¶¶ 16-17)     With respect to the Defendant's claim that

other employees spoke to Bofman, the Plaintiff  would be unable to stipulate to the underlying

factual assertion because he does not have  knowledge of any such conversations.

15.    Denied insofar as the Defendant characterizes the Plaintiff's behavior as within

 his control.   Admitted that due to his anxiety, the  Plaintiff would occasionally interrupt with

questions or blurt things out.  (Beaudette Aff. ¶¶ 16 -17)

16.    Denied.   Beaudette told Bofman that he was having trouble staying still and not

 asking too many questions.    (Beaudette Aff. ¶19)    While he did not provide Bofman with a

diagnosis, he told him that his difficulties were because he was feeling very anxious.    (Beaudette

Aff.¶ 19)    Bofman  suggested that he contact the Defendant's EAP program. (Beaudette Aff.¶19)

17.    Denied.     Beaudette told Bofman that he was having trouble staying still and

not  asking too many questions.    (Beaudette Aff.¶ 19)    While he did not provide Bofman with a

diagnosis, he told him that his difficulties were because he was feeling very anxious.    (Beaudette

Aff.¶ 19)    Bofman  suggested that he contact the Defendant's EAP program. (Beaudette Aff.¶19)

18.      Denied in part.  During the fall, the Plaintiff let Bofman know that he was

 suffering from anxiety related to the classroom work.      (Beaudette Aff ¶ 19)  On or about

November 17, 2000, when Bofman criticized  Beaudette for asking for help with a computer

problem, Beaudette  explained that he had attention deficit disorder with hyperactivity ("ADHD"

or may be referred to as "ADD"), and  was having some difficulties.    (Beaudette Aff.¶ 21;

Beaudette Depo at  122-123)

19.      Denied in part.  Admitted that Plaintiff suffers from panic attacks and agoraphobia

 and  has trouble  concentrating in a classroom. (Selig Report ; Zeman Report; Beaudette Aff.  ¶¶

49-51) To the extent that the Defendant suggests that these are the Plaintiff's only mental

impairments or that these are the only problems suffered as a result of this impairment, denied.

The Plaintiff also has generalized anxiety disorder.  (Ex. 6)   These two conditions substantially

limit the Plaintiff in the major life activities of learning, thinking, concentrating and sleeping. (Ex.

6; Beaudette Aff 1 ¶ 49)

20.      Admitted that while medicated the Plaintiff has panic attacks only a few times per

 year, and that during the time that the Plaintiff was employed by Defendant he had two panic

attacks while at work.  (Beaudette Depo at 66-68)   Denied insofar as the Defendant characterizes

such attacks as "seldom" or "rare".

21.   Denied in part.  Admitted that the Plaintiff had problems twenty years ago with panic attacks

and agoraphobia.    Admitted that since he has been on medication his agoraphobia is less severe

and panic attacks occur less frequently. The Plaintiff further admits that during the time that the Plaintiff was employed by Defendant he had only two panic attacks while at work. (Beaudette Depo at 66-68)  Denied insofar as the Defendant characterizes such attacks as "seldom" or "rare". To the extent that the Defendant suggests that these are the Plaintiff's only mental impairments or that these are the only problems suffered as a result of this impairment, denied. (Beaudette Aff. ¶¶ 44-52; Selig Depo at 32-35, 52-53)

22.    Admitted.

23.    Denied in part. When Plaintiff told Bofman that he had ADHD, Bofman responded that his son had recently been diagnosed with ADHD. Denied that Bofman reported that he sought a second opinion and the second physician disagreed with the prior physician's diagnosis. (Beaudette Aff.¶21) Denied that Bofman recommended that Plaintiff get a full diagnosis to ensure that he had indeed been properly diagnosed. (Beaudette Aff.¶ 21)

24.    Denied in part. Bofman did recommend that Plaintiff use the company's Employee Assistance Program ("EAP"). However, the Plaintiff denies that this recommendation was made at the time that the Plaintiff disclosed his ADHD. (Beaudette Aff. ¶¶ 19) The recommendation was made earlier, when the Plaintiff disclosed his problems with anxiety. (Beaudette Aff. ¶¶ 19)

25.    Denied in part. Bofman did not state that he had used EAP. (Beaudette Aff.¶ 19)

26.    Denied in part. It is admitted that the Plaintiff s had trouble in high school paying attention in class. To the extent that the Defendant suggests that these are the are the only problems suffered as a result of the Plaintiff's mental impairments, denied. (Ex. 6; Beaudette Aff. ¶¶ 44-52; Selig Depo at 32- 35; 52-53)

27.    Denied that the Plaintiff had trouble "adjusting".   The Plaintiff had trouble learning and concentrating during the  classroom portion of his job due to his mental impairments.    (Ex. 6; Rothman Records; Beaudette Aff. ¶¶ 16; 44-52; Selig Depo at 32-35; 52-53)

28.    Denied in part.   The Plaintiff admits that he was certified for the  O & M technician position  at the same time as everyone else.    The Plaintiff denies that the learning of the material  for the O & M technician position ended upon certification.   Instead, after the classroom learning, there was on-the-job training.  (Beaudette Aff. ¶¶ 28-29)

29.    Denied in part.  The Plaintiff testified that Tim Bofman told him that he knew more about the duties than an employee named Will.  (Beaudette Depo at 135) He also believed that he knew more than Larry Alice, but that Alice might have known more than him about some things.  (Beaudette Depo at 118)   The Plaintiff testified that he needed an accommodation to learn his job, but once he had learned the duties he did  not believe he would need an accommodation to perform the duties.  (Beaudette Depo at 59)   He also explained that at the time of his termination he was very anxious because he had not yet learned all of the systems involved with the job. (Beaudette Aff. ¶35)

30.    Denied in part.  Admitted that the Plaintiff made no allegations of discrimination at the time he was employed.   Admitted that the Plaintiff disputes that he committed any infraction related to the lockout/tagout procedures, and that he did not complain.   Insofar as the Defendant suggests that the claim of unfair treatment is a recent fabrication, denied.   At the time the Plaintiff tried to explain to Bofman, Lavigne and Carlton what had actually occurred, and how it might be related to his mental impairments. (Beaudette Aff. ¶¶ 25-27)   The Defendant's management officials

refused to listen or to talk about the Plaintiff's ADHD.   (Beaudette Aff. ¶¶ 25-27)   Denied that

the Plaintiff disputes that he committed any infraction with respect to the contamination of the

Demin water tank.   He testified that he was partially to blame for the contamination. (Beaudette

Depo at 29-33)   Admit that the Plaintiff did not complain about the discipline he received for the

Demin water tank contamination at the time.   Insofar as the Defendant suggests that the claim of

unfair treatment is a recent fabrication, denied.    He did not complaint because he was afraid of

losing his job. (Beaudette Depo at 31)   Denied that the Plaintiff disputes that he ever committed

a safety infraction with respect to the forklift.  (Beaudette Depo.  at 34-35).

31.      Denied in part.  Admit that on or about November 17, 2000, Bofman reprimanded Plaintiff

 for asking for help from another employee regarding a computer issue.   Denied that his

reprimand was about  violating the chain of command.  (Beaudette Depo at 121-122)  To the

extent that the Defendant suggests that  the Plaintiff's request for assistance when he was having

trouble due to his mental impairments, was a performance problem, denied.  (Beaudette Aff.¶ 21)

Plaintiff would be unable to stipulate to the factual assertion with respect to the Defendant's

beliefs because he  does not have  knowledge of such beliefs.

32.      Denied in part.  Admit that Bofman noted in the February 15, 2001 memorandum

 that Plaintiff had previously behaved in an insubordinate manner when he failed to follow proper

procedures on November 17, 2000 for a computer-related matter.   To the extent that the

Defendant suggests that the Plaintiff's request for assistance when he was having trouble due to

his mental impairments, was insubordinate, denied.   (Beaudette Aff. ¶¶ 21)

33.      Denied in part.  Admit that on  February 13, 2001, Plaintiff was suspended.

 Admit that the Defendant claimed the suspension was for insubordination involving the

36

lockout/tagout program.   Deny that the Plaintiff was insubordinate.    (Beaudette Aff. ¶¶ 25-27)

Deny that Beaudette disagreed with Bofman's instructions.   (Beaudette Aff. ¶¶ 25-27)      In fact,

Bofman had given inconsistent instructions, and Beaudette had tried to follow them .   (Beaudette

Aff. ¶¶ 25-27)

34.     Denied in part.   Admit that under certain circumstances following proper

Lockout/tagout practices could implicate safety issues.   Deny that the plaintiff's actions in

February regarding the creation of lockout/tagout procedures involved an important "safety

practice".   (Reindl Depo at 75-76)

35.   Denied in part.   Admit the Beaudette disagreed with Bofman's accusations against him with

respect to what was supposed to occur.  (Beaudette Depo at 128)  Deny that Plaintiff failed to

follow instructions because he disagreed with Bofman.  (Beaudette Depo at  25, 128; Beaudette

Aff. ¶¶ 25-27)

36.     Denied in part.  Admit that at a meeting relating to discipline, the Plaintiff

 informed the Defendant that he had been diagnosed with ADD or ADHD and he was taking

medication for it.  Deny that this was the first time that Plaintiff had reported his condition  or

medication.  (Beaudette Aff. ¶¶ 19-22; 25-27)      Deny that Plaintiff was guilty of

insubordination.      (Beaudette Aff. ¶¶ 25-27)      Deny that Plaintiff had disagreed with or failed

to follow instructions regarding lockout/tagout.     (Beaudette Aff. ¶¶ 25-27) To the extent that

Defendant suggests that this was all that Plaintiff said about his mental impairments and need for

accommodation, denied.   Plaintiff explained that he had been put on different medications, and

felt like his "head was spinning" and he "didn't know if he was coming or going". (Beaudette Aff.

¶¶ 25-27;  Beaudette Depo at 47-49)

37.    Denied.    At the meeting  the Plaintiff stated that he had not been insubordinate
and believed that he had been following his supervisor's instructions.  (Beaudette Aff. ¶¶ 25-27)
He explained that he had been diagnosed with anxiety and ADHD, and tried to tell them of the
problems that he was having.    (Beaudette Aff. ¶¶ 25-27)   He specifically informed the
Defendant that   he had been put on different medications, and felt like his "head was spinning"
and he "didn't know if he was coming or going". (Beaudette Aff. ¶¶ 25-27;  Beaudette Depo at
47-49)   Carlton cut him off- refusing to discuss the problems that Beaudette was having.
(Beaudette Aff. ¶¶ 25-27)     Carlton said that he did not want to hear about it, and that ADD was
not the issue.    (Beaudette Aff. ¶¶ 25 -27; Beaudette Depo  at  48.) Carlton then suspended
Beaudette and  ordered him to write a paper explaining the importance of following orders.
(Beaudette Aff. ¶¶ 25-27; Ex. 15)

38.    Denied in part.   Admit that Defendant claims that it was disciplining Plaintiff for
 insubordinate behavior regarding the lockout/tagout program.  Deny that Plaintiff was
insubordinate and deny that this was Defendant's actual reason for discipline.        (Beaudette Aff.
¶¶ 25-27; Beaudette Depo at 23, 34)

39.    Denied in part.   Admit that after the February meeting, the Defendant
 sent Plaintiff for a Fitness for Duty evaluation with Putnam Medical Associates to determine
whether his medication and/or medical condition would have an impact on whether he could
perform the duties of his position.   Deny that this was the first time the Plaintiff informed
Defendant he was on medication for mental impairments.        (Beaudette Aff. ¶¶ 21-22)    Deny
that the report of medication was the only reference  to the issues surrounding the mental
impairments that Plaintiff reported at the  meeting.  (Beaudette Aff. ¶¶ 25-27)

38

40.    Admitted.

41.    Denied in part.   Admit that on  the night of September 10, 2001, the
Demineralized Water Storage Tank was contaminated.   Deny that contamination was caused by
the Plaintiff's closing of the wrong valve.  (Beaudette Aff. ¶¶ 30)        The Plaintiff had no
experience taking the tank offline.  (Beaudette Aff. ¶¶ 30)       The Defendant had no written
procedures.  (Beaudette Aff. ¶¶ 30)      He  had been verbally instructed on how to do this only
once several weeks before.  (Beaudette Aff. ¶¶ 30)       The schematics  that Beaudette was given
were wrong.  (Beaudette Aff. ¶¶ 30;    Reindl Depo  at 74).   The system itself was also very
confusing.  (Reindl Depo  at 73-74)  Beaudette, trying to perform his tasks in a dimly lit area,
neglected to close a  valve, and raw water contaminated the Demin water  tank. (Beaudette Aff. ¶¶
30)   One of the valves was not operable.  (Beaudette Aff. ¶¶ 30;  Bofman Depo  at 82-83 )   Had
the valve been operable,  it would not have been contaminated.  (Beaudette Aff. ¶¶ 30;  Bofman
Depo  at 82-83 )

42.    Admitted.

43.    Denied in part.  Admit that on September 11, 2001, Reindl spoke with Bofman
and told Bofman that Plaintiff was struggling.  Deny that Bofman reported problems with
performance and not problems with learning the systems due to the Plaintiff's mental
impairments.  (Reindl Depo  at 32-34)  Deny that this was all that Bofman reported.   (Reindl
Depo  at 32-34)  Reindl  explained that Beaudette was  was having  trouble remembering the
different systems.  (Reindl Depo  at 32-34)  Reindl told Bofman that  Beaudette, "had so much to
offer, but he was having trouble".     (Reindl Depo  at 32-34)

44.    Denied in part.  Admit that Reindl recommended to Bofman transfer the Plaintiff

39

temporarily to an open maintenance role, and bring him back into operations when things slowed

down. (Reindl Depo at 34)   Admit that Reindl told Bofman that Plaintiff was trying, "to measure

up to people who had years and years of experience and he clearly didn't have the background.

And he was having trouble remembering things".  (Reindl Depo at 34)   Admit that the

maintenance position would have been more structured.  (Reindl Depo at 34) Deny that this was

the only accommodation suggested by Reindl.   (Ex. 18)  Reindl also suggested that the Defendant

put another person on the night shift to help Beaudette.  (Reindl Depo at 62-64; Ex. 18)

45.    Admitted.

46.    Denied in part. Admit that Reindl recalled that Bofman said that when he was

new to power plants, he made mistakes too.   Admit that Bofman refused to transfer the Plaintiff

to an open maintenance position.  Deny that this was the only accommodation that Reindl asked

for that Bofman rejected.   (Reindl Depo at 62-64; Ex. 18)   Deny that Reindl recalled Bofman as

simply rejecting the requested accommodations.     Reindl testified that Bofman,  "just played it

off as not a big deal".  (Reindl Depo at 35-36)

47.    Denied in part.     Plaintiff would be unable to stipulate to the factual assertion

 with respect to Reindl's response because he  does not have  knowledge of such beliefs.   Plaintiff

admits that Reindl testified that, "I was left with the impression that he was blowing me off.  So,

there wasn't much motivation to, you know, keep going back and talking to him".  (Reindl Depo

at  81)

48.    Admitted.

49.    Admitted.   Plaintiff testified that he did not do so because he was afraid of

 losing his job.  (Beaudette Depo at  31).

50.    Denied in part.  Admit that on or about October 18, 2001, Plaintiff failed to wear his seat belt while operating a fork lift.    Admit that Bofman told Plaintiff to wear the seatbelt. Admit that company's Safe Work Practice directs employees to wear seatbelts while on equipment.    Denied that Bofman spoke to Plaintiff because of reports of others.   The Plaintiff reported his concerns about  forgetting to wear his seatbelt.  (Beaudette Aff ¶ 33)  Plaintiff would be unable to stipulate to the other factual assertions because he  does not have  knowledge of such events.

51.    Plaintiff is  unable to stipulate to the factual assertions because he  does not have knowledge of such events.

52.    Denied in part.  Admit that Bofman instructed Plaintiff that he could not operate the fork lift, and removed from the "Qualified Fork Lift Operator" list.  Admit that Bofman told the Plaintiff  him  he had to set an example for the trades.    Deny that the Plaintiff was removed permanently from the list.  (Beaudette Aff ¶ 33)  Beaudette was removed from the forklift operator list for three days  until he was retrained.   (Beaudette Aff ¶ 33) Deny that the reason that Bofman spoke to the Plaintiff was the reports of other persons.    (Beaudette Aff ¶ 33)   The Plaintiff went to Bofman and told him about his concerns, explaining that his forgetfulness scared him.     (Beaudette Aff ¶ 33) To the extent that the Defendant suggests that this was a performance problem, denied.   When the Plaintiff reported his forgetfulness,  Bofman shrugged off the concern, assuring  Beaudette that he was not worried about the  absentmindedness. (Beaudette Aff¶ 33 Beaudette Depo at  34-35)

53.    Denied in part.   Admit that the Defendant positive year-end review with an annual raise of 2.5%.  (Ex. 20)   Deny that the evaluation was only "fairly" positive.  (Ex. 20)

54.     Plaintiff is  unable to stipulate to this factual assertion  because he  does not
have  knowledge of the Defendant's intentions.

55.     Denied in part.   Admit that on February 5, 2002, Plaintiff spoke with Bofman
about feeling stressed  and said that he might "go off" on someone.    To the extent that the
Defendant implies that this was the only thing said between  Plaintiff and Bofman, denied.   He
told Bofman that he was afraid he would go off on someone or walk off  the job. (Beaudette Aff¶
36) Beaudette asked Bofman  for a break- either time off or time away from the stress.  (Beaudette
Aff¶ 36; Beaudette Depo  at  37-38)   Bofman refused to discuss accommodations, telling
Beaudette  he was doing a great job,  that everyone was  under stress, that things would change
and that things would get better when the commission turned over.  (Beaudette Aff¶   36;
Beaudette Depo   at  37-38; Bofman Depo  at 74-75)  Bofman also told  Beaudette to, "maintain
control".  (Bofman Depo  at 74-75)

56.     Plaintiff is  unable to stipulate to this factual assertion  because he  does not
have  knowledge of Bofman's understanding or interpretation.  To the extent that the Defendant
suggests that the Plaintiff did become violent, denied.  (Beaudette Aff¶ 40; 46).

57.     Denied.   (Beaudette Aff¶ 36;  Beaudette Depo at 36-38)

58.     Admitted.   To the extent that the Defendant implies that this was the only time
that he suffered stress and anxiety denied.        (Selig Depo at 33-35)

59.     Denied in part.  The Plaintiff admits that one potential accommodation could
have been time away from the "fray." (Beaudette   Depo  at 36-38)   The Plaintiff denies that this
was the only potential accommodation and further denies that this was the only potential
accommodation discussed with Bofman.  (Beaudette   Depo  at 36-38)  He told Bofman that he

wanted, "a break... some time off".  (Beaudette  Depo  at 36-38)

60.    Denied.   The Plaintiff told Bofman that he was afraid he would go off on

 someone or walk  off  the job. (Beaudette Aff¶ 36) Beaudette asked Bofman  for a break- either

time off or time away from the stress.  (Beaudette Aff¶ 36; Beaudette Depo  at  37-38)   Bofman

refused to discuss accommodations, telling Beaudette  he was doing a great job,  that everyone

was  under stress,  that things would change and that things would get better when the commission

turned over.  (Beaudette Aff¶ 36;  Beaudette Depo  at  37-38; Bofman Depo  at 74-75)  Bofman

told  Beaudette to, "maintain control".   (Bofman Depo  at 74-75)

61.     Denied.  Bofman told Beaudette  he was doing a great job,  that everyone was

 under stress,  that things would change and that things would get better when the commission

turned over.  (Beaudette Aff¶ 36;  Beaudette Depo  at  37-38; Bofman Depo  at 74-75)  Bofman

told  Beaudette to, "maintain control".   (Bofman Depo  at 74-75)

62.    Denied in part.  Admitted that on  February 6, 2002, Reindl asked Plaintiff over

 the radio about overtime if he wanted to work overtime.  (Beaudette Depo at 109) Denied that he

asked if the Plaintiff "wanted" to work overtime.  (Beaudette Depo at 109)   Reindl asked the

Plaintiff if he "would" work.  (Beaudette Depo at 109)

63.    Denied.   The Plaintiff told Reindl that he really didn't want to work but said, "if

 you really need me, I'll stay".   (Beaudette Depo at 110)

64.    Denied.  Reindl said that he needed a yes or no answer.  (Beaudette Depo at

 110)

65.    Denied in part.   Admit that Reindl testified that he, "got someone else".

 (Reindl Depo at 43) Denied that the Plaintiff was noncommittal.   The Plaintiff

43

unambiguously said no. (Beaudette Depo at 110)    Denied that Reindl asked the next

available person to work overtime. (Reindl Dep. Tr. at 42-43; 70-71) Reindl could not recall if

the practice, at that time, was to use an overtime list. (Reindl Depo at 42-43; 70-71)

66.    Denied in part. Admit that later that evening, Plaintiff saw Reindl in the Control

Room and told Reindl that he could work the overtime hours if Reindl needed or wanted him to

do so. Admit that Reindl said words to the effect of "I don't want to have to stroke you to get you

to stay" to Plaintiff. Deny that this was all Reindl said. (Reindl Depo at 69)    Reindl explains

that, "I got right in his face, and I said it's a simple F'ing question, it's a yes or a no answer and

that kind of escalated thing to the next level. Something to that effect" (Reindl Depo at 69)  The

Plaintiff is unable to stipulate to whether or not Reindl had already found someone to work the

extra hours at that time because he has no knowledge of when Reindl found someone else.

67.    Denied in part. Admit that Bofman came out of his office and told them

to calm down.    The Plaintiff is unable to stipulate to why Reindl came out of his office.    Admit

that Plaintiff became upset and argued with Reindl.    To the extent that the Defendant suggests

that only Beaudette was angry, or that he started the argument, denied. (Reindl Depo at 69;

Beaudette Aff¶ 39) Reindl started the argument by "getting in his face", yelling and swearing at

the Plaintiff when he offered to work. (Reindl Depo at 69; Beaudette Aff¶ 39)   When Reindl

shouted at Beaudette, Beaudette shouted back. (Beaudette Aff¶ 39)

68.    Denied. Bofman told the Plaintiff to go to his locker.    (Beaudette Aff¶ 39)

While walking away, Beaudette threw his hard hat against the wall. (Beaudette Aff¶ 39)

69.    The Plaintiff is unable to stipulate to whether or not he force of the impact took

44

the finish off a frame on the wall.  Photographs produced by the Defendant show no observable

damage.  (Ex. 21)

70.    Denied in part.   Admit that there were  a number of people  in the room.

 Denied that the  Plaintiff's hard hat flew in the vicinity or passed close by any of them.

(Beaudette Aff ¶ 40)  There were no people in the area in which he threw the hard hat.  (Beaudette

Aff¶ 40)   To the extent that the Defendant suggests that someone could have been hurt, denied.

(Beaudette Aff¶ 40; Reindl Depo at  46)

71.    Denied in part.  Admit that the Control Room contains controls operating the power plant.

The Plaintiff is unable to stipulate to whether or not the room contains "all" of the controls as

alleged.   To the extent that the Defendant suggests that equipment could have been damaged,

denied.  (Beaudette Aff¶ 40; Reindl Depo at  46)

72.  Denied.   Bofman had already directed the Plaintiff to leave at the time that he threw the hard

hat.   (Beaudette Aff¶ 39; Beaudette Depo at 112)   After he threw the hard hat, Bofman walked

him to this locker.  As soon as the moment had passed,  Beaudette was calm.  (Beaudette Aff¶ 41;

Bofman Depo at 71)   He was co-operative when Bofman asked him to go to his locker, and

gather his stuff, and left voluntarily.   (Beaudette Aff¶ 41)   He did not argue or act in a belligerent

manner.  (Beaudette Aff¶   41)  Beaudette was suspended pending an investigation.  (Beaudette

Aff¶ 42)

73.    Admitted.  To the extent that the Defendant suggests that an investigation was

 actually conducted, denied.   (Kinder Depo at 25-26)

74.    Denied in part.  Admitted that under its written procedures, the Defendant is

45

supposed to place an employee who has been temporarily relieved of his duties, on paid leave during the investigation to ensure that the employee is not unjustly punished.    To the extent that the Defendant suggests that an investigation was actually conducted, denied. (Kinder Depo at 25-26)

75.    Admitted.

76.    Denied in part.  Admitted that on or about February 11, 2002, during Plaintiff's administrative leave, Reindl and Bruce Carr, one of Plaintiff's co-workers, approached Bofman and told him that they had concerns.    Admit that to the best of Plaintiff's knowledge, the Defendant did not solicit or encourage them to do so; they did it on their own initiative.    Deny that the concerns involved the Plaintiff's performance and not fears related to his mental impairments.    (Reindl Depo  at 49-54, 67-68, 79-81; Ex. 23)      In fact, the concerns involved fears that  Beaudette might not be able to do his job because of his mental impairments.    (Reindl Depo  at 49-54, 67-68, 79-81; Ex. 23)

77.    Denied in part.  Admit that the Defendant's representation of the contents of Bofman's notes is  accurate.  Deny that  the notes themselves accurately report the discussions with Carr, Reindl and Alice.  (Reindl Depo at 49-54, 75; 82-83; Ex. 23; Ex. 24)   Deny that the notes accurately describe the actual events.  (Beaudette Aff ¶ 40; 46-48) Deny that the Plaintiff's co-workers were afraid of him.   (Reindl Depo at 49-54, 75; 82-83; Ex. 23; Ex. 24)     Deny that Plaintiff told stories about chasing people with guns.  (Beaudette Aff ¶ 48)    While he occasionally had disagreements, deny that he became "enraged"  or acted in a violent manner. (Beaudette Aff ¶ 40; 46-48) The only conversation he had  about losing control was his statement

on February 5, that the stress was unbearable and he was concerned that he might "go off".

(Beaudette Aff ¶ 48)

76[sic[16]].    Denied.  Reindl did not agree that the notes were accurate.  He testified as to numerous inaccurate statements included in the portion of the notes involving his discussion with Bofman.  (Reindl Depo at 49-54; 75; 82-83)  He could not, of course, address the numerous other inaccuracies in the notes concerning Carr and Alice.   Deny that sworn statements of Carr and Alice support allegations contained in notes.  (Ex. 23; Ex. 24)

77[sic].    Admitted.  To the extent that the Defendant suggests that this argument was a "confrontation" as described in Bofman's notes, denied.  (Reindl Depo at 51-52)   Reindl explained that this was not a display of "temper".   (Reindl Depo at 51-52)  He explained that it was the night before the hard hat incident, it was not violent, Beaudette did not lose his temper, and Beaudette  apologized.  (Reindl Depo  at 51-52)   Reindl also testified that other than the hard hat incident Beaudette had never been belligerent, and had never been insubordinate. (Reindl Depo  at 75)

78.    Denied in part.  Admit that Reindl testified that Plaintiff did give Reindl a  look of disgust, on February 6, 2002.   Deny that Reindl described it as a "scary look" .  (Reindl Depo at 49, 52).

79.    Denied in part.  Admit that Reindl  himself was not concerned about Plaintiff retaliating against him.  Admit that another co-worker, Larry Alice ("Alice"), had told him that he had a concern that Beaudette might retaliate against Reindl.  Admit that Reindl mentioned that concern to Bofman.   Deny that this was why Reindl went to Bofman. (Reindl Depo at 50)

---

[16] Defendant's statement has two paragraphs numbered 76 and two numbered 77.

80.    Denied in part.  Admit Reindl testified that on one occasion Alice reported to him that Beaudette had told stories  about how he had lost control, hit people and pointed a gun at people.   Deny that Beaudette ever told a story about pointed a loaded firearm.  (Beaudette Aff. ¶ 48) The Plaintiff  did not tell stories about chasing people with guns.  (Beaudette Aff ¶ 48)  While he occasionally had disagreements, he did not become "enraged" with his co-workers or act in a violent manner.  (Beaudette Aff ¶ 40; 46-48) The only conversation he had  about losing control was his statement on February 5, that the stress was unbearable and he was concerned that he might "go off".   (Beaudette Aff ¶ 48)    Deny that  Alice or Carr's sworn statement confirm the notes.  (Ex. 23; Ex. 24)

81.   Denied in part.  Admit that the Defendant has produced an affidavit, drafted by Defendant's counsel,  in which Alice states, inter alia,  that he had witnessed Plaintiff lose his temper on one or two occasions, and on one occasion got angry during a discussion about "whose turn it was to work overtime."  Deny that the Plaintiff ever become "enraged" with his co-workers or acted in a violent manner.  (Beaudette Aff ¶ 40;46-48)

82.    Denied in part.  Admit that the Defendant has produced an affidavit drafted by Defendant's counsel in which  Alice states, inter alia, that he was concerned that the throwing of the hard hat might be a prelude to Beaudette's doing  "something significantly more violent at the plant." (Ex, 24)    Deny that the Plaintiff ever become "enraged" with his co-workers or acted in a violent manner.  (Beaudette Aff ¶ 40; 46-48)

83.    Denied in part.  Admit that the Defendant has produced an affidavit drafted by Defendant's counsel in which  Alice states, inter alia, that after  speaking with Reindl, Alice went to see Bofman and told him that he was "worried about what [Plaintiff] might do next", that he

48

"made it a point to tell Bofman that [he] was not fearful of" Plaintiff but felt compelled to

approach Bofman "because [Alice] would not have been able to live with [himself] if [he] had not

said anything and [Plaintiff] had done something terrible." (Ex 24) Deny that the Plaintiff ever

become "enraged" with his co-workers or acted in a violent manner. (Beaudette Aff ¶ 40; 46-48)

84.    Denied in part. Admit that at his deposition, Reindl testified that he never

explicitly mentioned the Plaintiff's medical condition in his conversations. To the extent that the

Defendant suggests that management did not know of the Plaintiff's medical condition or that

management did not understand that the concerns that Reindl, Carr and Alice were raising were

directly related to their fears with respect to Plaintiff's mental impairments, denied. (Reindl

Depo at 37-39, 80-81, 92; Ex. 23)

85.    Denied in part. Admit that Reindl thought that Plaintiff might not be taking

his medication. Admit that the concerns that he relayed to Bofman were related to his concerns

about the Plaintiff's medical conditions. Deny that Reindl expressed concern about Plaintiff's

past and potential future behavior. (Reindl Depo at 37-39, 64-65, 80-81, 92; Ex. 23)

86.    Denied in part. Admit that at his deposition, Reindl testified that he never

explicitly mentioned the Plaintiff's medical condition in his conversations. To the extent that the

Defendant suggests that management did not know of the Plaintiff's medical condition or that

management did not understand that the concerns that Reindl, Carr and Alice were raising were

directly related to their fears with respect to Plaintiff's mental impairments, denied. (Reindl

Depo at 37-39, 80-81, 92; Ex. 23)

87.    Denied. Plaintiff testified at his deposition that since medication was first

49

prescribed for him in 1984 for his alleged anxiety disorder, he has taken Paxil daily but has not always taken Xanex.  (Beaudette Depo  at 195)

88.    Denied.   The Plaintiff testified that his medical conditions caused him to be
 upset on the night he threw his hard hat.  (Beaudette Depo  at 216) He also testified that he believed his throwing of the hard hat was related to his mental conditions in that he had a long history of anxiety, symptoms of acute anxiety, and was not sleeping for days at a time.  (Beaudette Depo at 213-214)     Dr. Selig concluded that in his expert opinion the  throwing of the hard hat was, "an impulsive reaction to tremendous inner stress", and **not** a violent act.   (Selig Depo  at 45; Ex 6)   He  explained that such impulsive behavior  is a feature  of generalized anxiety and ADHD.   (Selig Depo at 55-57)  Dr. Zeman admitted that Beaudette has poor impulse control as a result of his  mental impairments, and that his symptoms- including poor impulse control-  would increase under stress.   (Zeman Depo  at 61-62; 65-66)

89.    Denied in part.  Admitted that Plaintiff testified at his deposition that he did not
 know whether his mental state caused him to throw the hard hat.   To the extent that the Defendant suggests that the Plaintiff did not believe that the throwing of the hard hat was directly related to his mental impairments, denied.  (Beaudette Depo  at 213-216) The Plaintiff testified that his medical conditions caused him to be upset on the night he threw his hard hat.  (Beaudette Depo  at 216) He also testified that he believed his throwing of the hard hat was related to his mental conditions in that he had a long history of anxiety, symptoms of acute anxiety, and was not sleeping for days at a time.  (Beaudette Depo at 213-214)

90.    Admitted.

91.    Denied in part.  Admit that at this meeting, they asked Plaintiff to give a

50

statement concerning the February 6 incident.   (Beaudette Aff. ¶ 44) Deny that the Defendant actually gave him a chance (Beaudette Aff¶ 53)

92.    Denied in part.   Admit that at this meeting Beaudette so informed the Defendant. Deny that this was the first time that Plaintiff had informed the Defendant of these facts. (Beaudette Aff. ¶ 44)   Earlier Beaudette had faxed  Bofman a memo discussing the February 6 incident, and providing further detailed information about his ADHD and treatment, including the fact that he was seeing a mental health counselor referred through the defendant's EAP who had been very helpful.   (Beaudette Aff. ¶ 44; Ex. 25)  Deny that this is all that the Plaintiff said in the letter.  (Ex. 25)

93.    Admit that Bofman claims to have had several discussions concerning the decision to terminate the Plaintiff with Carlton, Kinder and Hanrahan.  The Plaintiff is unable to stipulate to this fact as he has no personal knowledge.

94.    Denied in part.  Admit that Bofman claims that sometime before February 13, he  Carlton, Bofman, Kinder and Hanrahan collectively made the decision to terminate Plaintiff's employment.  However,  Carlton suggests that the termination decision  was made by someone from human resources.   (Carlton Depo  at 22)   Kinder claims that she doesn't know who made the final decision.    (Kinder Depo at  25-26)    Based on the conflicting testimony of the Defendant's own managerial witnesses, the Plaintiff is unable to stipulate to the details of the termination decision.

95.    The Plaintiff is unable to stipulate to this fact as he has no personal knowledge.

96.    Denied in part.  Admit that Bofman claims that sometime before February 13,

he Carlton, Bofman, Kinder and Hanrahan collectively made the decision to terminate Plaintiff's employment. However, Carlton suggests that the termination decision was made by someone from human resources. (Carlton Depo at 22) Kinder claims that she doesn't know who made the decision. (Kinder Depo at 25-26) Bofman testified that the reason for the termination was the hard hat incident, explaining that as a result of that incident he believed that Mr. Beaudette was a safety risk. (Bofman Depo. at 45-46) Carlton testified that he recommended firing Mr. Beaudette because of workplace violence. (Carlton Depo at 22) However, he conceded that he believed that Beaudette was a safety risk because of the **potential** for violence. (Carlton Depo at 24) He also admitted that his belief that other employees had voiced concern about their safety was a factor in his decision, and that he considered the "culmination of previous experiences and documented disciplinary action". (Carlton Depo at 24) Kinder testified only that the concerns about the perceived risk of Beaudette to the safety of other workers was a factor in the decision. (Kinder Depo at 29-30).

97.     Denied.     Bofman testified that the reason for the termination was the hard hat incident, explaining that as a result of that incident he believed that Mr. Beaudette was a safety risk. (Bofman Depo. at 45-46) Carlton testified that he recommended firing Mr. Beaudette because of workplace violence. (Carlton Depo at 22) However, he conceded that he believed that Beaudette was a safety risk because of the **potential** for violence. (Carlton Depo at 24) He also admitted that his belief that other employees had voiced concern about their safety was a factor in his decision, and that he considered the "culmination of previous experiences and documented disciplinary action". (Carlton Depo at 24) Kinder testified only that the concerns about the perceived risk of Beaudette to the safety of other workers was a factor in the decision.

(Kinder Depo at 29-30).      Given the contradictory testimony of defendant's own witnesses, the Plaintiff is unable to stipulate as to what the Defendant considered.  He believes that his disability or record of disability was the actual motivating factor.  (Beaudette Aff.¶ 53)

98.    Admitted.

99.    Denied in part.  Admitted that Dr. Selig testified that generalized anxiety disorder and panic disorder do not necessarily lead to physically aggressive behavior.  Denied that Dr. Selig testified that generalized anxiety could not lead to physically aggressive behavior. (Selig Depo at 11)  Dr. Selig testified that irritability is a feature of generalized anxiety disorder, and explained that a person who is irritable and under stress that may result in some type of aggressive behavior.  (Selig Depo at 11) To the extent that the Defendant is suggesting that Dr. Selig testified that  the throwing of the hard hat was behavior  unrelated to his medical conditions, denied.      Dr. Selig testified that  in his expert opinion the  throwing of the hard hat was, "an impulsive reaction to tremendous inner stress", and **not** a violent act.   (Selig Depo at 45; Ex 6) He  explained that such impulsive behavior  is a feature  of generalized anxiety and ADHD. (Selig Depo at 55-57)

100.   Denied in part.  Admitted that Plaintiff testified at his deposition that he did not know whether his mental state caused him to throw the hard hat.   To the extent that the Defendant suggests that the Plaintiff did not believe that the throwing of the hard hat was directly related to his mental impairments, denied.  (Beaudette Depo  at 213-216) The Plaintiff testified that his medical conditions caused him to be upset on the night he threw his hard hat.  (Beaudette Depo  at 216) He also testified that he believed his throwing of the hard hat was related to his

mental conditions in that he had a long history of anxiety, symptoms of acute anxiety, and was not

sleeping for days at a time.  (Beaudette Depo at 213-214).

101.    Admitted.

THE PLAINTIFF,

By:    _____
      Mary E. Kelly
      Gregg D. Adler ct05698
      Livingston, Adler, Pulda,
      Meiklejohn & Kelly, P.C.
      557 Prospect Avenue
      Hartford, CT 06105-2922
      (860) 233-9821

## <u>CERTIFICATE OF SERVICE</u>

      This is to certify that a copy of the foregoing Plaintiff's Local Rule 56(a)2 Statement In Support of Memorandum Opposing Summary Judgment has been mailed first-class, postage pre-paid on this 21st day of September, 2004 to the following counsel of record:


Claudia T. Centomini
James W. Bucking
Foley, Hoag, LLP
155 Seaport Boulevard
Boston, MA 02210-2600

Michael S. Taylor
Daniel J. Krisch
Horton, Shields & Knox, P.C.
90 Gillett Street
Hartford, CT 06105


 

 

_____
Mary E. Kelly