UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Michael Beaudette,<br><br>        Plaintiff,<br><br>v.<br><br>Power Services Company,<br><br>        Defendant. | CIVIL ACTION NO.<br>303CV899 (RNC)<br><br><br><br>October 4, 2004 |

## DEFENDANT'S REPLY BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 9(a) (formerly 7(a)), Defendant hereby requests a hearing on its Motion for Summary Judgment, Motion to Strike and accompanying documents.

FHBOSTON/1112062.2

I.  **INTRODUCTION**

Rule 56 requires that the Court view the facts in the light most favorable to the plaintiff. It does not, however, require the Court to accept the Plaintiff's attorneys' spin on, or any mischaracterization of, the facts. Nor is the process designed to allow the Plaintiff to avoid summary judgment by barraging the Court and the Defendant with reams of paper, hoping that it will exhaust and confuse the readers into abandoning any attempts to decipher the material issues at hand. Finally, it is expected that the Plaintiff will refute the arguments the Defendant has actually made, not ignore those arguments and in their stead create a straw man that is easily torn down. Yet this is the substance of Plaintiff's opposition papers.

This is a simple case. The primary issue is the absence of evidence that the Defendant's stated reason for terminating Plaintiff's employment is a pretext for disability discrimination. According to Plaintiff's papers, all of the Defendant's decision-makers were aware of Plaintiff's alleged mental disabilities. Indeed, some managers knew of them early in Plaintiff's employment. There is no dispute that the Defendant disciplined Plaintiff on several occasions for a variety of issues, yet it did not discharge Plaintiff for any of those incidents, although it knew of Plaintiff's alleged disabilities at the time. The Defendant did not discharge Plaintiff for what it believed to be insubordinate behavior by Plaintiff in February 2001. It did not discharge Plaintiff for contaminating the demineralization tank on September 10, 2001. Even after these events, the Defendant gave Plaintiff a relatively positive review on November 30, 2001. And at the beginning of 2002, the Defendant still had no intention of discharging Plaintiff, even though it had grounds to do so several times and presumably would have done so had it been motivated, as Plaintiff now claims, by Plaintiff's disabilities of which it was aware.

It is beyond dispute that the catalyst for Plaintiff's discharge was the incident on February 6, 2002 in which Plaintiff threw his hard hat in the control room of the power plant. The

Defendant immediately suspended Plaintiff pending further action, its policy in these situations. Thereafter, three employees approached Plaintiff's supervisor. The Defendant did not seek out these individuals. They came to the Defendant on their own and volunteered information to Plaintiff's supervisor. Irrespective of whether the information they provided to Plaintiff's supervisor was true or from personal knowledge, they conveyed concerns regarding Plaintiff's prior conduct. That one or more of these employees may have speculated that Plaintiff's misconduct was tied to his disabilities and/or failure to take his medication is irrelevant. The decision-makers considered this information -- in kind with the violent display of throwing his hard hat -- in making their decision to terminate Plaintiff's employment.

In sum, the Defendant has put forth a legitimate, non-discriminatory reason for terminating Plaintiff's employment and nothing in Plaintiff's papers demonstrates that its stated reason was pretextual. Ironically, when citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133 (2000), Plaintiff acknowledges that summary judgment must be granted…"if the plaintiff [has] created only a weak issue of fact as to whether the employer's reason was untrue." <u>Reeves</u>, 530 U.S. at 148. At best that is what Plaintiff has done here, conjuring up weak issues regarding pretext.

## II.    **PLAINTIFF HAS MADE FACTUAL MISCHARACTERIZATIONS**

By and large, the Defendant, Power Services Company ("PSC"), is not contesting the facts asserted in Plaintiff's misnamed Statement of Material Facts in Dispute for purposes of summary judgment. It does take issue, however, with the manner in which Plaintiff has portrayed certain facts. Unlike the facts themselves, Plaintiff's spin on the facts is entitled to no deference. See <u>Davis v. Chicago</u>, 841 F.2d 186 (7th Cir. 1988). For example, there were four people involved in the decision to discharge Plaintiff, three of whom were deposed nearly two years after PSC discharged Plaintiff, and three years after certain alleged conversations with

Plaintiff about his having anxiety and/or Attention Deficit Disorder ("ADD" or "ADHD"). It would be miraculous, if not a sign of planned alignment of testimony, if their recollection of events were identical with one another. The fact is that people remember events slightly differently. This does not show that one or the other is lying or trying to cover up evidence of discrimination. It just shows that the witnesses are human. Here, their testimony is consistent with one another in all material respects.

Plaintiff claims that "Lavigne and Carlton have falsely denied" that Bofman reported Plaintiff's diagnosis to them on or about November 2000. Opp. at 5.[1] Plaintiff further alleges that Lavigne "lied about having a conversation with [Nurse Nancy] Beaudry." Opp. at 6. These claims are nothing more than a scurrilous label on ordinary issues of recollection.

Lavigne did not lie about having a conversation with Nancy Beaudry. Lavigne said that she did not recall the conversation. Lavigne Dep. at 37-38. (Excerpts of Heidi Lavigne's Deposition are attached to the Supplemental Affidavit of Claudia T. Centomini ("Supp. Aff.") as Exhibit 1).[2] Nor did Lavigne lie about her knowledge of Plaintiff's diagnosis. Lavigne recalled having a conversation with Plaintiff wherein he told her that he was not diagnosed with ADD but was diagnosed with anxiety. Supp. Aff., Ex. 1 at 15-16, 19-20. Lavigne also testified that she did not recall anyone telling her that Plaintiff was diagnosed with ADD. Supp. Aff., Ex. 1 at 19-22. Nothing about this testimony suggests dishonesty. Indeed, it is difficult to imagine why Lavigne would choose to remember Plaintiff telling her that he had been diagnosed with anxiety but not ADD, if she were trying to conceal knowledge of his medical condition.

---

[1] "Opp. at 5" refers to page 5 of Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment.

[2] Portions of the deposition transcripts of Lavigne, Carlton, Bofman and Reindl were already attached to Centomini Aff., which was submitted to the Court with Defendant's Motion for Summary Judgment on August 11, 2004. Accordingly, those portions of the transcripts shall be noted in Defendant's Reply.

Likewise with Carlton, who honestly testified that while he did not know whether Plaintiff had ADD, he did recall Plaintiff raising his ADD at a meeting but stated that he was no aware of Plaintiff having ADD or ADHD. Carlton Dep. at 25. (Excerpts from Carlton's Deposition are attached to Supp. Aff. as Exhibit 2).

Thereafter, however, Carlton acknowledged that he remembered Plaintiff bringing up the term "ADD" at a meeting on February 13, 2001. At that meeting, however, Plaintiff did <u>not</u> say that he had been <u>diagnosed</u> with ADD. Supp. Aff., Ex. 2 at 26-27. Thus, Plaintiff's allegation that Carlton "lied" about knowing of Plaintiff's diagnosis because Plaintiff made a comment about ADD during the meeting is a distortion of the record. Opp. at 7-8.

Similarly, Plaintiff's attempt to portray Joseph Reindl's testimony as inconsistent with notes prepared by Tim Bofman, Plaintiff's supervisor, of his conversation with Reindl and Bruce Carr, warps the record. Opp. at 14-15. Plaintiff tries to undermine the accuracy of Bofman's notes by stating: (1) that Reindl did not fear retaliation from Plaintiff; (2) that Plaintiff had not told Reindl stories of him carrying a loaded gun to someone's house and pointing the gun at the person, and hitting people; and (3) that Reindl was not afraid of Plaintiff and described the look he gave as one of "disgust," not of rage. <u>Id.</u> In reality, Reindl testified that he did tell Bofman that Plaintiff might want to retaliate against him for the incident on February 6, 2002 (the hard hat incident). Reindl Dep. at 48-49. (Excerpts from Reindl's Deposition are attached to Supp. Aff. as Exhibit 3). Reindl clarified that while he did not personally fear that Plaintiff would retaliate against him, he mentioned it to Bofman because Larry Alice raised the concern to Reindl. Supp. Aff., Ex. 3 at 49-50. Second, Reindl verified that Bofman's summary in paragraph six of his notes was accurate insofar as the stories of Plaintiff pointing a loaded gun at

someone and Plaintiff losing control and hitting people were mentioned to Bofman.[3]  Supp. Aff., Ex. 3 at 54.  Although Reindl now says that the stories were heard third-hand, the fact remains that he mentioned these stories to Bofman during their February 11, 2002 conversation.  Id.  Irrespective of who had these concerns or even whether the stories were true,[4] Bofman learned of these matters in his conversation with Reindl and Carr.

Finally, while it is true that Reindl testified that he "did mention [to Bofman]" that Plaintiff "gave [him] kind of a look of disgust" on "the day [Plaintiff] was escorted out," Supp. Aff., Ex. 3 at 49, it is also true that Reindl acknowledged telling Bofman that Plaintiff gave him a scary look as well.  In paragraph three of Bofman's notes, Bofman states that Reindl said to him that Plaintiff's "eyes causes a scary feeling inside him."  When questioned as to the accuracy of paragraph three of Bofman's notes, Reindl testified that "it was just that one look…it's not like -- the way that's stated, it sounds like it was happening on a weekly basis or something, and that's not the case."  Centomini Aff, Ex. D at 52.  Thus, Reindl simply clarified that Plaintiff did not give him the scary look on a frequent and repetitive basis.  Accordingly, Plaintiff cannot show that the parties have a material factual dispute with respect to the February 11, 2002 conversation among Reindl, Carr and Bofman.

Next, Plaintiff contends that the persons involved in making the decision to terminate Plaintiff's employment "offered inconsistent testimony as to the termination decision."  Opp. at 16.  Plaintiff also takes issue with PSC's investigation of Plaintiff after it suspended him for throwing his hard hat.  Opp. at 15.  In each case, Plaintiff is nitpicking the procedures the

---

[3] Carr also admits that he recalled hearing stories about Plaintiff "hitting people and pointing a gun."  Opp. at 14.

[4] Bofman's notes acknowledge that Reindl and Carr said that these stories cannot be substantiated.  Centomini Aff., Ex. Q.

Company followed in its collaborative investigation and decision-making process. PSC's policy, entitled "Termination for Misconduct" ("Termination Policy"), states:

> Termination procedures should be initiated by the employee's manager and must be coordinated with the Human Resources Department…Terminations for misconduct should be approved by the next level manger in consultation with the Human Resources Department. Centomini Aff., Exhibit O.

Under the Investigation Procedure, PSC's Termination Policy provides:

> w]her. an incident occurs requiring immediate action by the manager, and there is no time to consult with a representative from the Human Resources department, the employee may be temporarily relieved of his or her work duties. This temporary relief of duties will give the manager time to investigate, as necessary, and consult with the Human Resources representative, the next level manager and/or the CHRO or Legal…During the investigation period, the manager, in conjunction with the local Human Resources representative, will assemble all relevant facts about the situation." Id.

Bofman, Carlton, Karen Kinder and Sharon Hanrahan acted in complete accordance with the Termination Policy. Bofman suspended Plaintiff after he threw his hard hat in the control room. The incident occurred at "1838 hours," which is after work hours for Human Resources. Centomini Aff., Exhibit P. Bofman then sent an e-mail to his boss, Carlton, who forwarded the e-mail to Kinder, the Human Resources Manager for Lake Road, and copied it to Hanrahan, PSC's Human Relations Manager. Id. In accordance with standard procedure, Bofman, Carlton, Kinder and Hanrahan conferred among themselves about Plaintiff's conduct and the disciplinary action warranted. Id., Kinder Dep. at 18-19, Centomini Aff., Ex. E at 44 and Ex. I at 22. (Excerpts from Kinder's Deposition are attached Supp. Aff. as Exhibit 4). Bofman, Carlton and Kinder met with Plaintiff to hear Plaintiff's perspective of the hard hat incident. Supp. Aff., Ex. 4 at 16-17 and Ex. 2 at 34, and Centomini Aff., Ex. E at 57-58.

During her deposition, Kinder described the process of what occurs when PSC is determining how to discipline an employee. Kinder explained that after management and human resources have interviewed [the] employee, they "sit and discuss the issue. The people in the

FHBOSTON/1112062.2                                  - 6 -

room usually make a consensus decision and then we have to go and talk to, you know, higher-ups. I'm not of a level of authority to make any final decisions to discuss the situation and determine what the action would be." Supp. Aff., Ex. 4 at 18-19. Kinder further testified that she reached consensus with Bofman and Carlton to terminate Plaintiff's employment but they did not have the authority to discharge Plaintiff without Hanrahan's consent. Supp. Aff., Ex. 4 at 19-20, 26. Her testimony is completely consistent with Carlton's testimony regarding the decision to terminate Plaintiff's employment, i.e., that Human Resources (Hanrahan) made the final call. Carlton testified that Human Resources made the decision to terminate Plaintiff's employment "in consultation with the plant management," and that he had recommended to Human Resources that Plaintiff's employment be terminated. Supp. Aff., Ex. 2 at 22. Bofman also testified that Carlton, Kinder and Bofman reached consensus in their decision to terminate Plaintiff's employment but Human Resources (Hanrahan) had to approve the decision before PSC could discharge Plaintiff. Bofman Dep. at 43-45, 80. (Excerpts from Bofman's Deposition are attached to Supp. Aff. as Exhibit 5). Thus, Plaintiff's effort to portray the participants as pointing fingers at one another with nobody willing to take responsibility for the decision is inaccurate.

## III.  PSC DISCHARGED PLAINTIFF FOR HIS MISCONDUCT

Apparently troubled by the legal principles relied upon by PSC, Plaintiff changes the subject. He ignores the legal argument PSC is making -- essentially dismissing it in a footnote -- and spends the majority of his brief attacking an argument PSC has not made. The Court, however, must focus on the arguments at issue and not the one Plaintiff wishes were at issue. Plaintiff's straw man is the affirmative defense of direct threat. PSC did not assert in its Answer the defense that Plaintiff posed a direct threat to health or safety because of his disability, and is not asserting such a defense as part of this Rule 56 motion. Nevertheless, Plaintiff makes the

bizarre claim that PSC cannot assert its real defense -- that Plaintiff committed a violent act that warranted discharge -- but must instead assert a direct threat defense. The fact is, PSC discharged Plaintiff for engaging in a physically aggressive act in violation of appropriate workplace conduct standards. A medical expert is not needed to determine whether Plaintiff's conduct was indeed physically aggressive or whether PSC is allowed to fire him for it. He behaved badly and his disability does not shield him from the consequences.

Plaintiff relies on School Board of Nassau County v. Arline, 480 U.S. 273 (1987), for the proposition that the employer must conduct a medical inquiry before it fires an employee who has acted violently.[5] This is not what Arline says. In that case, the employer acted directly because of the employee's disability and attempted to justify it on the grounds that the employee posed a direct threat. The employee was suffering from a contagious illness. There was no claim by the employer that the disabled employee had acted violently or otherwise failed to comply with workplace conduct rules. When the employee has committed acts of misconduct, as Plaintiff did here, the direct threat defense is inapplicable. See Misek-Falkoff v. International Bus. Machs. Corp., 854 F. Supp. 215 (S.D.N.Y. 1994), aff'd, 60 F. 3d 811 (2d. Cir. 1995); Palmer v. Circuit Court of Cook County, Ill., 117 F.3d 351, 352 (7th Cir. 1997); see also La Penta v. Commission On Human Rights and Opportunities, No. CV930524017, 1994 WL 591774, at *2, (Conn. Super. Oct. 19, 1994).

In making its decision to discharge Plaintiff, PSC did not consider Plaintiff's purported disabilities. It did not analyze whether Plaintiff's disabilities caused him to throw his hard hat across the control room. Nor did PSC consider whether Plaintiff's disabilities were a threat to the safety and health of the other employees in the workplace. These inquiries were irrelevant.

---

[5] Additionally, Plaintiff cites Ascani v. Hofstra University, 173 F.3d 843 (2d Cir. 1999), an unpublished opinion upon which Plaintiff cannot rely.

Plaintiff had engaged in a physically aggressive act that PSC management viewed as violent behavior which it would not tolerate. PSC's view of Plaintiff's misconduct is apparent in its initial reaction to the incident: When Carlton first learned of the hard hat incident on February 7, 2002, he characterized Plaintiff's conduct as a "case of insubordination and discplay [sic] of violence" in an e-mail to Human Resources.[6] Centomini Aff., Exhibit P. Plaintiff's disability does not insulate him from being discharged for misconduct, nor does PSC need to prove the affirmative defense of "direct threat" to take such action.

The EEOC fully supports PSC's legal position on this issue. Plaintiff states that "the Second Circuit has held that 'great deference' should be afforded the EEOC's interpretation of the ADA since it is charged with administering the statute." EEOC v. Blue Cross Blue Shield of Connecticut, 30 F. Supp. 2d 296, 306 n.14 (D. Conn. 1998). Plaintiff fails to mention that EEOC's Compliance Manual provides that "employers may hold all employees, disabled …and nondisabled, to the same performance and conduct standards." EEOC Enforcement Guidance on the ADA and Psychiatric Disabilities, No. 915.002 (3/25/97) at p. 29. The EEOC has also stated that "[n]othing in the ADA prevents an employer from maintaining a workplace free of violence or threats of violence." Id. See Raytheon Co. v. Hernandez, 540 U.S. 44, 124 S.Ct. 513, 520 (2003) (holding that the employer's neutral no-rehire policy plainly satisfied its obligation to provide a legitimate, nondiscriminatory reason for refusing to rehire the former employee who was terminated for violating workplace conduct rules when he tested positive for drug use).

This Court should take judicial notice of the serious problem of workplace violence and the legitimacy of employers' efforts to stop it. When employees engage in physically aggressive

---

[6] The edits to Plaintiff's termination letter, a focus of Plaintiff's papers, amount to nothing. Plaintiff tries to insinuate that PSC was somehow engaged in deceptive practices when Carlton revised the description of the February 6th incident from a display of "anger" to a display of "violence" in the termination letter. Opp. at 17. The revision, however, is consistent with Carlton's initial description of the incident. Centomini Aff., Ex. P.

misconduct, employers must be permitted to act. Many employers have "zero tolerance" policies and other similar approaches to deal with workers who engage in misconduct before something truly awful occurs. This not only protects the workforce, but employers need to contend with claims that they negligently retained an employee who has exhibited violent conduct. Brown v. Nationscredit Commercial Corp., No. 3:99-CV-592 (EBB), 2000 U.S. Dist. LEXIS 9130, at *21 (D. Conn. Jun. 26, 2000) (finding that "'[n]egligent retention occurs, when during the course of employment, the employer becomes aware of problems with an employee that indicates his unfitness and the employer fails to take further action'") (citations omitted). In addition, employers must comply with federal and state laws that obligate employers to take steps to prevent violence in the workplace. Accordingly, employers are acting properly, lawfully and prudently when they refuse to tolerate violent behavior in the workplace.

## IV. **PLAINTIFF DOES NOT HAVE OF A RECORD OF A DISABILITY**

Plaintiff argues in the alternative that even if he is not disabled within under the ADA, he can still survive summary judgment because he has a record of a disability. The problem with this argument is that, to have a record of impairment, Plaintiff must show that the disability of which he has record meets the same standard of disability as a disability under the ADA. Colwell v. Suffolk County Police Dep't, 158 F. 3d 635, 636 (2d Cir. 1998). For all the reasons articulated in its Memorandum in Support of its Motion for Summary Judgment, Plaintiff cannot prove he is disabled within the meaning of the ADA, nor can he prove a record of a disability.

## V. **CONCLUSION**

For all the foregoing reasons and the reasons stated in its August 10, 2004 Memorandum of Law in Support of Defendant's Motion for Summary Judgment, PSC requests that the Court enter summary judgment in its favor on each of Plaintiff's claims.

                                          Respectfully submitted,

                                          **POWER SERVICES COMPANY**

                                          By its attorneys,

                                          */s/ Claudia T. Centomini*
                                          James W. Bucking (ct 24940)
                                          Claudia T. Centomini (ct 24941)
                                          FOLEY HOAG LLP
                                          155 Seaport Boulevard
Date:   October 4, 2004                    Boston, MA 02210-2600
                                          (617) 832-1000

### CERTIFICATE OF SERVICE

     I, Claudia T. Centomini, certify that on October 4, 2004, I served the foregoing document on plaintiff by causing a copy of the same to be delivered by first class mail, to Gregg D. Adler, Esq., Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C., 557 Prospect Avenue, Hartford, CT 06105-2022 and Daniel Krisch, Esq., Horton, Shields & Knox, P.C., 90 Gillett Street, Hartford, CT 06105.

                                          */s/ Claudia T. Centomini*
                                          Claudia T. Centomini